**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
ASSOCIATED BUILDERS AND                             )
CONTRACTORS, INC.                                   )
                                                    )
                  Plaintiff,                        )
v.                                                  )        Case No. 1:13-cv-01806-EGS
                                                    )
                                                    )
PATRICIA A. SHIU, et al,                            )
                                                    )
             Defendants                             )
                                                    )
                                                    )
_____)


**PLAINTIFF'S MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**




                              Maurice Baskin (D.C. Bar No. 248898)

                              Littler Mendelson, P.C.
                              1150 17th St., N.W.
                              Washington, D.C. 20036
                              202-772-2526
                              mbaskin@littler.com

                              Attorney for Plaintiff
                              Associated Builders and Contractors, Inc.

## TABLE OF CONTENTS

PAGE(S)

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF THE CASE AND FACTS.................................................... 2

      A.    Statutory And Regulatory Framework Prior To The New Rule ............................ 2

      B.    OFCCP'S New Rule ............................................................ 5

      C.    Facts Pertaining To Unique Aspects Of The Construction Industry .................. 11

III.  JURISDICTION AND VENUE.................................................................. 14

IV.   STANDING ................................................................................ 14

V.    STANDARD FOR REVIEW ..................................................................... 17

VI.   ARGUMENT ................................................................................ 20

      A.    THE NEW RULE IMPERMISSIBLY EXCEEDS OFCCP'S STATUTORY
            AUTHORITY UNDER SECTION 503…………………………………………20

      B.    THE NEW RULE IS ARBITRARY AND CAPRICIOUS IN ITS
            FAILURE TO RATIONALLY EXPLAIN THE REVERSAL OF FOUR
            DECADES OF CONSISTENT ENFORCEMENT OF SECTION 503……….. .26

      C.    OFCCP HAS NOT COMPLIED WITH THE REGULATORY FLEXIBILITY
            ACT ……………………………………………………………………………..30

VII.  CONCLUSION............................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aeronautical Repair Station Ass'n v. FAA,*
494 F.3d 161 (D.C. Cir. 2007)……………………………………………………………31

*AFL-CIO v. Chao,*
496 F.Supp.2d 76, 81 (D.D.C.2007)……………………………………………………17

*Alcoa Steamship Co. v. Federal Maritime Commission,*
348 F. 2d 756 (D.C. Cir. 1965)...................................................................................23

*American Bar Ass'n v. FTC,*
430 F. 3d 457 (D.C. Cir. 2005)..................................................................................18

Am. Library Ass'n v. FCC,
406 F.3d 689 (D.C. Cir. 2005)……………………………………………………..18

*American Petroleum Institute v. Environmental Protection Agency,*
706 F. 3d 474 (D.C. Cir. 2013).................................................................................18

*API v. UNITED STATES EPA,*
52 F.3d 1113 (D.C. Cir. 1995)..................................................................................18

*Bell Atl. Tel. Cos. v. FCC,*
131 F.3d 1044 (D.C. Cir. 1997)....……………………………........................................17

*Cal. Indep. Sys. Operator Corp. v. FERC,*
372 F.3d 395 (D.C. Cir. 2004)..................................................................................18

*Chamber of Commerce v. Dept. of Labor,*
174 F. 3d 206 (D.C. Cir. 1999)..................................................................................30

*Chamber of Commerce v. NLRB,*
721 F. 3d 152 (4th Cir. 2013) .................................................18, 21, 22, 23, 25

*Chamber of Commerce of the United States v. NLRB,*
856 F. Supp. 2d 778 (D.S.C. 2012).................................................................20,22, 25

*Chevron USA, Inc. v. NRDC,*
467 U.S. 837 (1984).................................................................................17, 19, 20

*Chrysler Corp. v. Brown,*
441 U.S. 281 (1979).................................................................................18, 21

*City of Arlington v. FCC,*
    133 S. Ct. 1863 (U.S. 2013)................................................................17

*Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n,*
    466 F.3d 134 (D.C. Cir. 2006)………………………………………19

*EchoStar Satellite L.L.C. v. FCC,*
    704 F.3d 992 (D.C. Cir. 2013)............................................................18

*FCC v. Fox TV Stations, Inc.,*
    556 U.S. 502 (U.S. 2009)...................................................19, 20, 25

*Hunt v. Washington State Apple Advertising Commission,*
    432 U.S. 333 (1977)............................................................................15

*Lutheran Church-Missouri Synod v. Fcc,*
    141 F.3d 344 (D.C. Cir. 1998)...........................................................30

MCI Telecomms. Corp. v. AT&T Co.,
    512 U.S. 218 (U.S. 1994)………………………………………………19

*MD/DC/DE Broadcasters Associations v. FCC,*
    236 F. 3d 13 (D.C. Cir. 2001)............................................................30

*Motion Picture Ass'n of Am. v. Fcc,*
    309 F.3d 796 (D.C. Cir. 2002)............................................................18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (U.S. 1983)................................................................19, 24

*Nat'l Ass'n of Mfrs. v. NLRB,*
    717 F.3d 947 (D.C. Cir. 2013)………..............................................18, 21

*National Fed'n of Fed. Employees v. Greenberg,*
    983 F.2d 286 (D.C. Cir. 1993)………………………………………………19

*NLRB v. Bell Aerospace Co. Div. of Textron, Inc.,*
    416 U.S. 267 (U.S. 1974)...........................................................20, 22, 25

*North Carolina Fisheries Ass'n v. Daley,*
    27 F. Supp. 2d 650 (E.D. Va. 1998) ..................................................31

*Public Citizen, Inc. v. HHS,*
    332 F.3d 654 (D.C. Cir. 2003)............................................................19

*Railway Lab. Executives Assn. v. National Mediation Board,*
    29 F. 3d 655 (D.C. Cir. 1994) (en banc)...............................17, 18, 20

*Serono Labs., Inc. v. Shalala,*
158 F.3d 1313 (D.C. Cir. 1998)…………………………….……………………..17

*Sierra Club v. Mainella,*
459 F. Supp. 2d 76 (D.D.C. 2006)…………...…………………………….……17

*Southern Cal. Edison Co. v. FERC,*
116 F.3d 507 (D.C. Cir. 1997)...................................................................21

**STATUTES**

5 U.S.C. § 601-611 ...................................................................................32

5 U.S.C. § 702 .........................................................................................17

5 U.S.C. § 706 .........................................................................................17

15 U.S.C. § 637(d) ...............................................................................17, 33

28 U.S.C. §1331 ......................................................................................17

28 U.S.C. § 1391(c) .................................................................................17

28 U.S.C. § 2201 .....................................................................................17

28 U.S.C. § 2202 .....................................................................................17

Section 503 of the Rehabilitation Act of 1973, 29 U.S.C. § 793 ........................ *passim*

Section 4212 of the Vietnam Era Veterans Readjustment Assistance Act of 1974, 38
U.S.C. 4212 ("VEVRAA")................................................................10, 25

**OTHER AUTHORITIES**

41 C.F.R. Part 60-4 .................................................................................14

41 C.F.R. Part 60-741, 78 Fed. Reg. 58682 (Sept. 24, 2013) ............................. *passim*

48 C.F.R. Part 19 ....................................................................................33

76 Fed. Reg. 77056 (Dec. 9, 2011) .............................................................11

Center for Corporate Equality (CCE) study, "A Review of OFCCP Enforcement Statistics Related to
Section 503 of The Rehabilitation Act and the Vietnam Era Veterans Readjustment Assistance Act"
(2012)…………………………………………………………………….......................................5

Clark, Moutray and Saade, *The Government's Role in Aiding Small Business Federal
Subcontracting Programs in the United States* ........................................................33

Executive Order 11246 ..................................................................................15, 16, 33

Note, *Rehabilitating the Rehabilitation Act of 1973,* 58 B.U. L. Rev. 247 (1978)....................9, 24

OFCCP, *Technical Assistance Guide For Federal Construction Contractors* (May 2009),
    available at http://www.dol.gov.........................................................................11, 15, 26, 27

## I.    INTRODUCTION

Plaintiff Associated Builders and Contractors, Inc. ("ABC"), hereby files this memorandum in support of its Motion for Summary Judgment.   Plaintiff's Motion seeks expedited declaratory and injunctive relief against significant provisions of the new Rule recently promulgated by the Defendants, Patricia A. Shiu, in her official capacity as Director of the Office of Federal Contract Compliance Programs ("OFCCP"), Thomas E. Perez, in his official capacity as Secretary of the United States Department of Labor, and the United States Department Of Labor (collectively "Defendants" or "OFCCP").   The new Rule is entitled "Affirmative Action and Nondiscrimination Obligations of Contractors and Subcontractors Regarding Individuals With Disabilities," 41 C.F.R. Part 60-741, 78 Fed. Reg. 58682 (Sept. 24, 2013) (hereafter the "new Rule").   Absent the requested relief, the new Rule is scheduled to go into effect on March 24, 2014.

The new Rule revises and supersedes current regulations implementing the affirmative action and nondiscrimination provisions of Section 503 of the Rehabilitation Act of 1973, 29 U.S.C. § 793.   Section 503 prohibits discrimination by covered federal contractors and subcontractors against individuals on the basis of disability, and requires such contractors to engage in "affirmative action to employ and advance in employment qualified individuals with disabilities." *Id*.

In filing its Complaint, ABC has not taken issue with the legitimate affirmative action and nondiscrimination objectives of Section 503.   ABC's government contractor members have made a longstanding commitment to affirmative action and nondiscrimination towards qualified individuals with disabilities.   ABC has encouraged its members to engage in affirmative action

1

and nondiscriminatory practices towards qualified individuals with disabilities on government construction projects, and will continue to do so.

ABC has been compelled to challenge the new OFCCP Rule, however, because it imposes unprecedented, wasteful and burdensome data collection and utilization analysis requirements on government construction contractors, without statutory authority and in an arbitrary and capricious manner. The challenged aspects of the new Rule do not increase work opportunities for the disabled but will instead have the opposite effect, as the new burdens imposed by the new Rule are likely to drive many construction contractors out of the market for government construction services. Hardest hit will be the many small businesses who currently provide construction services to the government but who lack the resources to meet the new Rule's burdensome requirements.

The new Rule exceeds the authority delegated to OFCCP by Congress, is unsupported by substantial evidence in the administrative record, and reverses longstanding precedent without any adequate explanation. For each of these reasons, the challenged provisions of the new Rule must be set aside.

## II.     STATEMENT OF THE CASE AND FACTS[1]

### A.     Statutory And Regulatory Framework Prior To The New Rule

Section 503 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 793, states in pertinent part:

> Any contract in excess of $10,000 entered into by any Federal
> department or agency for the procurement of personal property and

---

[1] Pursuant to LCvR 7(h), because this case is an APA challenge that is to be decided based on the Administrative Record ("A.R."), the parties are not required to file statements of undisputed material facts as in other summary judgment motions.

> nonpersonal services (including construction) for the United States shall contain a provision requiring that the party contracting with the United States shall take affirmative action to employ and advance in employment qualified individuals with disabilities. The provision of this section shall apply to any subcontract in excess of $10,000 entered into by a prime contractor in carrying out any contract for the procurement of personal property and nonpersonal services (including construction) for the United States.   The President shall implement the provisions of this section by promulgating regulations ….

Pub. L. 93-112, 87 Stat. 355, enacted September 26, 1973, codified at 29 U.S.C. § 793.

Nowhere in this or any other provision of the Rehabilitation Act did Congress authorize the President or the OFCCP (the agency to whom the President has delegated his regulatory authority) to require government contractors covered by the Act to engage in any data collection or utilization analysis with regard to the hiring and/or employment of disabled workers.  Nor does the Act anywhere authorize the OFCCP to set numerical goals for the employment of disabled workers by government contractors.

Since 1974, until now, OFCCP has implemented the foregoing affirmative action requirement of Section 503 exclusively in the following two ways: First, OFCCP promulgated regulations still in effect that required all service and construction contracts above $10,000 to include clauses requiring contractors to take affirmative action to employ and advance in employment qualified individuals with disabilities.   *See* 41 C.F.R. Part 60-741, at 741.5. Second, for contractors who employ 50 or more employees and hold federal contracts of $50,000 or more, the current OFCCP rules require such contractors to prepare and maintain a written affirmative action program setting forth the employer's policies, practices and procedures for hiring and employing disabled applicants and employees.  *Id*. at 741.40.  Covered contractors are required to review and update their programs annually and make them available for inspection by employees and applicants upon request. *Id*. at 741.41.

3

The required contents of the currently mandated affirmative action programs are specified in Section 741.44 of the OFCCP's current (now superseded) rule.  They include affirmative policy statements, review of personnel processes, physical and mental qualifications, reasonable accommodation to physical and mental limitations, anti-harassment procedures, external disseminations of policies, outreach and recruitment, internal dissemination of policies, audit and reporting systems, responsibility for implementation, and training. *Id.*

At no time during the past four decades, until now, has OFCCP required government contractors in any industry, including construction, to collect data on their hiring or employment of disabled workers other than protected disabled veterans for whom certain data collection requirements are expressly set forth in Section 4212 of the Vietnam Era Veterans Readjustment Assistance Act of 1974 ("VEVRAA"), 38 U.S.C. § 4212.[2]   OFCCP has never previously required contractors as part of Section 503's affirmative action requirements to analyze disabled applicant or employment data to determine whether any particular utilization goal for such hiring or employment of disabled workers was being met.

Though Congress enacted the data collection requirements of VEVRAA in 1974, shortly after passage of the Rehabilitation Act in 1973, and subsequently has amended the Rehabilitation Act on numerous occasions, at no time during the past four decades has Congress expressed dissatisfaction with OFCCP's previous regulations implementing Section 503, nor has Congress in any way authorized the agency to impose any data collection or utilization analysis requirements on covered government contractors in the construction industry (or any other industry) with regard to disabled applicants or workers.

---

[2] Significantly, Section 4212 of VEVRAA imposed its data collection requirements only "in addition to" (not as a part of) the statute's affirmative action requirement.  *Id.*

There is no substantial evidence in the administrative record that government contractors in the construction industry have failed to meet their affirmative action obligations under the previous OFCCP rule implementing Section 503. Indeed, the evidence is to the contrary, according to a review of OFCCP enforcement statistics submitted to the Office of Management and Budget as part of the rulemaking proceeding.[3]  There is also no evidence in the record that the previous rule has failed to implement the statutory directive that government contractors engage in affirmative action, as set forth in Section 503.  Finally, there is no evidence in the record that imposition of burdensome data collection and utilization analysis requirements is necessary to achieve compliance with the limited Congressional directive set forth in Section 503.

### B.    OFCCP'S New Rule

OFCCP published a Notice of Proposed Rulemaking (NPRM) in the Federal Register on December 9, 2011 seeking comments on its proposed changes to the agency's longstanding affirmative action regulations implementing Section 503 of the Act. 76 Fed. Reg. 77056 (Dec. 9, 2011).  After extension of the comment period, OFCCP received more than 400 comments on the NPRM, including comments in opposition to the proposed rule from ABC and several other construction industry associations and contractors.  The construction industry comments emphasized in particular that OFCCP had previously recognized the uniquely fluid and temporary nature of the construction industry workforce and that the construction industry is uniquely physical and hazardous. ABC and others pointed out that OFCCP had previously

---

[3] Center for Corporate Equality (CCE) study, "A Review of OFCCP Enforcement Statistics Related to Section 503 of the Rehabilitation Act and the Vietnam Era Veterans Readjustment Assistance Act" (2012) (finding less than 2% likelihood of discrimination findings against federal contractors with regard to individuals with protected disabilities and/or veterans over the last decade), available at http://cceq.org/whatsnewpage.asp.

deemed construction contractors to be exempt on the foregoing grounds from information collection and utilization analysis requirements of other affirmative action rules similar to the requirements of the proposed new Rule. *See* A.R., Comments of Associated Builders and Contractors dated Feb. 21, 2012, at 2, *citing* OFCCP, *Technical Assistance Guide For Federal Construction Contractors* (May 2009), available at www.dol.gov.  The ABC comments also challenged OFCCP's proposal to impose an arbitrary 7% goal on all contractors, regardless of the longstanding differences between the construction industry and other industries, and without any statutory authority.  *See, e.g.*, ABC Comments at 4-5; see also Comments of American Road & Transportation Builders Association dated Feb. 21, 2012; Comments of Associated General Contractors of America dated Feb. 21, 2012; and Comments of Command Construction Industries dated Feb. 9, 2012.

Although the final Rule withdrew a number of proposed provisions from the NPRM to which many commenters had objected, OFCCP refused to acknowledge the unique burdens imposed by the new Rule on the construction industry. Without any rational explanation, OFCCP refused to exempt construction contractors from the burdensome and unauthorized data collection and utilization requirements of the new Rule.  The Final new Rule was published on September 24, 2013 in its current form.

The provisions of the new Rule that are being challenged by ABC begin with the revised section 741.40, which redefines the term "Affirmative Action Program" (AAP), which all government contractors employing 50 employees on contracts of more than $50,000 are required to maintain.  For the first time, OFCCP declares in the new Rule that such AAP's must include "measurable objectives, quantitative analyses, and internal auditing and reporting systems that measure the contractor's progress toward achieving equal employment opportunity for

individuals with disabilities." *Id.* None of these new requirements appear in the governing statute.

Section 741.42(a) of the new Rule adds a new requirement that covered contractors must invite all job applicants to voluntarily inform the contractor whether they are disabled before they receive offers of employment. Again, no such requirement appears in Section 503. In addition, absent case-by-case analysis of each applicant's alleged disability and the job to which they are applying, construction contractors (and OFCCP) will be unable to determine as part of their data collection whether such self-identifying individuals are in fact qualified to perform the particular jobs for which they are applying. Thus, the new Rule's pre-offer self-identification requirement will result in a burdensome collection of data that will ultimately be meaningless with regard to construction contractors' compliance with the statute.

Section 741.44(k) of the new Rule creates an entirely new element of all Affirmative Action Programs covered by the new Rule, which is again mentioned nowhere in Section 503, called "data collection analysis." This new provision requires contractors to "document the following computations or comparisons pertaining to applicants and hires on an annual basis" (to be kept for three years): (1) The number of applicants who self-identified as individuals with disabilities pursuant to 741.42(a) or who are otherwise known to be individuals with disabilities; (2) The total number of job openings and total number of jobs filled; (3) The total number of applicants for all jobs; (4) The number of applicants with disabilities hired; and (5) The total number of applicants hired.

According to the OFCCP's "Summary and Preamble to the Final Rule," 78 Fed. Reg. at 58702, contractors are expected to review the collected data for the past two years to "assess trends related to the contractor's outreach and recruitment efforts." The OFCCP further states

that "compliance determinations" for the foregoing data collection and analysis will be made based on "whether the contractor has completely and accurately documented and maintained the listed metrics in the final Rule. *Id*. Finally, OFCCP states that compliance officers will "look to see whether the contractor has critically analyzed and assessed the effectiveness of its recruitment efforts," using the data in subparagraph (k) "and any other reasonable criteria." *Id*. Contractors are then expected to "pursue additional efforts if those were not effective."

Neither the Preamble nor the new Rule itself identifies any precedent for requiring the construction industry to engage in such data collection or utilization analysis.  As noted above, comments filed in the Administrative Record by the construction industry pointed out that construction contractors had previously been exempted from similar data collection and utilization analysis under Executive Order 11246. *See, e.g.*, A.R., Comments of ABC at 2. OFCCP responded with the following two-sentence explanation: "Traditionally, construction …contractors who meet the basic coverage thresholds (contract amount and number of employees) of section 503 have not been exempted from any of its provisions. Accordingly, we decline to exempt construction … contractors." 78 Fed. Reg. 58702.  This explanation ignored the fact that Section 503 has never previously been interpreted to authorize imposition of data collection or utilization analysis of disabled applicants or workers; hence no government contractors have been "traditionally" required to engage in such burdensome activities.

Section 741.45 of the new Rule establishes for the first time a nationwide, all-industries utilization goal of 7% for government contractors' utilization of qualified individuals with disabilities. According to the new Rule, contractors with more than 50 employees and federal contracts of more than $50,000 are expected to meet the goal by utilizing qualified individuals

8

with disabilities as 7% of the contractors' entire workforce. Again, Section 503 authorizes no such utilization goal of any kind.

According to OFCCP, the new 7 percent goal is derived from an American Community Survey (ACS) that did not use the same definition of disabilities as the new Rule. *Id*. at 58703. In addition, the survey in question is incapable of being broken out into industry-specific or geography-specific categories by job groups. *Id*. Finally, the ACS survey could not possibly have surveyed whether the disabled workers in question were "qualified" for jobs in different industries in any particular percentages.   78 Fed. Reg. at 58703-04.   In a significant understatement, OFCCP conceded that 7 percent "is an imprecise estimate." *Id*. at 58705.

OFCCP further conceded that the ACS survey itself gives an actual employment figure for individuals with disabilities in the entire national workforce as being only 4.83 percent. 78 Fed. Reg. at 58724.  To meet the new goal of 7 percent, OFCCP estimates that government contractors will have to hire 594,580 disabled individuals, who would presumably displace an equal number of non-disabled workers. *Id*.  Significantly, the ACS survey does not purport to estimate the number of "qualified" individuals with disabilities.  Nevertheless, OFCCP asserts that the number of "available" disabled individuals for all industries, based upon the ACS survey, is somehow estimated to be 5.7 percent.

Not satisfied that this estimate adequately captured the unknown number of "discouraged" disabled workers, OFCCP added to the 5.7 percent estimate an additional 1.7 percentage of workers who the agency deems to fall within the "discouraged" category, in order to reach the 7 percent goal. *Id*. There is no substantial evidence in the record to support this claim, and it is refuted in a number of comments in the Administrative Record. *See, e.g.*, Comments of HR Policy Association dated Feb. 7, 2012, at 13; Comments of Sparlin Law Office

LLC dated Feb. 6, 2012. The most glaring flaw in OFCCP's analysis of this issue is the failure to account for the strong likelihood that a significant number of disabled workers are unable to work because of the disqualifying nature of their disabilities. *Id*.  None of the data cited by the agency attempts to calculate the number of *qualified* (or disqualified) individuals with disabilities for any industry, and certainly not for the uniquely physical and transitory jobs in the construction industry.

Section 741.45(d)(2) states that covered contractors who employ more than 100 employees are required to meet the new 7% goal on a "job group" basis, a concept which has never before been applied to the construction industry for any affirmative action purpose. This section of the new Rule states that contractors "must use the same job groups established for utilization analyses under Executive Order 11246." 41 C.F.R. Part 60-741.45(d)(2).  But OFCCP's regulations implementing  Executive Order 11246, which relate only to affirmative action requirements for minorities and women, expressly exempt construction industry government contractors from having to perform any job group (or other) utilization analysis, directly contradicting the foregoing provision of the new Rule.  *See* 41 C.F.R. Part 60-4. Notwithstanding this contradiction, Section 741.45(d)(2) of the new Rule requires covered contractors to conduct a "utilization analysis" annually "designed to evaluate the representation of individuals with disabilities in each job group."

In establishing its unprecedented utilization goal for all industries, the new Rule fails to differentiate between physically hazardous occupations such as those in the construction industry and other types of jobs and industries. In response to construction industry comments questioning the application of the uniform multi-industry utilization goal to the physically demanding construction workplace, OFCCP erroneously claimed that any request for a

construction industry exemption was "based on the flawed notion that individuals with disabilities as a group are incapable of working in these jobs."  78 Fed. Reg. at 58707.  In the same paragraph, however, OFCCP acknowledged "that some individuals with certain disabilities may not be able to perform some jobs." With no further explanation, OFCCP declined to apply different utilization goals to vastly different industries, as it has done for the past four decades. *Id.*[4]

Section 741.45(e) of the new Rule states that "when the percentage of individuals with disabilities in a job group does not meet the utilization goal," the contractor "must take steps to determine whether and where impediments to equal employment opportunity exist."  These steps include an assessment of personnel processes, evaluation of outreach and recruitment efforts, and results of the affirmative action program audit that is required under Section 741.44(h).  Section 741.45(f) requires that "the contractor must develop and execute action-oriented programs designed to correct any identified problem areas."

Sections 741.45(g) and (h) state that the newly required utilization goal is not a "quota" and that failure to meet the goal is not an admission of discrimination.  However, failure to comply with the audit requirement of 741.44(h), the analysis requirements of 741.44(k) and 741.45(d) and (e), and the action step requirements of 741.45(f) may be grounds for penalties up to and including debarment from government contracts.  *See* Section 741.65.  None of the foregoing requirements are referenced or otherwise authorized by Section 503 of the Rehabilitation Act.

---

[4] ABC's Comments in the Administrative Record contain no assertion that disabled individuals as a group are incapable of working on construction jobs.  ABC contended only that a multi-industry utilization goal failed to take into account fundamental differences between industries and physically demanding occupations.  As further discussed below, OFCCP has failed to explain why the same utilization standard should be applied to industries which are radically different from each other with regard to the ability of *some* individuals to perform *some* jobs.

### C.      Facts Pertaining To Unique Aspects Of The Construction Industry

As noted above, OFCCP has recognized for more than four decades that the construction industry workforce is uniquely "fluid and temporary," compared to non-construction supply and service contractors. *See, e.g.,* OFCCP, *Technical Assistance Guide For Federal Construction Contractors*, at 7, available at http://www.dol.gov.  As a result, OFCCP has expressly exempted the construction industry from the types of utilization analysis and statistical data collection that are imposed under the new Rule, with regard to the only other utilization requirements that currently exist – specifically the utilization requirements of Executive Order 11246.  *Id.*  As is further reflected in comments in the Administrative Record, work in the construction industry is typically project-based, transitory and seasonal.   The number of workers in construction establishments varies widely from day to day and from project to project.   Workers are frequently reassigned from one establishment to another depending on constantly shifting labor needs.  *See* ABC Comments in the Administrative Record; see also Comments filed by American Road Transportation Builders Association; Associated General Contractors of America; and Command Industries. OFCCP failed to dispute any of the factual assertions regarding the construction industry contained in these comments. 78 Fed. Reg. 58682.

The tracking and analysis of hiring and employment data by construction contractors is more problematic with regard to disabled workers and applicants than for minorities and women or even protected veterans, because disabilities come in many forms. Certainly, the impact of disabilities on the ability of workers to perform the jobs for which they apply is widely varied and virtually impossible to measure statistically. This is particularly so in the construction industry because of the unique hazards present on construction jobsites.  In this environment, decisions to hire and/or employ disabled individuals must be made on a case by case basis,

without regard to statistics, in order to determine the ability of each individual to perform the essential functions of particular construction jobs, with or without reasonable accommodation. Contractors are also required to determine on a case by case basis whether employment of disabled workers endangers the safety of such workers or their coworkers, or the public at large. *Id.*

As is further reflected in the administrative record, construction contractors are uniquely decentralized compared to other industries. Of necessity, most construction contractors maintain numerous "establishments" located at construction job sites, where hiring and day-to-day employment decisions are made without direct involvement of central office staff. Indeed, most construction contractors are small businesses who do not have significant numbers of staff dedicated to human resource matters, particularly at dispersed establishment locations. Many construction contractors will be simply unable to track and analyze the newly required hiring and utilization data, and the analysis will shed no light on the contractors' good faith affirmative action efforts towards disabled workers. *Id*.

As further noted above, because construction contractors have always been exempt from "job group" utilization analysis under Executive Order 11246, they have no experience with defining such job groups, unlike non-construction service contractors. The OFCCP ignored this important distinction in its new Rule, stating that the impact of the new Rules would be mitigated by the fact that contractors could apply the same job group analyses that they have already established under the Executive Order for minorities and women. 78 Fed. Reg. at 58704. No such mitigation of burdens is available to the construction industry under the new Rule.

Finally, as noted above, a high percentage of construction contractors, and a high percentage of ABC's government contractor membership, are small businesses. As such, they

are supposed to be given preference in the award of government contracts without being subject to the same burdens that may be imposed on larger firms.  *See* 15 U.S.C. § 637(d).

### III.    JURISDICTION AND VENUE

Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1331 (Federal question jurisdiction) and the APA, 5 U.S.C. § 702 ("[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof").

Venue is proper in this Court under 28 U.S.C. § 1391(c) in that (i) Defendants reside in the District of Columbia, and (ii) a substantial part of the events giving rise to this claim occurred in the District of Columbia.

This Court is authorized to grant declaratory and injunctive relief under 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 701-706, for violations of, *inter alia*, the APA, 5 U.S.C. § 706.

### IV.    STANDING

Plaintiff ABC is a national trade association representing 22,000 members from more than 19,000 construction and industry-related firms. A.R., Comments of ABC dated Feb. 24, 2012.  Founded on the merit shop philosophy, ABC and its 70 chapters help members win work and deliver that work safely, ethically and profitably for the betterment of the communities in which they work. ABC's membership represents all specialties within the U.S. construction industry, many of whom perform work on government construction contracts and are covered by Section 503 of the Rehabilitation Act of 1973, 29 U.S.C. § 793.  *See* ABC Comments in the Administrative Record; s*ee also* Affidavit of Geoffrey Burr, attached to ABC's Motion.

The great majority of ABC's contractor members are classified as small businesses by the Small Business Administration.[5]  Many such small business contractors who are members of ABC nevertheless employ more than 50 employees and perform federal contracts or subcontractors valued above $50,000 so as to be covered by the new Rule.  At the same time, ABC includes among its members many larger construction companies who have contracted directly with the federal government for many years in the successful construction of large projects of the type that are covered by the new Rule. *Id*.

ABC has standing to pursue this action on behalf of its members under the three-part test of *Hunt v. Washington State Apple Advertising Commission*,432 U.S. 333, 343 (1977), because (1) ABC's members would otherwise have standing to sue in their own right; (2) the interests at stake in this case are germane to ABC's organizational purposes; and (3) neither the claims asserted nor the relief requested requires the participation of ABC's individual members. *See* Attached Affidavit of Geoffrey Burr.

The first of the foregoing criteria, whether ABC's members would otherwise have standing to sue in their own right, is satisfied because imminent and substantial harm will occur to all of ABC's government contractor members who are covered by the new Rule, unless DOL's new Rule is enjoined by this Court before its effective date of March 24, 2014. Specifically, and as further described below, the many ABC members who perform government contracts covered by the new Rule will be required by that date to spend many hours and many dollars that they can ill afford to spend, coming into compliance with the new Rule's unlawful

---

[5] This is consistent with the findings of the Small Business Administration that the construction industry has one of the highest concentrations of small business participation (more than 86 percent). *The Small Business Economy: A Report To The President*, U.S. Small Business Administration, Office of Advocacy (2009), at 8.

and unprecedented data collection and analysis requirements, unless the new Rule is enjoined. Burr Affidavit.

The second association standing criterion, whether the interests at stake are germane to ABC's principles, is satisfied because one of ABC's core principles is to advance and protect the free enterprise system and open competition in both public and private procurements in the construction industry.  *See* Burr Affidavit.  The new Rule unlawfully imposes burdensome data collection and analysis requirements on government contractors that will discourage competition for government procurements, particularly by small businesses who can least afford the significant new burdens being imposed by the new Rule.  The new Rule also infringes on businesses both large and small in the construction industry, by imposing burdensome data collection and utilization analysis requirements that have not been authorized by Congress. *Id*.

The final criterion for association standing, that the claims asserted and relief requested do not require participation of individual ABC members, is also satisfied.  ABC's Complaint is a facial challenge to the new Rule based upon the Rule's unlawful departure from the statutory authority delegated by Congress under Section 503. The Complaint also challenges the arbitrary and capricious nature of the rule, based upon the absence of substantial evidence supporting the Rule in the Administrative Record.  Finally, the Complaint challenges the failure of the agency to comply with the Regulatory Flexibility Act.  The Complaint is entirely based on principles of law and the Administrative Record and thus requires no individual contractor participation.

## V.        STANDARD FOR REVIEW

Under Federal Rule of Civil Procedure 56(c), in a case such as this involving review of a final agency action under the Administrative Procedure Act, 5 U.S.C. § 706, courts have recognized that the purpose of a summary judgment motion is to provide a mechanism for deciding, as a matter of law, whether the challenged agency action is supported by the administrative record and is otherwise consistent with the APA standard of review. *See AFL-CIO v. Chao,* 496 F.Supp.2d 76, 81 (D.D.C.2007); Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006).

Under the APA, OFCCP's new Rule is subject to review under the standards set forth in *Chevron USA, Inc. v. NRDC,*467 U.S. 837 (1984); s*ee also City of Arlington v. FCC, 133 S. Ct. 1863 (U.S. 2013)*.   Under *Chevron* Step I, the Court asks "whether Congress has directly spoken to the precise question at issue." *Id*. at 842.  If Congress has spoken, then that is the end of the analysis, and the Court "must give effect to the unambiguously expressed intent of Congress."  No deference is shown to the governmental Defendants under this Step.  *Id*.  In making this determination, courts are called upon to "use traditional tools of statutory construction to determine whether Congress has unambiguously expressed its intent." *Serono Labs., Inc. v. Shalala,* 158 F.3d 1313 (D.C. Cir. 1998). Such tools of statutory construction include examination of the tatute's text, structure, purpose, and legislative history.  *Bell Atl. Tel. Cos. v. FCC,* 131 F.3d 1044 (D.C. Cir. 1997).

In applying *Chevron* Step I, courts have further held that Congressional silence as to a particular delegation of power does not allow a court to "presume a delegation of power" to a federal agency.  *See Railway Lab. Executives Assn. v. National Mediation Board*, 29 F. 3d 655 (D.C. Cir. 1994) *(en banc)* (warning against "presum[ing] a delegation of power from the

17

absence of an express withholding of such power."). *See also American Petroleum Institute v. Environmental Protection Agency,*706 F. 3d 474 (D.C. Cir. 2013); *American Bar Ass'n v. FTC,*430 F. 3d 457 (D.C. Cir. 2005); *Chamber of Commerce v. NLRB,*721 F. 3d 152 (4th Cir. 2013) (Finding "support in our precedent" for the proposition that "[W]e should invalidate the … rule unless we find that Congress intended to delegate to the [agency] the power to issue it."); *see also Nat'l Ass'n of Mfrs. v. NLRB, 717 F.3d 947, 966 (D.C. Cir. 2013)* (majority concurring opinion) ("An agency, we have stated, is bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.").[6]

In the parallel *Chamber of Commerce* and *National Association of Manufacturers* cases referenced above, the Fourth and D.C. Circuits both recently struck down a final rule of the National Labor Relations Board due to the absence of any expression of Congressional authority for the new mandate imposed by the rule in the National Labor Relations Act.  In both cases, the court majorities found that the agency rule in question could not be upheld without a showing by the agency that Congress intended to delegate authority for the agency's imposition of new requirements on employers. Likewise in the affirmative action context, the Supreme Court in *Chrysler Corp. v. Brown*, 441 U.S. 281 (1979), struck down OFCCP disclosure regulations that could not be said to be contemplated by Congress's general grant of rulemaking authority under applicable laws.

---

[6] The foregoing citations are merely representative of a long line of authority in the D.C. Circuit adhering to the court's *en banc* refusal to presume a delegation of authority in the *Railway Labor Executives* case. *See, e.g., EchoStar Satellite L.L.C. v. FCC, 704 F.3d 992 (D.C. Cir. 2013)*; Am. Library Ass'n v. FCC, 406 F.3d 689 (D.C. Cir. 2005); *Motion Picture Ass'n of Am. v. Fcc, 309 F.3d 796 (D.C. Cir. 2002)*; *Cal. Indep. Sys. Operator Corp. v. FERC, 372 F.3d 395 (D.C. Cir. 2004)*; *API v. UNITED STATES EPA, 52 F.3d 1113 (D.C. Cir. 1995).*

As the D.C. Circuit has further observed:   "General rulemaking authority," although facially broad, "does not mean that the specific rule the agency promulgates is a valid exercise of that authority." *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n, 466 F.3d 134 (D.C. Cir. 2006)* (quoting National Fed'n of Fed. Employees v. Greenberg, 983 F.2d 286 (D.C. Cir. 1993))). The court further stated that an agency is "bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.' " *Id*. at 139-40 (quoting MCI Telecomms. Corp. v. AT&T Co., 512 U.S. 218, 231 n.4 (U.S. 1994)).

Under *Chevron* Step II, the Court may defer to the Defendants' application of the statute, but only if it is a permissible and reasonable construction of the law.   *Id*. at 844; *see also Public Citizen, Inc. v. HHS, 332 F.3d 654 (D.C. Cir. 2003)*; *Southern Cal. Edison Co. v. FERC, 116 F.3d 507 (D.C. Cir. 1997)* (deference is owed to an agency only if its construction is "reasonable" in light of the statutory text, history, and purpose).

Finally, it is important to note that the challenged rule in this case reverses an agency's application of the affirmative action language of Section 503 to government contractors that has been in place for nearly 40 years. OFCCP has previously stated that data collection and utilization analysis requirements make no sense for the "fluid and temporary" workforce of the construction industry.   In such circumstances courts have uniformly held that the agency bears the burden to explain and justify its reversal of policy. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (U.S. 1983) ("[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance."); *see also FCC v. Fox TV Stations, Inc., 556 U.S. 502 (U.S. 2009)* (requiring agency reversing course to demonstrate to a court's satisfaction

19

that the new policy is "permissible under the statute," that "there are good reasons for it," and that "the agency believes it to be better [than the old policy]").[7]

As the Supreme Court further held in *NLRB v. Bell Aerospace Co. Div. of Textron, Inc., 416 U.S. 267, 274-75 (U.S. 1974)*   "[A] court may accord great weight to the longstanding interpretation placed on a statute by an agency charged with its administration. This is especially so where Congress has re-enacted the statute without pertinent change. In these circumstances, congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *See also Chamber of Commerce of the United States v. NLRB, 856 F. Supp. 2d 778 (D.S.C. 2012)* (invalidating NLRB reversal of longstanding policy on this ground), *aff'd* 721 F. 3d 152 (4th Cir. 2013).   As noted above, Congress has amended the LMRDA on several occasions since OFCCP first implemented the affirmative action requirements of Section 503, without ever challenging or changing the scope of that exemption as previously enforced by the agency.

## VI.    ARGUMENT

### A.    THE NEW RULE IMPERMISSIBLY EXCEEDS OFCCP'S STATUTORY AUTHORITY UNDER SECTION 503.

Under *Chevron*, as discussed above, a reviewing court must first consider whether Congress intended to delegate authority to an agency to promulgate a challenged rule.   *See Railway Lab. Executives Assn. v. National Mediation Board, 29 F. 3d 655 (D.C. Cir. 1994) (en banc)* and the numerous D.C. Circuit cases reaffirming that holding cited above.   *See also*

---

[7] In the *Fox* case, the Court held that an agency bears an even higher burden of justification for reversal of a longstanding policy where the reversal "rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account. In such cases, … a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." 556 U.S. at 515-16.   As further discussed below, such contradictory facts and reliance interests are present in this case, heightening the agency's burden of justifying its reversal of longstanding policy.

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) (finding no statutory authority for OFCCP disclosure requirement relating to affirmative action plans). See also *Chamber of Commerce v. NLRB,* 721 F. 3d 152, 159 (4th Cir. 2013); *Nat'l Ass'n of Mfrs. v. NLRB,* 717 F.3d at 966 (D.C. Cir. 2013).

In the present case, it is clear that Congress did not delegate authority to OFCCP to issue a Rule establishing a "utilization goal" for disabled workers in the construction (or any other) industry.   Nor does the statutory language of Section 503 authorize the agency to require contractors to collect and analyze burdensome and meaningless data relating to the number of allegedly disabled applicants and employees who may or may not be qualified to perform the essential elements of the jobs offered by government contractor employers. Certainly, neither the plain language nor legislative history of Section 503 of the Rehabilitation Act reveals any Congressional delegation of authority to OFCCP to implement either requirement.

OFCCP's Preamble to the new Rule fails to cite any statutory authority for its challenged aspects in the plain language or legislative history of Section 503.  The agency's only reference to statutory authority for any aspect of the new Rule appears under the heading "Statement of Legal Authority" at 78 Fed. Reg. at 58683.  There, OFCCP cites no authorization in the statute to do anything other than to "require each covered federal government contractor and subcontractor to take affirmative action to employ and advance in employment qualified individuals with disabilities." The new Rule identifies no language in the statute, and there is none, that authorizes the agency to take the additional step of imposing a "utilization goal" on government contractors or to compel government contractors to collect and analyze the number of self-identified disabled workers and/or to analyze the utilization of such workers.  The new Rule also cites no

reference to any such requirements in the legislative history of Section 503 leading up to its enactment.  Again that is because there is no such authorization in the legislative history.[8]

     Not only is there no support for OFCCP's newly expansive view of its statutory authority in the plain language or legislative history of Section 503 itself, but such a view is contradicted by Congressional enactments subsequent to passage of the Rehabilitation Act, which in two significant respects compel a finding here that the new Rule exceeds OFCCP's statutory authority. First, after OFCCP promulgated its original rules implementing Section 503, which contained no utilization goal and no data collection or analysis requirement, Congress repeatedly amended the Act without expressing any disapproval of OFCCP's implementation of it.[9]  As noted above, where Congress has re-enacted its statute without pertinent change in an agency's longstanding interpretation of it, "such congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *NLRB v. Bell Aerospace Co. Div. of Textron, Inc.,* 416 U.S. 267 (U.S. 1974); *see also Chamber of Commerce of the United States v. NLRB, 856 F. Supp. 2d 778 (D.S.C. 2012),* aff'd *Chamber of Commerce v. NLRB,721 F. 3d 152 (4th Cir. 2013).*

---

[8] At the time of enactment of Section 503 and the OFCCP's subsequent regulations implementing that law, it was widely understood that a "goals and timetables" approach to employment of the disabled was not feasible for at least two reasons which remain true today: First,  unlike such factors as race and sex, which should not of themselves disqualify a person from performing a particular job,  it was recognized that "the existence of a handicap may well disqualify an individual from performing a particular job." Note, *Rehabilitating the Rehabilitation Act of 1973,* 58 B.U. L.Rev. 247, 262 (1978).  Second, it was understood that "because handicaps differ in degree as well as in kind, the development of labor market availability data for the handicapped is technically and economically unfeasible." *Id.*

[9] *See* Pub. L. 93-516 ("Rehabilitation Act Amendments of 1974"); Pub. L. 94-230 ("Rehabilitation Act Extension of 1976"); Pub. L. 95-602 ("Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978"); Pub. L. 98-221 ("Rehabilitation Act Amendments of 1984"); Pub. L. 99-506 ("Rehabilitation Act Amendments of 1986"); Pub. L. 102-52 ("Rehabilitation Act Amendments of 1991"); Pub. L. 102-569 ("Rehabilitation Act Amendments of 1992"); Pub. L. 103-73 ("Rehabilitation Act Amendments of 1993"); Pub. L. 105-220 ("Rehabilitation Act Amendments of 1998").

Even more telling is that Congress demonstrated almost immediately after enactment of the Rehabilitation Act that it knew how to authorize an agency to require contractors to collect and report information about employee applicants, specifically in Section 4212 of VEVRAA passed in 1974.  In VEVRAA, Congress explicitly required contractors to submit annual reports called VETS-100 and VETS-100A that contain specific data on the protected veteran status of applicants and employees of government contractors. As noted above, VEVRAA also made clear that Congress did not consider data collection about employees or applicants to be a component of affirmative action programs, because Section 4212(a)(2) expressly states that the data collection will be required "in addition to" the affirmative action requirement set forth in Section (a)(1).

Courts have held that the expression of Congressional intent to delegate authority to an agency to engage in a specific activity (in this case to compel contractors to collect data about their employees and applicants) set forth in very similar legislation to the statute at issue, combined with the Congressional failure to include such authorization in the challenged statute itself, is compelling evidence as to Congressional intent. *See Chamber of Commerce v. NLRB, 721 F. 3d 152 (4th Cir. 2013)* ("A comparison of the NLRA to subsequent labor legislation provides additional evidence that Congress did not intend to grant the Board the authority to issue a [challenged] requirement."). *See also Alcoa Steamship Co. v. Federal Maritime Commission, 348 F. 2d 756, 759 (D.C. Cir. 1965)* ("Where Congress has consistently made express its delegation of a particular power, its silence is strong evidence that it did not intend to grant the power").

For all of the above reasons, OFCCP's unprecedented imposition of data collection and utilization goals and analysis requirements in the new Rule was not authorized by Section 503's

straightforward requirement that contractors take "affirmative action to employ and advance in employment qualified individuals with disabilities." By declaring that all government contractors in the construction industry must not only take the affirmative actions that they are already doing in compliance with Section 503, but must henceforward also meet an arbitrary goal of 7% qualified individuals with disabilities in their workforces, OFCCP has plainly exceeded its statutory authority.  OFCCP has further exceeded its statutory authority under the Rehabilitation Act by imposing burdensome and meaningless data collection and analytical requirements on government contractors in the construction industry with regard to self-identifying, known, and unknown disabled applicants and employees.

**B.   THE NEW RULE IS ARBITRARY AND CAPRICIOUS IN ITS FAILURE TO RATIONALLY EXPLAIN THE REVERSAL OF FOUR DECADES OF CONSISTENT ENFORCEMENT OF SECTION 503.**

OFCCP's new Rule reverses nearly four decades of agency policy implementing Section 503.  Never before has the agency interpreted the Act as authorizing it to impose any numerical utilization goals on government contractors, nor to force contractors to collect or analyze burdensome utilization data regarding disabled applicants or workers in any industry. In addition, OFCCP has recognized for <u>more</u> than four decades that the construction industry workforce is uniquely "fluid and temporary," compared to non-construction supply and service contractors. *See* OFCCP, *Technical Assistance Guide For Federal Construction Contractors*, available at <u>http://www.dol.gov</u>.   As a result, OFCCP has for many years expressly exempted the construction industry from the types of utilization analysis and statistical data collection that are now being imposed on all industries under the new Rule. *Id.*

Under such circumstances, the Supreme Court has held that the agency bears the burden of explaining and justifying its reversal of longstanding policy.  *Motor Vehicle Mfrs. Ass'n v.*

*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (U.S. 1983) ("[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance."); *see also* *FCC v. Fox TV Stations, Inc., 556 U.S. 502 (U.S. 2009)*. This is particularly so where Congress has amended the governing statute without expressing any disapproval of the agency's previous policy. *NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 274-75 (U.S. 1974) ("[C]ongressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress."). *See also* *Chamber of Commerce of the United States v. NLRB, 856 F. Supp. 2d 778 (D.S.C. 2012)*, *aff'd* *Chamber of Commerce v. NLRB,721 F. 3d 152 (4th Cir. 2013)*.

In the present case, OFCCP has provided no explanation at all for changing its longstanding policy towards the construction industry, with regard to employment data collection and utilization analysis requirements in the new Rule.  As noted above, the agency responded to construction industry objections to the new Rule's data collection and analysis requirements with two sentences that did not address at all the reasons for treating the construction industry differently from non-construction service industries.[10]  OFCCP has thus given no rational explanation at all for imposing unprecedented data collection and utilization analysis requirements on construction contractors.  For this reason as well, the new Rule must be set aside.

---

[10] OFCCP's response to ABC's comments on the exemption issue, as noted above, stated only that "traditionally, construction … contractors who meet the basic coverage thresholds (contract amount and number of employees) of section 503 have not been exempted from any of its provisions. Accordingly, we decline to exempt construction … contractors." 78 Fed. Reg. at 58701-02.  Again, until now Section 503 has never been held to require any contractors to collect meaningless data on the alleged disabilities of their applicants and employees or to analyze what such data reveals with regard to contractors' efforts to meat an arbitrary utilization goal for disabled workers.

Contrary to the new Rule, the Administrative Record establishes that work in the construction industry is typically project-based, transitory and seasonal. The number of workers in construction establishments varies widely from day to day and from project to project. Workers are frequently reassigned from one establishment to another depending on constantly shifting labor needs. The tracking and analysis of hiring and employment data by construction contractors is even more problematic with regard to disabled workers and applicants than for minorities and women, because construction work is uniquely hazardous and physical compared to other industries. In this environment, decisions to hire and/or employ disabled individuals must be made on a case by case basis, without regard to statistics, in order to determine the ability of each individual to perform the essential functions of particular construction jobs, with or without reasonable accommodation. Contractors are also required to determine on a case by case basis whether employment of disabled workers endangers the safety of such workers or their coworkers, or the public at large. *See* A.R. Comments of ABC. *See also* A.R. Comments of American Road & Transportation Builders Association, Associated General Contractors of America, and Command Construction Industries.

As is further reflected in the administrative record, construction contractors are uniquely decentralized compared to other industries. Of necessity, most construction contractors maintain numerous "establishments" located at construction job sites, where hiring and day-to-day employment decisions are made without direct involvement of central office staff. Indeed, most construction contractors are small businesses who do not have significant numbers of staff dedicated to human resource matters, particularly at dispersed establishment locations. Many construction contractors will be simply unable to track and analyze the newly required hiring and

utilization data, and the analysis will shed no light on the contractors' good faith affirmative action efforts towards disabled workers.  *Id*.

Finally, as noted above, because construction contractors have always been exempt from "job group" utilization analysis under Executive Order 11246, they have no experience with defining such job groups, unlike non-construction service contractors. *Id*. The OFCCP ignored this important distinction in its new Rule, stating that the impact of the new Rules would be mitigated by the fact that contractors could apply the same job group analyses that they have already established under the Executive Order for minorities and women. 78 Fed. Reg. 58704. This claim simply does not hold true for the previously exempt construction industry.

For similar reasons, OFCCP's attempt to justify its unauthorized decision to impose an all-industries utilization goal of 7% is grossly inadequate to explain the reversal of four decades of OFCCP policy under Section 503.  First, OFCCP has sought to justify the decision to impose a goal based on the claim that unemployment and workforce participation rates of individuals with disabilities generally have not improved since the 1970s.  OFCCP does not claim that the lack of improvement exists among *government construction contractors*, but only in the workforce population for all industries as a whole. Regardless of whether such a claim is true, and OFCCP offers no verifiable support for its assertion, the question of whether a utilization goal is a proper remedy to impose on government contractors is a policy choice of Congress, which has decided against it.

Even if OFCCP had properly justified its decision to impose an unprecedented utilization goal of some sort, the agency's rationale for adopting the particular goal of 7 percent utilization on an all-industries, nationwide basis cannot be squared with the Supreme Court's requirement of a "rational" explanation.  OFCCP concedes that 7 percent "is an imprecise estimate," *Id*. at

58705, but in reality the target number is supported by no substantial evidence and has simply not been justified by the agency.  According to OFCCP, the 7 percent goal is derived from an American Community Survey (ACS) that did not use the same definition of disabilities as the new Rule. *Id*. at 58703. In addition, the survey in question apparently did not survey industries independently of each other by job groups; and the ACS survey is incapable of being broken out into industry-specific or geography-specific job group categories. *Id*.  Most importantly, the ACS survey could not possibly have surveyed whether the disabled workers in question were "qualified" for jobs in different industries in any particular percentages.  78 Fed. Reg. at 58703-04. Section 503 only authorizes affirmative action towards "qualified" individuals with disabilities.

As further noted above, the actual utilization figure derived by OFCCP from the ACS survey itself was only 5.7 percent.  But the agency then added an additional 1.7% factor purporting to include "discouraged" disabled workers, in order to reach the new 7 percent goal. *Id*.  As pointed out by comments in the Administrative Record, the current BLS data can only be read to support at most a finding of 0.01 percent discouraged disabled workers, not 1.7%. *See* A.R., Comment of Sparlin Law Practice. OFCCP also rejected without any evidence the likelihood that a significant number of such workers were unable to work not because they were "discouraged," but because of the disqualifying nature of their disabilities. *Id*.  The agency certainly failed to address this possibility in the context of the construction industry.

OFCCP also failed to provide an adequate explanation of its decision to apply the same goal to all types of jobs, including safety sensitive positions and physically demanding jobs. Responding to comments from ABC and others in the construction industry, OFCCP mistakenly claimed that industry requests for consideration of the differences between types of jobs were

somehow based on the "flawed notion that individuals with disabilities as a group are incapable of working in these jobs." *Id*. at 58707.  That is certainly not ABC's position.  Rather, ABC and other commenters in the construction industry argued that employment of individuals with disabilities in safety sensitive jobs can only be evaluated on a case by case basis, because *some* disabilities in the physically demanding and hazardous construction workplace are undeniably incapable of being accommodated without undue hardship. The "flawed notion" in this instance is OFCCP's determination to consider all disabled individuals as a group, rather than as individuals.   Any imposition of a utilization goal based on such a determination, in the construction industry at least, is arbitrary and capricious.

OFCCP's final defense of its adoption of the uniform 7 percent goal for all industries and all jurisdictions is that the goal is not a "quota" and that no penalties will result from the failure of contractors to meet it.  *Id*. at 58707.  But this explanation overlooks the costs associated with compliance with such a goal in terms of the time and money spent attempting to track the hiring and employment data necessary to measure it;  the virtually impossible analysis of the meaningless data collected, and the time and money spent attempting to identify what if any aspect of the contractor's hiring and selection practices is "deficient" in meeting the arbitrary goal.  Even though OFCCP has disclaimed any intent to punish contractors for their failure to meet the 7 percent goal, OFCCP has *not* disclaimed the intent to punish contractors for failing to engage in any of the foregoing burdensome steps that will be necessary to satisfy the agency that contractors are trying their hardest to identify the reasons for failing to meet their newly imposed goals. *See* 41 C.F.R. Part 60-741.60-70.[11]  It is not necessary to ABC's complaint to establish

---

[11] It is well settled that an agency's use of ancillary enforcement powers to pressure employers to meet regulatory "goals" will be treated by the courts as converting voluntary goals into involuntary mandates. *See MD/DC/DE Broadcasters Associations v. FCC*,236 F. 3d 13 (D.C. Cir. 2001) (regulatory enforcement of record keeping and reporting of employment statistics deemed a "powerful threat"); *Chamber of Commerce*

that the new 7 percent goal is in reality a "quota." It should be sufficient that the new goal clearly creates new and unjustified burdens on contractors.[12]

There is no evidence in the administrative record that government construction contractors are currently failing to meet their affirmative action obligations under the Rehabilitation Act.  Nor is there any evidence in the administrative record that the newly compelled data collection and utilization analysis will in fact increase employment opportunities for disabled workers in the construction industry.  Finally, there is no statutory authority for OFCCP to impose such burdensome data collection or utilization analysis requirements in pursuit of an arbitrary utilization goal in the construction industry which fails to take into account the industry's unique hiring and employment practices.

Therefore, OFCCP has failed to rationally explain and justify its multiple reversals of decades of policy implementing Section 503's affirmative action requirement in the construction industry. The new Rule should be set aside on this ground as well.

### C.   OFCCP HAS NOT COMPLIED WITH THE REGULATORY FLEXIBILITY ACT.

OFCCP has failed to conduct an adequate cost-benefit analysis that complies with the Regulatory Flexibility Act (RFA), 5 U.S.C.  § 601-611, as amended by the Small Business Regulatory Enforcement Fairness Act, and for this additional reason the Court should remand the new Rule to OFCCP or enjoin its enforcement against small entities as provided in that statute. The RFA requires all agencies conducting rulemakings to "prepare and make available for public

---

*v. Dept. of Labor,*174 F. 3d 206, 209 (D.C. Cir. 1999) ("The voluntary form of the rule is but a veil for the threat it obscures."); *Lutheran Church-Missouri Synod v. Fcc, 141 F.3d 344 (D.C. Cir. 1998)*.

[12] Further evidence of the quota-like nature of the new utilization goal is OFCCP's assertion in the Preamble that "to meet the section 503 rule's utilization goal of 7 percent, Federal contractors would have to hire an additional 594,580 individuals with disabilities." 78 Fed. Reg. 58684.

comment an initial regulatory flexibility analysis," which "shall describe the impact of the proposed rule on small entities." *Id*. at § 603(a). As part of its analysis, the agency is required to consider other significant alternatives to the rule which could affect the impact on small entities, and explain any rejection of such alternatives in its final regulatory flexibility analysis. *Id*. at § 604.   The sole relevant exception to this requirement arises if "the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." *Id*. at § 605(b).   The agency must provide a factual basis for its certification. *See North Carolina Fisheries Ass'n v. Daley*, 27 F. Supp. 2d 650 (E.D. Va. 1998). Such a determination is subject to judicial review for its correctness under a non-deferential standard. *See Aeronautical Repair Station Ass'n v. FAA, 494 F.3d 161 (D.C. Cir. 2007)* (reversing agency certification of lack of impact on small entities); *see also Thompson v. Clark*, 741 F. 2d 401, 405 (D.C. Cir. 1984).

In the present case, OFCCP has undertaken no analysis to determine the real effects of the new Rule's data collection and utilization analysis requirements in the construction industry, which has never previously had to engage in such activities in the context of Executive Order 11246.   Indeed, whereas OFCCP bases much of its burden analysis on the fact that covered contractors already have systems in place to perform the newly required tasks because they already do so under Executive Order 11246, this assertion is plainly wrong with regard to the construction industry.   Yet, OFCCP failed to acknowledge or address this error in its analysis.

In addition, by imposing burdensome new data collection and analysis requirements on small business government contractors in the construction industry, the new Rule interferes with the Congressional mandate that federal agencies should encourage and give preference to small and disadvantaged businesses in procurement of government contracts. 15 U.S.C. § 637(d).   The

Small Business Administration reports that more than 38% of federal subcontracts, including construction contracts, are awarded to small businesses. *See* Clark, Moutray and Saade, *The Government's Role in Aiding Small Business Federal Subcontracting Programs in the United States,* Office of Advocacy, Small Business Administration (2006), available at sba.gov/advo/research.[13]  For this additional reason, the challenged Rule should be enjoined.

Unless the new Rule is enjoined, the challenged data collection and analysis provisions will go into effect on March 24, 2013.  In order to comply with that deadline, ABC members will be required to spend hundreds of hours creating new data collection systems and training personnel in the unprecedented data collection and analysis requirements of the new Rule. Many smaller construction contractors will have to hire new human resource personnel at considerable expense specifically to implement the new Rule's unprecedented data collection and analysis provisions. *See* Attached Burr Affidavit.

Construction contractors already are confronted with a continuing recession in their industry, which has resulted in reduced profit margins and severe business dislocations. *See* Comments of ABC and Associated General Contractors of America. They can ill afford the additional costs they will incur in complying with the new Rule's burdensome data collection and analysis requirements.  Yet, failure to incur these additional costs will result in lack of compliance with the new Rule's complex requirements. Such failure to comply with the new Rule's unlawful requirements will subject contractors to severe penalties, up to and including debarment from future government contracts. *Id., see also* 41 C.F.R. Part 60-741.65.  Faced with

---

[13] OFCCP's sole concession to small businesses is its exemption from burdensome "job group" analysis for contractors employing fewer than 100 employees. *See* 741.45(d)(2).   But this arbitrarily selected number provides no relief to the many small businesses who employ more than 100 employees. The SBA recognizes businesses employing up to 500 employees as small businesses, and has established small business standards for the construction industry that are not based on the number of employees at all, but are instead based upon annual receipts. *See* 48 C.F.R. Part 19.

this Hobson's choice many of ABC's members are expected to drop out of the government construction market, or be forced out by OFCCP, thereby reducing competition and employment opportunities for disabled construction workers. *Id.*

Setting aside the new Rule will not result in any lessening of the construction industry's compliance with the affirmative action requirements of Section 503.  Construction contractors on government contracts will continue to engage in all required affirmative actions to hire and employ the disabled, as they have for nearly forty years.  Summary judgment in this case will simply insure that the same level of data collection and utilization analysis that has been in effect for the past four decades will remain in effect for the construction industry now.  As previously noted, OFCCP has cited no evidence that government contractors in the construction industry are presently failing to meet their affirmative action obligations towards disabled workers.

Congress has mandated full and open competition for government contracts without unnecessary burdens on small businesses. The public interest will not be served by adding further regulatory burdens to small businesses in an arbitrary and capricious manner and without authorization from Congress.

## VII.    CONCLUSION

In light of the foregoing, summary judgment should be granted to ABC. The Court should set aside and enjoin enforcement of OFCCP's new Rule to the extent that the new Rule imposes obligations on construction contractors that are not authorized by Section 503. The new Rule should also be enjoined and set aside to the extent that the OFCCP has failed to provide rational explanation of its reversal of four decades of policy implementing the Act, or has otherwise failed to protect small businesses from the increased regulatory burdens imposed by the new Rule.

Respectfully submitted,

*/s/ Maurice Baskin*

Maurice Baskin (DC Bar No. 248898)

Littler Mendelson, P.C.
1150 17th St., N.W.
Washington, D.C. 20036
202-722-2526
mbaskin@littler.com

**AFFIDAVIT OF GEOFFREY BURR**

I, Geoffrey Burr, hereby swear or affirm in Arlington, Virginia that the following statement is true, based upon personal knowledge:

1.     I am the Vice President of Government Affairs of Associated Builders and Contractors, Inc. ("ABC").  ABC is a national trade association representing 22,000 members from more than 19,000 construction and industry-related firms. Founded on the merit shop philosophy, ABC and its 72 chapters help members win work and deliver that work safely, ethically and profitably for the betterment of the communities in which they work. ABC's membership represents all specialties within the U.S. construction industry, many of whom perform work on government construction contracts and are covered by Section 503 of the Rehabilitation Act of 1973, 29 U.S.C. 793.

2.     The great majority of ABC's government contractor members are classified as small businesses by the Small Business Administration.  Many such small business contractor members of ABC nevertheless employ more than 50 employees and perform federal contracts or subcontracts valued above $50,000 so as to be covered by the requirements of the new Rule recently issued by the Office of Federal Compliance Programs, entitled "Affirmative Action and Nondiscrimination Obligations of Contractors and Subcontractors Regarding Individuals With Disabilities," 41 C.F.R. Part 60-741, 78 Fed. Reg. 58682 (Sept. 24, 2013)  (hereafter the "new Rule").  ABC also includes among its members many larger construction companies who contract with the federal government and are also covered by the new Rule.  Absent injunctive relief, the new Rule is scheduled to go into effect on March 24, 2014.

1

3.     On behalf of all of its government contractor members, ABC has filed a

Complaint in U.S. District Court challenging OFCCP's new Rule on behalf of the association's

members, under the three-part test for association standing set forth in *Hunt v. Washington State*

*Apple Advertising Commission*, 432 U.S. 333, 343 (1977). ABC satisfies each of the three parts

of the Supreme Court's test as outlined in that case, because: (1) ABC's members would

otherwise have standing to sue in their own right; (2) the interests at stake in this case are

germane to ABC's organizational purposes; and (3) neither the claims asserted nor the relief

requested requires the participation of ABC's individual members. By this affidavit, I am

providing further support for each of the foregoing statements below.

4.     ABC's members would otherwise have standing to sue in their own right because

imminent and irreparable harm will occur to all of ABC's government contractor members who

are covered by the new Rule, unless DOL's new Rule is declared unlawful and enjoined by this

Court.  As further described in ABC's Motion papers, the many ABC members who perform

government contracts and subcontracts covered by the new Rule will be required to spend many

hours and many dollars that they cannot afford to spend in efforts to come into compliance with

the new Rule's unlawful and unprecedented data collection and analysis requirements, unless the

new Rule is enjoined.

5.     The interests at stake are germane to ABC's principles, because one of ABC's

core principles is to advance and protect the free enterprise system and open competition in both

public and private procurements in the construction industry.  The new Rule unlawfully imposes

burdensome data collection and analysis requirements on government contractors that will

discourage competition for government procurements, particularly by small businesses who can

least afford the significant new burdens being imposed by the new Rule.

6.     Finally, the claims asserted and relief requested by ABC do not require participation of individual ABC members, because ABC's Complaint is a facial challenge to the new Rule based upon the Rule's unlawful departure from the statutory authority delegated by Congress under Section 503. The Complaint also challenges the arbitrary and capricious nature of the new Rule, based upon the absence of substantial evidence supporting the Rule in the Administrative Record and the failure of OFCCP to provide adequate explanation of its reversal of four decades of policy implementing Section 503's affirmative action requirements. Finally, ABC's Complaint challenges the failure of the agency to comply with the Regulatory Flexibility Act. The Complaint is entirely based on principles of law and the Administrative Record and thus requires no individual contractor participation.

7.     For purposes of ABC's Motion for Summary Judgment, I wish also to affirm that irreparable harm will befall ABC's government contractor members if the new Rule goes into effect. Specifically, the many hours and dollars that ABC members will be required to spend in their efforts to comply with the new data collection and utilization analysis requirements of the new Rule cannot be recovered. Many ABC members, particularly the small businesses, do not have technological systems or human resource personnel in place to handle the unprecedented data collection and analysis requirements of the new Rule. Unlike any other industry, construction contractors must also deal with what OFCCP has acknowledged to be a uniquely "fluid and transitory" workforce. Many smaller construction contractors will have to hire new human resource personnel or pay outside consultants at considerable expense specifically to implement the new Rule's unprecedented data collection and analysis provisions.

8.     ABC's members already are dealing with a devastating and continuing recession in our industry, which has resulted in reduced profit margins and severe business dislocations. In

the current depressed construction economy, construction contractors can ill afford the additional costs they will incur in complying with the new Rule's burdensome data collection and analysis requirements. At the same time, failure to incur these additional costs may result in contractors' misunderstanding of the new Rule's complex requirements and ultimately failure to comply with the new Rule. Failure to comply with the new Rule's unlawful requirements will subject contractors to severe penalties, up to and including debarment from future government contracts. 41 C.F.R. Part 60-741.65.

9.      Moreover, absent injunctive relief, many government construction contractors will be unable to properly estimate their costs of fulfilling government contracts and/or will be forced to greatly increase their bid prices for such contracts above competitive levels, with no provision for reimbursement by the government. Faced with the inability to submit competitive bids and the threat of severe penalties including debarment for failing to comply with the unlawful new Rule, many ABC members will have no choice but to exit the market for government construction services, thereby depriving the government of the benefits of competition, including small business competition, and depriving disabled workers of job opportunities in the construction industry.


I hereby swear under penalties of perjury that the foregoing statement is true and accurate. Sworn to in Arlington, Virginia:


_____                    _11_-_18_-_13_

Geoffrey Burr                                              Date


4