# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| ASSOCIATED BUILDERS AND CONTRACTORS, INC., | ) |
| | ) |
| **Plaintiff,** | ) |
| v. | )    **Case No. 1:13cv1806-EGS** |
| | ) |
| | ) |
| PATRICIA A. SHIU, Director, Office of Federal Contract Compliance Programs, in her official capacity, <u>et al.</u>, | ) |
| | ) |
| **Defendants.** | ) |

_____ )

## DEFENDANTS' COMBINED MEMORANDUM IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND <u>OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

BACKGROUND ...........................................................................................................3

I.      Section 503(a) of the Rehabilitation Act .........................................................3

II.     Labor's Regulations Implementing Section 503(a) of the Rehabilitation Act ..................4

III.    The Labor Rule ...............................................................................................5

IV.     The Present Action..........................................................................................11

ARGUMENT ...............................................................................................................11

I.      The Labor Rule Represents a Permissible Construction of the Governing
        Statute, Expressed in Accordance with Labor's Rulemaking Authority
        To Interpret the Statute .................................................................................11

        A.      Congress Has Delegated to Labor the Authority to Issue Rules
                "Implementing the Provisions of" Section 503(a), Which
                Mandates That Covered Federal Contractors "Shall Take
                Affirmative Action to Employ and Advance in Employment
                Qualified Individuals with Disabilities" ...............................................12

        B.      Because Congress Has Not Clearly Spoken on the Issue of
                Whether "Tak[ing] Affirmative Action to Employ and Advance
                In Employment Qualified Individuals with Disabilties" Should
                Include a Utilization Goal and Data Collection and Analysis,
                Labor's Reading of the Statute as Bestowing That Authority
                Must Be Given Considerable Deference.................................................20

        C.      The Labor Rule Permissible Construes Section 503(a) .........................26

II.     Labor's Decision to Issue the Rule Was Not Arbitrary or Capricious ..............29

        A.      Labor's Inclusion of a Utilization Goal in Implementing
                Section 503(a)'s Affirmative Action Requirement Was Rational .........29

                1.      The Use of a Utilization Goal Does Not Represent a
                        Reversal of Agency Policy, and the Goal Is Not Invalid
                        Simply Because It Is New......................................................29

i

2.      Labor Reasonably Included a 7 Percent Workforce
        Utilization Goal to Implement Section 503(a)'s
        Affirmative Action Requirement In Order to Provide a
        Management Tool Informing Contractors' Decisionmaking
        Process and to Provide Better Accountability ...........................................30

3.      Labor Used a Reasonable Methodology in Determining
        the Utilization Goal to Be 7% ...................................................................32

4.      The Job Groupings Required of Construction Contractors
        in Measuring Progress Against the Utilization Goal Are
        the Same Job Groupings Already Used by Construction
        Contractors in Measuring Progress Against Utilization
        Goals Pertaining to Racial Minorities and Women ..................................41

5.      Plaintiff Overstates the Novelty of a Provision Containing
        an Employment Utilization Goal in Regulations
        Implementing an Affirmative-Action Mandate That
        Applies to Construction Contractors.........................................................42

B.      Labor's Use of Data Analysis and Data Collection in the New
        Rule Is Rational...............................................................................................43

1.      Because Labor Has Not Traditionally Exempted
        Construction Contractors from Otherwise-Applicable
        Affirmative Action Requirements Under Its Regulations
        Implementing Section 503(a), Not Exempting
        Construction Contractors from Data Collection and
        Utilization Analysis Requirements Is Not a Reversal in
        Policy .......................................................................................................43

2.      Labor Rationally Required Federal Contractors to Use
        Data Collection and Analysis...................................................................46

C.      Plaintiff Has Otherwise Failed to Demonstrate That the Labor
        Rule Is Arbitrary and Capricious ..........................................................................47

1.      Labor Has Adequately Explained Its Rationale for
        Requiring Contractors to Invite Employment
        Applicants to Voluntarily Self-Identify as Individuals
        With a Disability ......................................................................................47

2.    Labor Reasonably Expects That Construction Contractors
       Will Be Able to Comply with the Same General
       Requirements to Preserve Data Related to the Hiring and
       Employment of Individuals with Disabilities Generally
       Applicable to Other Federal Contractors ...................................................48

III.    Labor Has Fully Complied with the Regulatory Flexibility Act .....................................49

CONCLUSION...........................................................................................................................54

## INTRODUCTION

Federal agency action taken under wide-ranging congressionally granted authority, after careful and insightful consideration of the various issues related to the action, and in compliance with applicable procedural rules, should easily withstand judicial review.  Yet, Plaintiff here is challenging just such action.  That challenge should be rejected.

Following an extensive public outreach and comment period, the U.S. Department of Labor's Office of Federal Contract Compliance Programs ("OFCCP" or "Labor") acted to strengthen its regulations articulating the affirmative action obligations of federal contractors under Section 503 of the Rehabilitation Act, 29 U.S.C. § 793, with regard to the employment of qualified individuals with disabilities.  Notwithstanding the clear statutory authority authorizing Labor's issuance of these regulations, and its detailed explanations of the reasons for issuing the specific provisions in the regulations, Plaintiff, a national trade association, brought this action to enjoin Labor from strengthening federal contractors' obligations to take affirmative action to employ qualified individuals with disabilities.  Because none of Plaintiff's three claims has any merit, the Court should enter summary judgment for Labor.

First, taking an unduly narrow view of the broad rulemaking authority vested by Congress in the Executive Branch to implement the Rehabilitation Act's affirmative-action obligations relating to federal contractors, Plaintiff mistakenly contends that issuing the new regulations exceeded that authority.  In fact, Congress has mandated that covered federal contractors "shall take affirmative action to employ and advance in employment qualified individuals with disabilities" and that the Executive Branch "shall implement" this mandate "by promulgating regulations."  29 U.S.C. § 793(a).  Labor's new regulations fall within the scope of that delegated authority by prescribing the content of the affirmative-action obligations that

1

federal contractors must meet to employ, and to advance in employment, qualified individuals with disabilities.  Moreover, the specific provisions of the regulations challenged by Plaintiff represent permissible constructions of the Rehabilitation Act's substantive mandate, warranting deference to those constructions under Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984).

Second, far from behaving in an arbitrary and capricious manner by issuing the new regulations, Labor carefully considered all relevant factors, and articulated a rational connection between the facts it found and the specific choices it made.  In particular, the agency considered and responded to a number of comments made during the notice-and-comment period raising many of the same objections now asserted by Plaintiff.  Because Labor has provided sufficient explanations for the choices it made in prescribing the content of the regulations, it has complied with the requirements of the Administrative Procedure Act, 5 U.S.C. § 701 et seq.

Third, and finally, Labor fully complied with the Regulatory Flexibility Act, 5 U.S.C. §§ 601 et seq., as amended.  Because that Act is a procedural statute, as long as an agency complies with the Act by taking the procedural steps it requires – which Labor has done here – a plaintiff cannot obtain relief for an alleged violation.  And in any event, Labor's predictive judgments that the new regulations will not have a significant economic impact on a substantial number of small entities are reasonable, and should be upheld by the Court under the highly deferential standard of review that applies to cases brought under the Act.

For these various reasons, this action should be dismissed or alternatively, summary judgment should be granted in favor of Defendants.

# BACKGROUND

## I.      Section 503(a) of the Rehabilitation Act

Congress enacted the Rehabilitation Act in 1973.  See Pub. L. No. 93-112, 87 Stat. 355.

Section 503 of the Rehabilitation Act addresses the obligations of federal contractors not to

discriminate against individuals with disabilities, and to take affirmative action to employ and to

advance in employment such individuals.  29 U.S.C. § 793.  That section states in pertinent part:

"Any contract in excess of $10,000 entered into by any Federal department or agency for the

procurement of personal property and nonpersonal services (*including construction*) for the

United States shall contain a provision requiring that the party contracting with the United States

shall take affirmative action to employ and advance in employment qualified individuals with

disabilities."  Id. § 793(a) (emphasis added).  It also expressly mandates: "The President *shall*

*implement* the provisions of this section *by promulgating regulations* within ninety days after

September 26, 1973."  Id. (emphasis added).

The President has delegated the authority to implement the provisions of Section 503(a)

to the Secretary of Labor.  Exec. Order No. 11,758, 39 Fed. Reg. 2075 (Jan. 15, 1974).  The

Secretary has delegated this authority to Labor's Office of Federal Contract Compliance

Programs.  41 C.F.R. § 60-1.2.  That Office also implements Executive Order 11,246, which, as

amended, requires affirmative action by covered federal contractors to provide equal

employment opportunities to individuals without regard to race, religion, color, national origin,

or sex.  See Exec. Order No. 11,246, 30 Fed. Reg. 12,319 (Sept. 24, 1965); Final Rule,

Affirmative Action and Nondiscrimination Obligations of Contractors and Subcontractors

Regarding Individuals with Disabilities, 78 Fed. Reg. 58,682, 58,682 (Sept. 24, 2013).

Additionally, that Office implements the Vietnam Era Veterans' Readjustment Assistance Act,

38 U.S.C. § 4212 ("VEVRAA"), which requires affirmative action by covered federal

contractors to employ, and to advance in employment, certain protected veterans.  See 78 Fed.

Reg. at 58,682.

## II.    Labor's Regulations Implementing Section 503(a) of the Rehabilitation Act

The current rules that implement Section 503(a)'s regulation of federal contractors are

codified in Title 41, Part 60-741 of the Code of Federal Regulations.  41 C.F.R. §§ 60-741.1 –

60-741.84 & Apps. A-D.   Subpart C contains the obligations of federal contractors to prepare

and maintain an affirmative action program regarding the employment of individuals with

disabilities.  Id. §§ 60-741.40 – 60-741.45.  This subpart makes no distinction between federal

contractors in general and sub-groupings of federal contractors (such as construction

contractors).  See id.  Rather, these obligations apply to all federal contractors that have 50 or

more employees and a contract with the government of $50,000 or more.  Id. § 60-741.40(a).

Under the regulations, covered federal contractors must prepare and maintain an

affirmative action program at each of their establishments, and that program must be reviewed

and updated annually.  41 C.F.R. § 60-741.40(b), (c).  Such an affirmative action program must

contain at least the following elements: (1) an equal opportunity employment policy statement;

(2) a description of the contractor's review program of its personnel processes to ensure that they

allow for careful, thorough, and systematic consideration of the job qualifications of applicants

and employees with disabilities for job vacancies and training opportunities; (3) a schedule for

the periodic review of all job qualification standards to ensure that any qualification standards

that tend to screen out qualified individuals with disabilities are job-related and consistent with

business necessity; (4) reasonable accommodations to individuals with known disabilities except

where such accommodations would cause undue hardship to the contractor; (5) anti-harassment

policies; (6) appropriate outreach and positive recruitment activities; (7) internal procedures for communication to supervisory and management personnel of the contractor's obligation to engage in affirmative action efforts; (8) a designated official to implement the contractor's affirmative action activities; and (9) training of personnel who make hiring and promotion decisions in the contractor's affirmative action obligations.  Id. § 60-741.44.  In addition to the written affirmative action program requirements, after making an offer of employment to a job applicant, a covered contractor must invite the applicant to inform the contractor whether he or she believes that he or she is an individual with a disability and wishes to benefit under the contractor's affirmative action program.  Id.  § 60-741.42(a).

## III.    The Labor Rule

In 2010, Labor issued an advance notice of proposed rulemaking inviting the public to provide input on how Labor could strengthen its Section 503 affirmative action regulations. Evaluation of Affirmative Action Provisions of Contractors and Subcontractors Under Section 503 of the Rehabilitation Act ("Advance Notice"), 75 Fed. Reg. 43,116 (July 23, 2010).  The Advance Notice listed eighteen specific inquiries as to which the agency sought public comment. Id. at 43,117 - 43,118.  Labor received 127 comments in response to the Advance Notice.  See Affirmative Action and Nondiscrimination Obligations of Contractors and Subcontractors Regarding Individuals with Disabilities ("Notice"), 76 Fed. Reg. 77,056, 77,057 (Dec. 9, 2011). During 2010 and 2011, Labor also conducted multiple town hall meetings, webinars, and listening sessions with individuals from the contractor community, state employment services, disability organizations, and other interested parties to ascertain which features of the Section 503 regulations worked well, which could be improved, and what possible new requirements

could help to effectuate the regulations' primary goal of increasing employment opportunities with federal contractors for individuals with disabilities.  Id. at 77,056 – 77,057.

After studying the matter for over a year following the Advance Notice, Labor issued a notice of proposed rulemaking proposing to revise its Section 503 affirmative action regulations. Notice, 76 Fed. Reg. at 77,056.  The notice included proposals to strengthen the regulations by detailing specific actions that contractors would need to take to satisfy their affirmative action obligations, increasing contractors' data collection obligations, establishing a utilization goal for individuals with disabilities to assist in measuring the effectiveness of contractors' affirmative action efforts, and implementing changes required by the passage of the ADA Amendments Act of 2008.  See id. at 77,085 – 77,105 (listing proposed regulations); 77,058 – 77,074 (performing section-by-section analysis of the proposed regulations).  The notice also responded to comments Labor received in response to its Advance Notice.  Id. at 77,057 – 77,058.  Labor explained that these comments were generally reflective of the comments, suggestions, and opinions expressed during the town hall meetings, webinars, and listening sessions it had conducted.  Id. at 77,057. After receiving several requests to extend the 60-day comment period, Labor published a third notice extending the public comment period for an additional 14 days.  Notice of Proposed Rulemaking and Extension of Comment Period, 77 Fed. Reg. 7108 (Feb. 10, 2012).

Labor received more than 400 comments in response to its notice of proposed rulemaking.  See Final Rule, Affirmative Action and Nondiscrimination Obligations of Contractors and Subcontractors Regarding Individuals with Disabilities, 78 Fed. Reg. 58,682, 58,685 (Sept. 24, 2013) ("Labor Rule," "the Rule," or "Final Rule").  The commenters raised a broad range of issues, including concerns about the cost and burden associated with the proposed regulations, the extended recordkeeping requirements of the regulations, the proposed utilization

goal, and the new categories of data collection and analysis in the regulations.  Id.  In response to these comments, Labor revised or eliminated a number of provisions that had been found in the notice of proposed rulemaking, particularly with regard to these four specific issues.  Id.  Labor issued its Final Rule on September 24, 2013, and addressed the comments it received in its detailed section-by-section analysis of the Rule.  Id. at 58,687 – 58,727.

At issue in the present action are certain regulations that will be codified within the new Subpart C of Labor's Section 503 regulations, relating to the obligations of federal contractors to take affirmative action to employ, and to advance in employment, qualified individuals with disabilities.  Compl. for Decalaratory [sic] and Inj. Relief [ECF No. 1] ("Compl."); see 78 Fed. Reg. 58,742 – 58,746 (containing new Subpart C, to be codified as 41 C.F.R. §§ 60-741.40 – 60-741.47); see also id. at 58,689 – 58,711 (section-by-section analysis of these regulations).  These various regulations can be summarized as follows:

New Section 60-741.40(a) describes the general purpose of the affirmative action program requirement.  78 Fed. Reg. at 58,742; see also id. at 58,689 – 58,690 (containing section-by-section analysis of new Section 60-741.40(a)).  This provision states:

> (a) *General purpose*. An affirmative action program is a management tool designed to ensure equal employment opportunity and foster employment opportunities for individuals with disabilities.  An affirmative action program institutionalizes the contractor's commitment to equality in every aspect of employment and is more than a paperwork exercise.  An affirmative action program is dynamic in nature and includes measurable objectives, quantitative analyses, and internal auditing and reporting systems that measure the contractor's progress toward achieving equal employment opportunity for individuals with disabilities.

Id. at 58,742.

Amended Section 741.42 modifies the existing requirement that contractors invite each job applicant to inform the contractor whether he or she believes that he or she is an individual with a disability and wishes to benefit under the contractor's affirmative action program.  78 Fed.

Reg. at 58,742 – 58,743; see also id. at 58,690 – 58,695 (containing section-by-section analysis

of new Section 60-741.42).  Although the current requirement applies only with respect to

successful job applicants, see 41 C.F.R. § 60-741.42(a), the amended requirement would apply

with respect to all job applicants.  This amended provision states in relevant part:

> (a) *Pre-offer*. (1) As part of the contractor's affirmative action obligation, the contractor shall invite applicants to inform the contractor whether the applicant believes that he or she is an individual with a disability as defined in [these regulations].  This invitation shall be provided to each applicant when the applicant applies or is considered for employment.  The invitation may be included with the application materials for a position, but must be separate from the application.

78 Fed. Reg. at 58,742.

New Section 741.44(k) requires contractors to document and update annually certain

information related to job applicants and job hires.  78 Fed. Reg. at 58,745; see also id. at 58,700

– 58,702 (containing section-by-section analysis of new Section 60-741.44(k)).  This provision

states:

> (k) *Data collection analysis*. The contractor shall document the following computations or comparisons pertaining to applicants and hires on an annual basis and maintain them for a period of three (3) years:
>> (1) The number of applicants who self-identified as individuals with disabilities pursuant to [these regulations], or who are otherwise known to be individuals with disabilities;
>> (2) The total number of job openings and total number of jobs filled;
>> (3) The total number of applicants for all jobs;
>> (4) The number of applicants with disabilities hired; and
>> (5) The total number of applicants hired.

Id. at 58,745.

New Section 741.45 establishes a utilization goal (explicitly not a quota) of 7 percent for

the employment of qualified individuals with disabilities for each job group within the

contractor's workforce or, as applicable, within the contractor's entire workforce.

at 58,745 – 58,746; see also id. at 58,703 – 58,710 (containing section-by-section analysis of new

Section 60-741.45).[1]  This provision states:

**§ 60-741.45 Utilization goals.**
   The utilization goal is not a rigid and inflexible quota which must be met, nor is it to be considered either a ceiling or a floor for the employment of particular groups. Quotas are expressly forbidden.

   (a) *Goal*.  [The Office of Federal Contract Compliance Programs ("OFCCP")] has established a utilization goal of 7 percent for employment of qualified individuals with disabilities for each job group in the contractor's workforce, or for the contractor's entire workforce as provided in paragraph (d)(2)(i) of this section.
   (b) *Purpose*. The purpose of the utilization goal is to establish a benchmark against which the contractor must measure the representation of individuals within each job group in its workforce, or within the contractor's entire workforce as provided in paragraph (d)(2)(i) of this section.  The utilization goal serves as an equal employment opportunity objective that should be attainable by complying with all aspects of the affirmative action requirements of this part.
   (c) *Periodic review of goal*.  The Director of OFCCP shall periodically review and update, as appropriate, the utilization goal established in paragraph (a) of this section.
   (d) *Utilization analysis*—(1) *Purpose*. The utilization analysis is designed to evaluate the representation of individuals with disabilities in each job group within the contractor's workforce, or to evaluate the representation of individuals with disabilities in the contractor's entire workforce as provided in paragraph (d)(2)(i) of this section, with the utilization goal established in paragraph (a) of this section.
     (2) *Grouping jobs for analysis*.  The contractor must use the same job groups established for utilization analyses under Executive Order 11246, either in accordance with 41 CFR part 60-2, or in accordance with 41 CFR part 60-4, as appropriate, except as provided below.
       (i) *Contractors with 100 or fewer employees*.  If a contractor has a total workforce of 100 or fewer employees, it need not use the jobs groups established for utilization analyses under Executive Order 11246, and has the option to measure the representation of individuals with disabilities in its entire workforce with the utilization goal established in paragraph (a) of this section.
       (ii) [Reserved].
     (3) *Annual evaluation*.  The contractor shall annually evaluate its utilization of individuals with disabilities in each job group, or in its entire workforce as provided in paragraph (d)(2)(i) of this section.
   (e) *Identification of problem areas*.  When the percentage of individuals with disabilities in one or more job groups, or in a contractor's entire workforce as provided in paragraph (d)(2)(i) of this section, is less than the utilization goal established in paragraph (a) of this section, the contractor must take steps to determine whether and where

---

[1] This section was originally numbered as Section 60-741.46 in Labor's notice of proposed rulemaking.  Compare 76 Fed. Reg. at 77,099 with 78 Fed. Reg. at 58,745 – 58,746.

impediments to equal employment opportunity exist.  When making this determination, the contractor must assess its personnel processes, the effectiveness of its outreach and recruitment efforts, the results of its affirmative action program audit, and any other areas that might affect the success of the affirmative action program.

(f) *Action-oriented programs*.  The contractor must develop and execute action-oriented programs designed to correct any identified problems areas. These action-oriented programs may include the modification of personnel processes to ensure equal employment opportunity for individuals with disabilities, alternative or additional outreach and recruitment efforts from among those listed in § 60-741.44(f)(1) and (f)(2), and/or other actions designed to correct the identified problem areas and attain the established goal.

(g) A contractor's determination that it has not attained the utilization goal established in paragraph (a) of this section in one or more job groups does not constitute either a finding or admission of discrimination in violation of this part.

(h) The utilization goal established in paragraph (a) of this section shall not be used as a quota or ceiling that limits or restricts the employment of individuals with disabilities.

78 Fed. Reg. at 58,745 – 58,746.

Labor did not only consider the substance of its proposed rules when it issued them in final form.  The agency also reviewed these regulations to assess and take appropriate account of their potential effect on small businesses under the Regulatory Flexibility Act, 5 U.S.C. §§ 601 et seq.  See 78 Fed. Reg. at 58,727 – 58,728.  After conducting an economic analysis of the anticipated compliance costs by contractors with 50 to 500 employees, Labor certified that the new regulations would not have a significant economic impact on a substantial number of small entities.  Id.

Although the Final Rule becomes effective 180 days after its publication, or March 24, 2014, full compliance by current contractors will be phased in.  78 Fed. Reg. at 58,685.  Current contractors with Section 503 affirmative action programs already in effect on March 24, 2014 may keep those programs in effect until the start of their next 12-month affirmative action program review and updating cycle.  Id.

IV.     **The Present Action**

On November 19, 2013, Plaintiff initiated the present action.  <u>See</u> Compl.  Plaintiff's

Complaint includes three counts, alleging that (1) issuance of the Labor Rule exceeded Labor's

statutory authority under Section 503 of the Rehabilitation Act; (2) Labor failed to provide a

rational explanation for its alleged reversal of policy; and (3) Labor failed to comply with the

Regulatory Flexibility Act, as amended.  <u>Id.</u> ¶¶ 45-54.  On December 3, 2013, Plaintiff moved

for summary judgment.  Pl. Mem. Supp. Mot. for Sum. J. [ECF No. 9] ("Pl. Mot.").

## ARGUMENT

I.      **The Labor Rule Represents a Permissible Construction of the Governing Statute, Expressed in Accordance with Labor's Rulemaking Authority to Interpret the Statute.**

A challenge to an agency's construction of a statute that it administers is subject to the

standard of review articulated in <u>Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467</u>

<u>U.S. 837 (1984).</u>  In assessing the validity of an agency's interpretation of a statute, the court

must first determine "'whether Congress has directly spoken to the precise question at issue.'"

<u>Pharm. Research & Mfrs. of Am. v. Thompson, 251 F.3d 219, 223-24 (D.C. Cir. 2001)</u> (quoting

<u>Chevron, 467 U.S. at 842</u>)  If it has, "'that is the end of the matter; for the court, as well as the

agency, must give effect to the unambiguously expressed intent of Congress.'" <u>Id.</u> (quoting

<u>Chevron, 467 U.S. at 842-43</u>).  If, however "the statute is silent or ambiguous with respect to the

specific issue," the Court should proceed to the second step of <u>Chevron</u> analysis, asking

"'whether the agency's answer is based on a permissible construction of the statute.'"  <u>Id. at 224</u>

(quoting <u>Chevron, 467 U.S. at 843</u>).  In short, Plaintiff's "burden is to show that the statute

*unambiguously* supports its interpretation."  <u>Univ. of Tex. M.D. Anderson Cancer Ctr. v.</u>

<u>Sebelius, 650 F.3d 685, 690 (D.C. Cir. 2011)</u> (emphasis in original).

### A.   Congress Has Delegated to Labor the Authority to Issue Rules "Implementing the Provisions of" Section 503(a), Which Mandates That Covered Federal Contractors "Shall Take Affirmative Action to Employ and Advance in Employment Qualified Individuals with Disabilities."

The threshold issue in a Chevron analysis, sometimes referred to as "Chevron Step Zero,"[2] is whether Congress has delegated authority to the agency to issue rules carrying the force of law, and whether the rule in question was issued in the exercise of that authority.  See Chevron, 467 U.S. at 843-44, 865; see also United States v. Mead Corp., 533 U.S. 218, 226-27 (2001) ("We hold that administrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."); Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980 (2005) (explaining that an agency qualifies for Chevron deference where the statute delegates powers to execute the statute as well as to prescribe rules and regulations under the statute).  "The power of an administrative agency to administer a congressionally created program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress."  Chevron, 467 U.S. at 843 (quoting Morton v. Ruiz, 415 U.S. 199, 231 (1974)) (internal punctuation omitted).  "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation."  Id. at 843-44.  "Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."  Id. at 844.

---

[2] See, e.g., Prime Time Int'l Co. v. Vilsack, 930 F. Supp. 2d 240, 248 (D.D.C. 2013) (under Chevron, "[t]he threshold inquiry – sometimes called Chevron "step zero" – is determining whether Congress has delegated interpretive authority to the agency in question") (citing authorities).

Here, Congress "explicitly left a gap for the agency to fill" because it has "express[ly] delegat[ed]" the Executive Branch the authority to elucidate Section 503(a) of the Rehabilitation Act "by regulation."  Labor issued the rule under Section 503(a), which provides in relevant part:

> Any contract in excess of $10,000 entered into by any Federal department or agency for the procurement of personal property and nonpersonal services *(including construction)* for the United States shall contain a provision requiring that the party contracting with the United States *shall take affirmative action* to *employ and advance in employment qualified individuals with disabilities*. . . .  The President *shall implement* the provisions of this section by *promulgating regulations* within ninety days after September 26, 1973.

29 U.S.C. § 793(a) (emphasis added); see Final Rule, 78 Fed. Reg. at 58,733 (citing, inter alia, 29 U.S.C. § 793, as the statutory authority for the Labor Rule).  Significantly, Section 503(a) contains no textual limit on the scope of executive authority to fill the gap left by Congress by "promulgating regulations" to define the content of the requirement that federal contractors "shall take affirmative action to employ and advance in employment qualified individuals with disabilities."  And "statutes written in broad, sweeping language should be given broad, sweeping application."  Sabre, Inc. v. Dep't of Transportation, 429 F.3d 1113, 1125 (D.C. Cir. 2003) (citation and internal punctuation omitted).

Via executive order, the President has "delegated the *broad rulemaking authority* granted to him under Section 503(a) of the Rehabilitation Act of 1973, 29 U.S.C. § 793(a), to the Secretary of Labor."  Philip Morris, Inc. v. Block, 755 F.2d 368, 370 (4th Cir. 1985) (emphasis added) (citing Exec. Order No. 11,758, 3 C.F.R. § 841 (1974)).  The executive order "authorizes the Secretary of Labor to promulgate regulations for the enforcement of section 503."  Howard v. Uniroyal, Inc., 719 F.2d 1552, 1554 n.2 (11th Cir. 1983); accord Rogers v. Frito-Lay, Inc., 611 F.2d 1074, 1081 n.7 (5th Cir. 1980); Trinity Indus. v. Herman, 173 F.3d 527, 528 (4th Cir. 1999) ("Under Section 503 of the Rehabilitation Act [and other statutes], the Secretary of Labor is authorized to enforce non-discrimination and affirmative action obligations on parties to

13

government contracts.").  In turn, the Secretary has delegated this authority to the Office of

Federal Contract Compliance Programs.  41 C.F.R. § 60-1.2.

      That Office thus has the authority to promulgate regulations to enforce the requirement

that federal contractors "shall take affirmative action to employ and advance in employment

qualified individuals with disabilities."  The rule under discussion here falls within the scope of

that delegation because the rule prescribes the content of the affirmative action obligations that

contractors must fulfill.  See Durable Mfg. Co. v. U.S. Dep't of Labor, 584 F. Supp. 2d 1092,

1098 (N.D. Ill. 2008) ("The Secretary did not exceed the scope of her delegated authority in

promulgating the regulation imposing a six-month limit on the validity of labor certifications

because the regulation concerns an aspect of the [Labor Department's] own process that the

[Department] is entitled to control under the express terms of the statute."), aff'd, 578 F.3d 497

(7th Cir. 2009); cf. Trinity Indus. v. Reich, 901 F. Supp. 282, 285 (E.D. Ark. 1993) ("The

Regulations promulgated by the Secretary set forth the affirmative action obligations of

contractors and establish enforcement procedures.") (internal citations omitted), aff'd, 33 F.3d

942 (8th Cir. 1994) (per curiam).  The scope of the Labor rules is fully consistent with

Congress's general instruction to "implement regulations" to enforce Section 503(a)'s

requirement that federal contractors "shall take affirmative action to employ and advance in

employment qualified individuals with disabilities."  Through this conferral of regulatory

authority, there is no doubt that Labor's interpretation of Section 503(a) comes in the context of

"an executive department's construction of a statutory scheme it is entrusted to administer."

Chevron, 467 U.S. at 844.  It is thus subject to the two-prong Chevron analysis.  See Catawba

Cty. v. EPA, 571 F.3d 20, 32 (D.C. Cir. 2009) (explaining that because the agency "is entrusted

with administering" the statute at issue, the Court would "review the agency's construction of the statutory provisions under the familiar two-step framework set out in <u>Chevron</u> . . .").

Contrary to Plaintiff's position, then, this is not a case in which an agency is contending that no statutory delegation of authority exists to permit agency rulemaking within the scope of the subject matter in question, and is thus asking the Court to presume a delegation of rulemaking power from Congress based on the mere absence of an express withholding of that power.  <u>See</u> Pl. Mot. at 17-19, 20-22.  And the decisions Plaintiff cites under this rubric are thus irrelevant to the present case.  <u>See id.</u> at 17-19 & n.6, 20-21.[3]  For example, at issue in <u>Railway Labor Executives Association v. National Mediation Board, 29 F.3d 655 (D.C. Cir. 1994),</u> was a statutory provision granting the National Mediation Board "very limited authority" to undertake a particular task: namely, to investigate labor representation disputes "among a carrier's employees" only "upon request of either party to the dispute," not <u>sua</u> <u>sponte</u> or at the request of a carrier.[4]  <u>29 F.3d at 658</u>.  The Supreme Court had "made clear" that the Board's authority under the provision in question was "very narrow."  <u>Id. at 659</u> (citing <u>Switchmen's Union of N. Am. v. Nat'l Mediation Bd., 320 U.S. 297, 304, 305 (1943))</u>.  Despite these circumstances, the Board issued new "merger procedures" that authorized carriers, as well as the Board acting <u>sua</u> <u>sponte</u>, to initiate investigations of labor representation disputes.  <u>Id. at 658, 659-60</u>.  The D.C. Circuit struck down the new "merger procedures," explaining that the Board was "[u]nable to link its assertion of authority to any statutory provision."  <u>Id. at 670</u>.

---

[3] <u>See</u>, <u>e.g.</u>, <u>Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n, 466 F.3d 134, 137 (D.C. Cir. 2006)</u> ("Even now the Commission concedes that no provision of the Act explicitly grants it the power to impose operational standards on class III gaming [in tribal casinos].").

[4] The governing statute defined the term "carrier" to refer to certain railroads and railroad companies.  <u>See</u> <u>45 U.S.C. § 151.</u>

Railway Labor is not on point here.  Labor has not announced an unprecedented procedure directly at odds with a "very narrow" statutory provision under which Congress has carefully circumscribed an agency's authority to undertake a particular task.  Rather, Labor has simply promulgated a rule under the express rulemaking authority it was granted by Congress to implement Section 503.  By contrast to the "very narrow" statutory provision at issue in Railway Labor, Section 503 provides the agency with "broad rulemaking authority" to issue regulations implementing that statute's directive that federal contractors shall take affirmative action regarding qualified individuals with disabilities.

Nor are National Association of Manufacturers v. National Labor Relations Board ("NLRB"), 717 F.3d 947 (D.C. Cir. 2013), or Chamber of Commerce v. NLRB, 721 F.3d 152 (4th Cir. 2013), pertinent to the present action.  Both cases invalidated the same NLRB rule, albeit on different grounds.  The rule at issue required covered employers to post a written notification of employee rights on their properties and websites, and identified the failure to do so as an unfair labor practice.  Nat'l Ass'n of Mfrs., 717 F.3d at 949.  The D.C. Circuit explained that the rule expressly contradicted two provisions of the NLRB's governing statute: (1) a provision precluding the NLRB from finding noncoercive speech to be an unfair labor practice or evidence of an unfair labor practice, id. at 954-60; and (2) a statute of limitations provision that the rule purported to toll.  Id. at 960-63.  By contrast, Plaintiff has identified no provision of the Rehabilitation Act – or any other statute – that expressly contradicts the Labor Rule, or that prevents Labor from issuing such a rule.

And in Chamber of Commerce, the Fourth Circuit noted that although the NLRB had general authority to issue "such rules and regulations as may be necessary to carry out the provisions of" its governing statute, the statute itself limited the "core, specified functions" of the

NLRB to conducting representation elections and preventing and resolving unfair labor practices. 721 F.3d at 155. With respect to the latter function, the court underscored the passive nature of the Board's authority, noting that the Board "may not act until an unfair labor practice charge is filed," rather than possessing "roving investigatory powers." Id. at 155, 156 (citations and internal punctuation omitted). Emphasizing the purely "reactive nature of the Board's functions," the Fourth Circuit explained that the Board's "reactive mandate" fell squarely at odds with a rule requiring a proactive step such as posting notice of employee rights. Id. at 156 & n.2; see also id. at 161 ("[T]he substantive provisions of the [governing statute] make clear that the Board is a reactive entity, and thus do not imply that Congress intended to allow proactive rulemaking of the sort challenged here through [its] general rulemaking provision . . ."). In short, like Railway Labor, Chamber of Commerce involved a rule issued by an agency with severely circumscribed statutory authority. By contrast, Section 503 does not limit Labor to a purely reactive role that would preclude proactive rulemaking. Rather, Section 503 affirmatively *requires* federal contractors to "take affirmative action to employ and advance in employment qualified individuals with disabilities" and *mandates* executive "implement[ation of] the provisions of this section by promulgating regulations." 29 U.S.C. § 793(a). Chamber of Commerce is thus not relevant to the present case.

Nor, finally, does Chrysler Corporation v. Brown, 441 U.S. 281 (1979), cast any doubt on Labor's rulemaking authority here. Chrysler Corporation arose in a procedural posture very different from this case, and it demonstrates, if anything relevant here, that agencies may issue broad regulations when Congress gives them broad authority to do so. At issue in Chrysler Corporation were public-disclosure regulations issued under the Executive Order prohibiting discrimination by federal contractors, and requiring federal contractors to take affirmative action

17

to ensure equal employment opportunities.  441 U.S. at 285-86 & n.1.  The regulations (1) required federal contractors to submit to Labor, inter alia, written affirmative-action programs and compliance review reports, and (2) stated that, except under limited circumstances, such records maintained by Labor "shall be made [publicly] available for inspection and copying."  Id. at 286-87.  A third party submitted a Freedom of Information Act ("FOIA") request for an affirmative-action program and compliance review report that Chrysler had submitted to Labor, and Chrysler filed a "reverse FOIA" action seeking to prevent the agency from disclosing these records.[5]  Id. at 287-88.

One statutory basis for Chrysler's action was a trade secrets statute preventing federal employees from disclosing certain records relating to businesses "to any extent not authorized by law."  Id. at 294-95.  Because Labor contended that its regulations authorized disclosure, id. at 287, the Supreme Court examined whether these regulations had the "force and effect of law."  Id. at 301.  Explaining that it was "necessary to establish a nexus between the regulations and some delegation of the requisite legislative authority by Congress," id. at 304, the Court concluded that when Congress had enacted statutes prohibiting discrimination by federal contractors and requiring them to undertake affirmative action to further that goal, it "was not concerned with public disclosure of trade secrets or confidential business information."  Id. at 306.  The Court also determined that the regulations were not promulgated through notice-and-comment rulemaking.  Id. at 312-16.  Because the requisite nexus was lacking, and because the regulations were not properly promulgated as substantive rules, the Court concluded that they could not be the "authoriz[ation] by law" required by the trade secrets statute.  Id. at 301-16.

---

[5] "A person whose information is about to be disclosed pursuant to a FOIA request may file a 'reverse-FOIA action' and seek to enjoin the Government from disclosing it."  Canadian Comm. Corp. v. Dep't of Air Force, 514 F.3d 37, 39 (D.C. Cir. 2008) (citing Chrysler Corp., 441 U.S. at 317-18).

The Court cautioned, however: "This is not to say that any grant of legislative authority to a federal agency by Congress must be specific before regulations promulgated pursuant to it can be binding on courts in a manner akin to statutes.  What is important is that the reviewing court reasonably be able to conclude that the *grant of authority contemplates* the *regulations issued*."  441 U.S. at 308 (emphasis added).  The review envisioned by Chrysler Corporation "'is so basic that it rarely arises . . . as a meaningful challenge to agency action.'"  NVE, Inc. v. Dep't of Health & Human Servs., 436 F.3d 182, 190 (3d Cir. 2006) (quoting 33 Charles Alan Wright & Charles H. Koch, Jr., Federal Practice and Procedure § 8381 (2006)).  The regulations at issue here easily meet the test articulated in the Chrysler Corporation dictum.  Unlike the regulations found problematic in that case, the Labor Rule falls well within the scope of what was reasonably contemplated by Congress when it gave Labor rulemaking authority in this area.  Congress's grant of rulemaking authority to Labor to implement the mandate of Section 503 – requiring federal contractors to "take affirmative action to employ and advance in employment qualified individuals with disabilities" – clearly contemplates the Rule issued here, which prescribes the content of affirmative action obligations by federal contractors with respect to individuals with disabilities.

Indeed, the real thrust of Plaintiff's claim is not that the Rule lies outside the permissible scope of rulemaking authority of the agency.  After all, Congress has expressly delegated the authority to issue rules to implement Section 503's requirements.  And it is unmistakable that issuing rules such as those under challenge here falls within the scope of Labor's "broad rulemaking authority" to implement Section 503.  Rather, Plaintiff's real objection is to Labor's *exercise* of that authority: in other words, Plaintiff's real assertion is that the Labor Rule impermissibly construed the statute.  Plaintiff's true objection is that measures such as data

collection and analysis and a utilization goal do not permissibly constitute "tak[ing] affirmative action to employ and advance in employment qualified individuals with disabilities." But as explained below, see infra I.C, this objection is meritless because the Labor Rule permissibly construes the statutory text, is not inconsistent with the legislative history, and furthers the purposes of the statutory scheme. The authority to issue the Labor Rule thus falls within the scope of the "broad rulemaking authority" vested in the Secretary of Labor to issue regulations under Section 503. Philip Morris, 755 F.2d at 370.

> **B.    Because Congress Has Not Clearly Spoken on the Issue of Whether "Tak[ing] Affirmative Action to Employ and Advance in Employment Qualified Individuals with Disabilities" Should Include a Utilization Goal and Data Collection and Analysis, Labor's Reading of the Statute as Bestowing That Authority Must Be Given Considerable Deference.**

The first step under Chevron examines whether "Congress has directly spoken to the precise question at issue." Chevron, 467 U.S. at 842; see also Bell Atl. Tel. Cos. v. FCC, 131 F.3d 1044, 1047 (D.C. Cir. 1997). The text of Section 503(a) grants rulemaking authority to the Executive Branch to implement the requirement that federal contractors "shall take affirmative action" but says nothing about the specific means by which contractors shall take such action. In other words, the statutory text does not describe the content of that requirement. In particular, the text is silent on whether that affirmative-action requirement should include such measures as a utilization goal or data collection and analysis.

Nor is legislative history conclusive on this issue. Indeed, "[t]he legislative history of the Rehabilitation Act of 1973 contains little reference to Congress' intention regarding section 503." Howard, 719 F.2d at 1557 (citing S. Rep. No. 93-318, at 12-16 (1973)). "The statute's muteness, therefore, is not given meaning by the voices in the legislative background." Rogers, 611 F.2d at 1078. "The most extensive discussion of Congressional intent pertaining to section

503 is found in the legislative history of the 1974 amendments to the Rehabilitation Act."
Howard, 719 F.2d at 1558 (citing S. Rep. No. 93-1297, at 25-28; 1974 U.S.C.C.A.N. 6373,
6390-91.[6]  The legislative history of these amendments does not shed light on whether Section
503's affirmative action mandate should or should not include such measures as a utilization goal
or data collection and analysis.[7]

   Nor, contrary to Plaintiff's argument, does subsequent Congressional action shed any
light on this issue.  See Pl. Mot. at 22-23.  First, it is irrelevant to the present issue that Congress
has repeatedly amended the Rehabilitation Act "without expressing any disapproval of [Labor's]
implementation of it."  See id. at 22 & n.9.  It is one thing to apply the legislative re-enactment
doctrine, under which courts presume that congressional re-enactment of a statute without
pertinent change indicates Congress's awareness of and approval of an agency's interpretation of
that statute, as expressed through regulations.  See, e.g., NLRB v. Bell Aerospace Co., 416 U.S.
267, 274-75 (1974) ("[A] court may accord great weight to the longstanding interpretation placed
on a statute by an agency charged with its administration.  This is especially so where Congress
has re-enacted the statute without pertinent change") (footnotes omitted).  It is quite a different
matter to equate congressional silence with a clear statement that the agency's existing
regulations represent the outer boundary of the agency's rulemaking authority, or that the agency
should not revise or supplement those regulations.  See AFL-CIO v. Brock, 835 F.2d 912, 916
n.6 (D.C. Cir. 1987) ("[N]o case has rested on" the legislative re-enactment doctrine "alone as a
basis for holding that the statute *required* that interpretation") (emphasis altered); accord Shays

---

[6] Howard mistakenly cited Senate Conference Report No. 93-1270, rather than Senate Report No. 93-1297.

[7] Despite Plaintiff's contrary contention, see Pl. Mot. at 22 n.8, unsupported conclusions expressed in a 1978 student law review note do little to illustrate the intent of Congress when it enacted Section 503 in 1973.  Nor are such conclusions pertinent to the present-day feasibility of particular elements of an affirmative action program.

v. FEC, 337 F. Supp. 2d 28, 60 (D.D.C. 2004).  "Thus, all we can deem from congressional

silence on the [present] issue is just that – that Congress was silent on the issue." Castro v.

Chicago Hous. Auth., 360 F.3d 721, 728-29 (7th Cir. 2004); see id. (explaining that, under

Chevron step 1, congressional silence was not determinative on the issue of whether a Labor

regulation permissibly construed the statutory term "employer" as not applicable to government

entities).

Second, Plaintiff mistakenly argues that a provision of an entirely separate statute,

VEVRAA, is dispositive on the issue of Labor's regulatory authority to implement Section 503's

affirmative action mandate.  See Pl. Mot. at 23.  Section (a)(1) of VEVRAA requires contractors

to "take affirmative action to employ and advance in employment qualified covered veterans,"

while section (a)(2) directs the Secretary of Labor to prescribe certain regulations "[i]n addition

to requiring affirmative action to employ such qualified covered veterans . . . and in order to

promote the implementation of such requirement." 38 U.S.C. §§ 4212(a)(1), (a)(2).  Plaintiff's

contention that Congress intended to draw a sharp distinction between taking "affirmative

action" and reporting certain information about the veteran status of its employees by using the

phrase "in addition to" fails.

Initially, VEVRAA is not Section 503; what Congress might have meant in enacting one

provision is hardly entirely dispositive as to what it meant in enacting the other.  See United

States ex rel. Chicago, New York & Boston Refrigerator Co. v. Interstate Commerce Comm'n,

265 U.S. 292, 295 (1924) ("[B]ecause words used in one statute have a particular meaning they

do not necessarily denote an identical meaning when used in another and different statute.");

Firstar Bank, N.A. v. Faul, 253 F.3d 982, 991 (7th Cir. 2001) ("If a court has no other solid basis

for construing vague statutory language, if other interpretive principles are in equipoise, or if the

tribunal wants to shore up a determination made mostly on other grounds, then perhaps

borrowing from an unrelated statute makes sense.  However, this is a relatively weak aid given

that Congress may well have intended the same word to have a different meaning in different

statutes.").  Moreover, Congress made clear that the requirements of section (a)(2) are imposed

"in order to promote the implementation of such [affirmative action] requirement."  Additionally,

Plaintiff's contention is founded on a misunderstanding of VEVRAA's specific amendment

history.  When enacted in 1972, Section 4212(a)[8] of VEVRAA read in pertinent part:

> Any contract entered into by any department or agency for the procurement of personal
> property and non-personal services (including construction) for the United States, shall
> contain a provision requiring that, in employing persons to carry out such contract, the
> party contracting with the United States *shall give special emphasis* to the employment of
> qualified disabled veterans and veterans of the Vietnam era. . . . *The President shall
> implement the provisions of this section* by *promulgating regulations* within 60 days . . . ,
> which regulations shall require that (1) each such contractor undertake in such contract to
> list immediately within the appropriate local employment service office all of its suitable
> employment openings, and (2) each such local office shall give such veterans priority in
> referral to such employment openings.

Pub L. No. 92-540, 86 Stat. 1097, § 2012(a) (1972), reprinted in 1972 U.S.C.C.A.N. 1259, 1288

(emphasis added).[9]  As enacted, then, this section (1) required federal contractors to "give special

emphasis to" employing veterans with disabilities and Vietnam veterans and (2) directed the

President "to implement the provisions of this section" by enacting regulations that included

certain requirements.  In 1974, Congress changed this provision to read:

> Any contract in the amount of $10,000 or more entered into by any department or agency
> for the procurement of personal property and non-personal services (including
> construction) for the United States, shall contain a provision requiring that the party
> contracting with the United States *shall take affirmative action* to employ and advance in
> employment qualified disabled veterans and veterans of the Vietnam era. . . . *In addition
> to requiring affirmative action to employ such veterans* under such contracts and

---

[8] Originally designated 42 U.S.C. § 2012, this provision was renumbered as § 4212 in 1991.  Pub. L. No. 102-83, § 5(a), 105 Stat. 406 (1991).

[9] Because the text of Section 2012(a)  is not readily available in electronic legal sources, Defendants have attached as Exhibit 1 the text of that law, as reprinted in 1972 U.S.C.C.A.N. 1288-91.

> subcontracts *and in order to promote the implementation of such requirement, the President shall implement the provisions of this section* by promulgating regulations within 60 days . . . , which regulations shall require that (1) each such contractor undertake in such contract to list immediately within the appropriate local employment service office all of its suitable employment openings, and (2) each such local office shall give such veterans priority in referral to such employment openings.

Pub. L. No. 93-508, tit. IV, § 402(1), (2), 88 Stat. 1578, 1593, reprinted in 1974 U.S.C.C.A.N. 1835 (emphasis added).  The first quoted sentence corresponds to section (a)(1) of the present statute, while the second sentence corresponds to section (a)(2).  As amended, then, the statute required federal contractors to "take affirmative action to employ" veterans with disabilities and Vietnam veterans (rather than "giv[ing] special emphasis to" such employment).  Far from drawing a bright line between requiring contractors to take affirmative action and requiring contractors to comply with the agency's regulations, the amended statute underscores the fact that those regulations would "implement the provisions of this section" and were intended "to promote the implementation of [the affirmative action] requirement."  In short, the two parts operate in tandem, not at odds with one another.

Moreover, Congress added annual contractor reporting requirements to VEVRAA in 1982, in section (d).  Pub. L. No. 97-306, tit. III, § 310(a), 96 Stat. 1429, 1442.  The legislative history makes clear that requiring such reports fell within Labor's authority to implement the provisions of section (a)'s affirmative action requirement because Labor had earlier issued regulations requiring such reports on a quarterly basis:

> Under existing law, Federal contractors doing business with the government in amounts of $10,000 or more, and subcontractors, are required to take affirmative action to employ and advance in employment qualified service-connected disabled veterans rated 30-percent or more disabled and Vietnam-era veterans.  *Until earlier this year, such contractors were required by regulation to file quarterly reports on their compliance with this provision.*  At that time, it was decided to delete the requirement for those quarterly reports as they posed a significant burden on employers.  The Committee is concerned about unduly burdensome requirements imposed on employers.  However, it is likewise

> concerned that some means of report on the activities required by [38 U.S.C. § 4212] be maintained.  Thus, the Committee bill would require such contractors to report annually.

S. Rep. No. 97-550, at 82, reprinted in 1982 U.S.C.C.A.N. 2933 (emphasis added).  In other words, Labor had used its rulemaking authority to "implement the provisions of" the affirmative-action requirement of section (a) to require quarterly reports from contractors regarding their compliance with VEVRAA's affirmative-action requirement.  And Labor rescinded that rule, not because it believed the rule to lie beyond its rulemaking authority, but because it deemed such quarterly reports to impose a burden that it did not favor.  Congress amended the statute to reinstate the reporting requirement, but on an annual basis.  Thus, Congress's addition of the annual reporting requirement was not intended to draw a bright line between this requirement and Labor's rulemaking authority to implement VEVRAA's affirmative-action requirement.  Rather, Congress was expressing its approval of a regulatory requirement imposed by Labor by codifying that requirement (in a modified form).  VEVRAA's legislative history never suggests that Congress considered such a reporting requirement to fall outside Labor's regulatory authority to implement VEVRAA's affirmative-action provision.

In any event, the VEVRAA provision in question is not a definitions section, and does not purport to prescribe the outer boundary of Labor's authority to implement an affirmative-action provision relating to employment by federal contractors.  Plaintiff's reliance on VEVRAA is thus misplaced.

*     *     *     *     *     *     *

In sum, Congress has not directly spoken to the precise question at issue: namely, whether Section 503's federal contractor affirmative-action requirement should or should not include such measures as a utilization goal or data collection and analysis.  The Court should thus proceed to the next step of its analysis under Chevron.

25

### C.      The Labor Rule Permissibly Construes Section 503(a).

If, as here, Congress's intent is not clear from the statute, "the question for the court is whether the agency's answer is based on a permissible construction of the statute."  Chevron, 467 U.S. at 843; see also Holder v. Martinez Gutierrez, 132 S. Ct. 2011, 2017 (2012) (explaining that under Chevron deference, an agency's construction of a statute prevails "if it is a reasonable construction of the statute, whether or not it is the only possible interpretation or even the one a court might think best").  This standard is highly deferential to the agency and permits a court to uphold agency action so long as it "reflects a reasonable interpretation of the law."  Holly Farms Corp. v. Nat'l Labor Relations Bd., 517 U.S. 392, 409 (1996).  Indeed, this Court "need not conclude that the agency construction was the only one it permissibly could have adopted."  Rust v. Sullivan, 500 U.S. 173, 184 (1991) (quoting Chevron, 467 U.S. at 843 n. 11); see also Northpoint Technology v. FCC, 414 F.3d 61, 69 (D.C. Cir. 2005).  Nor does this Court need to conclude that it is "the best interpretation of the statute," United States v. Haggar Apparel Co., 526 U.S. 380, 394 (1999) (quoting Atl. Mut. Ins. Co. v. Comm'r of Internal Revenue, 523 U.S. 382, 389 (1998)), nor even that it is the "most natural one."  Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 702 (1991).  Rather, the agency's view is deemed to be reasonable so long as it is not "flatly contradicted" by plain language.  Dep't of Treasury v. Fed. Labor Relations Auth., 494 U.S. 922, 928 (1990).

Plaintiff, on the other hand, bears a daunting burden in showing that Labor's regulatory interpretation of the statute is not entitled to deference.  It is not enough for Plaintiff to argue that its interpretation is a "plausible" one, Reno v. Koray, 515 U.S. 50, 62 (1995), or that its view is "consistent with accepted canons of construction."  Pauley, 501 U.S. at 702.  Rather, Plaintiff must show that its reading of the statute is the "inevitable one," Regions Hosp. v. Shalala, 522

U.S. 450, 460 (1998), because Congress "unambiguously manifest[ed] its intent" as to that

reading, Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 703

(1995), such that the statutory language "cannot bear the interpretation adopted by the [agency]."

Sullivan v. Everhart, 494 U.S. 83, 92 (1990).  Plaintiff cannot carry this burden.

Labor's interpretation of Section 503, as expressed in its Rule, reasonably accords with

the statute's plain language.  Federal contractors must "take affirmative action to employ and

advance in employment qualified individuals with disabilities."  29 U.S.C. § 793(a).  "The

obligation to take affirmative action imports more than the negative obligation not to

discriminate."  S. Ill. Builders Ass'n v. Ogilvie, 471 F.2d 680, 684 (7th Cir. 1972); accord Allen

v. Heckler, 780 F.2d 64, 68 (D.C. Cir. 1985); Shirey v. Devine, 670 F.2d 1188, 1201 (D.C. Cir.

1982).  Applying the second step of Chevron, Labor's decision to craft the regulations as it did

should be recognized as entirely consistent with the language of the statute.

Similar to this case, at issue in Contractors Association of Eastern Pennsylvania v.

Secretary of Labor, 442 F.2d 159, 163 (3d Cir. 1971), was a challenge to Labor's adoption of an

employment goal implementing the affirmative action mandate of Executive Order 11,246.  The

Court explained that the directive requiring bidders to submit an affirmative action program with

specific utilization goals "is simply a refined approach to this 'affirmative action' mandate," id.

at 170, and thus permissible unless otherwise prohibited by statute.  Id. at 171.  As in Contractors

Association, here, Labor has issued a regulation interpreting the term "affirmative action," as

applied to federal contractors, to permit the use of a specific employment utilization goal.  The

fact that the authority here derives from Section 503 of the Rehabilitation Act rather than from an

executive order is of no moment because the language of the two provisions is substantively

indistinguishable.  Compare Exec. Order No. 11,246, § 202 ("The contractor will take

affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race. . . .") with 29 U.S.C. § 793(a) ("Any contract . . . entered into by any Federal department or agency for the procurement of . . . nonpersonal services (including construction) for the United States shall contain a provision requiring that the party contracting with the United States shall take affirmative action to employ and advance in employment qualified individuals with disabilities.").  And the D.C. Circuit has expressly stated that "the affirmative action programs upon which Section 503 was modeled" include "the government's imposition of contract clauses requiring affirmative action in employment of racial minorities by federal construction contractors."  Shirey, 670 F.2d at 1201.  See also Legal Aid Society of Alameda County v. Brennan, 608 F.2d 1319, 1329 n.14 (9th Cir. 1979) (observing that several attacks on a "goal-and-timetable enforcement system" in Labor's regulations implementing the affirmative-action mandate of Executive Order 11,246 were defeated during congressional consideration of an equal employment statute, and that "[i]n rejecting the assault on [Labor's] affirmative action approach, Congress approved the exercise of executive authority to issue binding regulations regarding minority utilization" under Executive Order 11,246).

Of course, the agency has no burden on the second step of Chevron to demonstrate that its statutory interpretation is bolstered by case law; rather, Plaintiff may prevail only if it shows that the agency's interpretation represents an impermissible construction of the statute.  Chevron, 467 U.S. at 843.  The Labor Rule permissibly construes Section 503's affirmative-action mandate to include measures that have been included in implementing other affirmative-action mandates relating to employment.  Therefore, under Chevron, the Court should defer to Labor's interpretation of this mandate, as expressed in its Rule.

28

## II.     Labor's Decision to Issue the Rule Was Not Arbitrary or Capricious.

Not only has Plaintiff failed to demonstrate that Labor's construction of Section 503 is impermissible, but it has not shown that the promulgation of the challenged rule is arbitrary and capricious.  In its Final Rule, Labor presented a thorough, reasoned explanation for the new rule and set forth its supporting findings in detail.  Plaintiff's objections largely reiterate arguments that Labor considered and rejected as part of the administrative process, and its other objections equally lack merit.

Under the Administrative Procedure Act, 5 U.S.C. § 701 et seq. ("APA"), a court may set aside agency action where such action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Ins. Co., 463 U.S. 29, 43 (1983). "Highly deferential, '[t]he arbitrary and capricious standard . . . presumes the validity of agency action.' " City of Portland v. EPA, 507 F.3d 706, 713 (D.C. Cir. 2007) (quoting Nat'l Ass'n of Clean Air Agencies v. EPA, 489 F.3d 1221, 1228 (D.C. Cir. 2007)).  "We must uphold an agency's action where it has considered the relevant factors and articulated a rational connection between the facts found and the choice made."  Id. (internal quotation marks omitted).

### A.     Labor's Inclusion of a Utilization Goal in Implementing Section 503(a)'s Affirmative Action Requirement Was Rational.

#### 1.     The Use of a Utilization Goal Does Not Represent a Reversal of Agency Policy, and the Goal Is Not Invalid Simply Because It Is New.

Plaintiff mistakenly characterizes Labor's inclusion of a numerical utilization goal in its Rule implementing Section 503(a)'s affirmative-action mandate as constituting a reversal of longstanding agency policy.  See Pl. Mot. at 24, 27.  But Plaintiff cites no occasion on which

Labor has opined that including a utilization goal fell outside the scope of its rulemaking authority to implement Section 503(a).

And the fact that an agency includes a new provision in a regulation properly issued under its authority delegated by Congress does not render that regulation invalid – or even suspect.  Once granted, an agency's "powers are not lost by being allowed to lie dormant." Altman v. SEC, 666 F.3d 1322, 1327 (D.C. Cir. 2011) (citation and internal punctuation omitted); see also Warner-Lambert Co. v. FTC, 562 F.2d 749, 759 (D.C. Cir. 1977) ("[T]he fact that an agency has not asserted a power over a period of years is not proof that the agency lacks such power.").  And the mere fact that, to date, Labor has not included a utilization goal in its regulations implementing Section 503's affirmative-action requirement does not somehow deprive the agency of its authority to include them now.  "An initial agency interpretation is not instantly carved in stone.  On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis." Chevron, 467 U.S. at 863-64.  Thus, Plaintiff is simply mistaken that new provisions in a regulation necessarily equate to a reversal of agency policy, or that the recent vintage of these requirements is cause for heightened judicial scrutiny.

> **2.      Labor Reasonably Included a 7 Percent Workforce Utilization Goal to Implement Section 503(a)'s Affirmative Action Requirement in Order to Provide a Management Tool Informing Contractors' Decisionmaking Process and to Provide Better Accountability.**

The Final Rule establishes a 7 percent workforce utilization goal for individuals with disabilities.  As Labor explained, the current Section 503 regulatory framework requires affirmative action by contractors but lacks a specific goal.  78 Fed. Reg. at 58,703; see also Notice, 76 Fed. Reg. at 77,069.  Although this has been the case since the initial publication of

Labor's Section 503 regulations in the 1970s, the years since have shown little improvement in the unemployment and workforce participation rates of individuals with disabilities. 78 Fed. Reg. at 58,703. In 2011, based on census data, the median household income for a head of household aged 18 to 64 with a disability was only $25,420, as compared with $59,411 for households with a head of household without a disability. Id. at 58,682. [10] The mean hourly wage of individuals aged 18 to 64 with a disability was $17.62 (with a median of $13.73), as contrasted with $21.67 for individuals aged 18 to 64 without a disability (with a median of $16.99). Id. Controlling for age and race, male workers with a disability earned 23 percent less than males without a disability. Id. The disability gap for female workers is 20 percent. Id. Although 28.8% of individuals aged 18 to 64 with a disability lived in poverty in 2011, data shows that only 12.5% of individuals without a disability lived in poverty during that year. Id. Additionally, based on an analysis of a 2008-10 survey, Labor found that, controlling for age and race, males aged 18 to 64 with a disability had a 7.2% higher unemployment rate than males in the same age range without a disability, and females with a disability had a 6.5% higher unemployment rate than females in the same age range without a disability. Id. The same analysis showed that females with a disability had a 29.2% higher probability of not participating in the labor force than females without a disability. Id. at 58,683.

Labor determined that without a quantifiable means of assessing whether progress toward equal opportunity is occurring, affirmative action process requirements are not sufficient. 78 Fed. Reg. at 58,703. The agency therefore concluded that establishing a utilization goal would provide a much-needed tool to help ensure that progress toward equal opportunity is achieved, and would create more accountability within a contractor's organization. Id. Thus, Labor has

---

[10] "Head of household" as used here refers to the person (or one of the people) in whose name a home is owned or rented and the person to whom the relationship of other household members is recorded. 78 Fed. Reg. at 58,682 n.3. Typically, this person is the head of a household. Id.

reasonably explained that establishing a utilization goal for individuals with disabilities will serve as a vital element to help enable Labor and contractors to assess the effectiveness of specific affirmative action efforts.  The agency has therefore articulated a reasonable connection between the facts it found and the choice it made.

### 3.    Labor Used a Reasonable Methodology in Determining the Utilization Goal to be 7%.

The specific utilization goal of 7% was derived primarily from disability data collected as part of the U.S. Census Bureau's American Community Survey ("Survey").  78 Fed. Reg. at 58,703.  The Survey collects data from a sample of 3 million people to gather information regarding the demographic, socioeconomic, and housing characteristics of the United States.  Id.  The Survey was first launched in 2005 after a decade of Census Bureau testing and development.  Id.  Refinement of Survey questions to characterize disability status has been continuous, and the current set of six disability-related questions was incorporated into the Survey in 2008.  Id.[11]  Taken as a group, the current set of six "yes" or "no" questions comprises a function-based definition of "disability," as used in the Survey and in most of the other major surveys administered by the Federal Statistical System.  Id.

The definition of disability used by the Survey is not as broad as that used by the Rehabilitation Act and the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA").  78 Fed. Reg. at 58,703.  Nevertheless, despite the Survey's limitations, Labor considers the Survey to be the best source of nationwide disability data available today.  Id. at 58,704.  In its Advance Notice, Labor specifically asked for public comment on the question: "If OFCCP were

---

[11] The six questions are: (1) Is this person deaf or does he/she have serious difficulty hearing?  (2) Is this person blind or does he/she have serious difficulty seeing even when wearing glasses?  (3) Because of a physical, mental, or emotional condition, does this person have serious difficulty concentrating, remembering, or making decisions?  (4) Does this person have serious difficulty walking or climbing stairs?  (5) Does this person have difficulty dressing or bathing?  (6) Because of a physical, mental, or emotional condition, does this person have difficulty doing errands alone such as visiting a doctor's office or shopping?  78 Fed. Reg. at 58,703 n.21.

to require Federal contractors to conduct utilization analyses and to establish hiring goals for individuals with disabilities, comparable to the analyses and establishment of goals required under the regulations implementing Executive Order 11246, what data should be examined in order to identify the appropriate availability pool of such individuals for employment?"  75 Fed. Reg. at 43,117.  Almost all of the commenters addressing this question referenced the Survey data as the best available source of nationwide data about the number of persons with certain types of disabilities.  See Notice, 76 Fed. Reg. at 77,057.  The agency thus reasonably determined that the Survey data could serve as an appropriate starting point for developing a utilization goal.  78 Fed. Reg. at 58,704.

    In developing the specific utilization goal, Labor considered two general approaches.  Id. One approach considered by Labor aimed to mirror precisely the goals framework for racial minorities and women used by non-construction contractors subject to Executive Order 11,246. Id.  After careful consideration of the available data and consultation with the U.S. Census Bureau, Labor concluded that because of various difficulties, replicating the Executive Order 11,246 goals framework would not provide the most effective approach for establishing goals for individuals with disabilities.  Id.  Labor also concluded that its second approach considered – establishing a single, national goal for all jobs in all geographic areas – would provide a more viable approach to establishing a utilization goal for individuals with disabilities.  Id.

    To determine an appropriate numerical utilization goal, Labor began with 2009 Survey disability data for the civilian labor force and the civilian population.  78 Fed. Reg. at 58,704.[12]

---

[12] The "civilian labor force" is the sum of people who are employed and people who are unemployed and looking for work.  78 Fed. Reg. at 58,704 n. 25.  The "civilian population" is the civilian labor force plus civilians who are not in the labor force, excluding individuals in institutions.  Id.

By averaging this data according to EEO-1 Report[13] job category, and then by averaging across EEO-1 Report job category totals, Labor estimated that 5.7% of the civilian labor force is comprised of individuals with a disability.  Id.  As explained above, however, because the definition of disability used by the Survey is not as broad as that used by the Rehabilitation Act and the ADA, Labor determined that 5.7% did not represent a sufficient percentage that reflected the true availability in the work force of individuals with disabilities.  Id.  Moreover, the 5.7% figure did not take into account the "discouraged worker effect," or the effects of historical discrimination against individuals with disabilities that has suppressed the representation of such individuals in the workforce.  Id.  Discouraged workers are individuals who are not now seeking employment, but who might do so in the absence of discrimination or other employment barriers. Id. at 58,704-05.  Given the acute disparity in workforce participation rates of individuals with and without disabilities, it is reasonable to assume that at least a portion of that disparity is owing to a lack of equal opportunity employment.  Id. at 58,705.  According to Labor's Bureau of Labor Statistics ("Bureau"), in 2011, 69.7% of working-age individuals without disabilities formed part of the workforce, as contrasted with just 20.9% of working-age individuals with certain functional disabilities.  Id. at 58,706.  Moreover, Bureau data shows that while the unemployment rate during that year for individuals without disabilities was 8.7%, the rate for individuals with these disabilities was 15.0%.  Id.

       To estimate the size of the discouraged worker effect, Labor compared the percentage of the civilian population with a disability (using the Survey definition of "disability") who identified as having an occupation to the percentage of the civilian labor force with a disability

---

[13] The EEO-1 Report, formally known as the "Employer Information Report," is a government form requiring many employers to provide a count of their employees by job category, and then by ethnicity, race, and gender.  See U.S. Equal Employment Opportunity Commission, Questions and Answers: Revisions to the EEO-1 Report, *available at* http://www.eeoc.gov/employers/eeo1/qanda.cfm.

who identified as having an occupation.  78 Fed. Reg. at 58,705.  Labor considered it reasonable

to believe that individuals in the civilian population who identify as having an occupation but

who are not currently in the workforce remain interested in working, if job opportunities become

available.  Id.  Using the 2009 Survey EEO-1 Report job category data, Labor determined the

result of this comparison to be 1.7%.  Id. [14]

Labor concluded by adding the 5.7% figure to the 1.7% figure, which yields 7.4%.  78

Fed. Reg. at 58,705.  The agency derived the national utilization goal for individuals with

disabilities from this total, rounding down to 7% to avoid implying a false level of precision.  Id.

Plaintiff's objections to the methodology by which Labor derived its 7% utilization goal

have no merit.  See Pl. Mot. at 9, 27-28.  First, while it is correct that the Survey did not use the

same definition of "disability" as the new Rule, see Pl. Mot. at 9, 28, as explained above, the

Survey's definition is narrower than the definition found in the Rehabilitation Act and ADA.

Thus, if anything, the 7% utilization goal likely underestimates the percentage of the civilian

labor force comprised of individuals with disabilities (while also taking into account the

discouraged-worker effect).  See also 78 Fed. Reg. at 58,706 (recognizing that the Survey data is

based on a narrower definition of disability than that used by Section 503, but explaining that

this factor does not represent a sufficient reason to eliminate the utilization goal).

Second, Labor has responded to the concerns raised by Plaintiff and others that the

Survey is not divided into industry-specific or geography-specific categories by job groups.  See

Pl. Mot. at 9, 27.  The agency explained that despite its limitations, the Survey represents the best

source of nationwide data relating to individuals with disabilities, and thus represents an

appropriate starting place for developing a utilization goal.  78 Fed. Reg. at 58,704.

---

[14] As noted above, because the Survey definition of "disability" is not as broad as the definition of disability used by
the Rehabilitation Act and the ADA, the 1.7% figure may be underinclusive.  See 78 Fed. Reg. at 58,705 n.28.

Additionally, Labor has recognized that the 7% figure may be less precise than the geographically-specific availability information that federal contractors are familiar with.  Id. at 58,706.  Nevertheless, as the agency has explained, while the utilization goal may not be perfect, it will provide a yardstick against which contractors will be able to measure the effectiveness of their equal employment opportunity efforts.  Id.  Labor intends for the goal to enable contractors to think critically about their employment practices, and to help them assess whether any barriers to equal employment opportunity for individuals with disabilities remain.  Id.  The ability to identify such barriers will assist contractors in taking effective corrective action.  Id.  Additionally, the Rule itself states twice that the goal is not a quota, id. at 58,745, 58,746, and that a failure to satisfy the goal will, in and of itself, neither result in a violation of Section 503 nor a finding of discrimination.  Id. at 58,746.  Moreover, Labor has stressed that the goal is not to be considered either a floor or ceiling for the employment of particular groups.  Id. at 58,683, 58,686, 58,706, 58,707, 58,708, 58,710.  Rather, Labor will examine the totality of a contractor's affirmative-action efforts to determine whether it has complied with its affirmative-action obligations.  Id. at 58,706.

Third, Plaintiff misses the mark when it objects that that the Survey does not purport to determine the number of "qualified" individuals with disabilities.  Pl. Opp. at 9, 10.  As an initial matter, all hiring by contractors must be based on merit; indeed, Labor amended the proposed rule to emphasize that the 7% utilization goal relates to *qualified* individuals with disabilities.  See 78 Fed. Reg. at 58,706.  Moreover, the fact that the Survey does not attempt to determine how many individuals with disabilities are "qualified" is not relevant to the key purposes of the utilization goal: namely, providing a yardstick against which contractors will be able to measure the effectiveness of their equal opportunity efforts, to enable them to think critically about their

employment practices, and to help them to assess whether and where any barriers to equal employment opportunity for individuals with disabilities remain.  See id.  In any event, whether a particular individual is qualified for the job for which he or she is applying depends on the essential functions of that particular job position, and thus no general survey could reasonably be expected to quantify how many identifiable individuals with disabilities are "qualified," in the abstract, for jobs in various industries.  See 41 C.F.R. § 60-741.2(t) (defining "[q]ualified individual with a disability" as "an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position").  Plaintiff's objection thus has no merit.

Fourth, Plaintiff incorrectly contends that no rational basis supports Labor's decision to add 1.7% to its 5.7% estimate of the percentage of the civilian labor force comprised of individuals with a disability.  Pl. Mot. at 9-10, 28.  But as noted above, Labor explained that even if the 5.7% figure represented a complete availability figure for all individuals with disabilities as defined by Section 503 (rather than a likely underestimate, as also explained above), this figure would not take into account the effects of historical discrimination against individuals with disabilities that has suppressed the representation of such individuals in the workforce.  See 78 Fed. Reg. at 58,704.  Specifically, as noted above, Labor observed that more than twenty years after the passage of the ADA, and nearly forty years after the passage of the Rehabilitation Act, a substantial discrepancy remains between the workforce participation and unemployment rates of working-age individuals[15] with and without disabilities.  Id. at 58,706.  Labor explained that

---

[15] The term "working-age individuals" is defined as individuals between the ages of 16 and 64, excluding individuals in the military and people who are in institutions.  78 Fed. Reg. at 58,706 n.29.

these acute disparities exist despite many technological advances that make it possible for a broad array of jobs to be successfully performed by individuals with severe disabilities.  Id.

And as explained above, the agency rationally estimated the size of this "discouraged worker effect" by comparing the percentage of the civilian population with a disability (using the narrower definition of "disability" used by the Survey) who identified as having an occupation to the percentage of the civilian labor force with a disability who identified as having an occupation.  Id. at 58,705.  Contrary to Plaintiff's representation, Pl. Mot. at 10, 28, in calculating this estimate, Labor specifically recognized that "[t]here are undoubtedly some individuals with disabilities who, for a variety of reasons, would not seek employment *even in the absence of employment barriers*."  78 Fed. Reg. at 58,705 (emphasis added).  However, the agency also recognized that in light of the acute disparity in workforce participation rates by individuals with disabilities, as contrasted with individuals without disabilities, it would be reasonable to assume that at least a portion of this disparity is due to a lack of equal opportunity.  Id.  Labor thus sought to take this disparity into account in establishing the utilization goal by including in its calculation a figure representing this "discouraged worker effect."  Id. at 58,706.  Moreover, the agency specifically addressed the commenter who represented that the Bureau reports discouraged workers with disabilities as accounting for only 0.1% of the workforce.  Pl. Opp. at 28; see 78 Fed. Reg. at 58,705, 58,706.  Labor explained that the 1.7% figure it used approximates the number of discouraged workers with disabilities among the universe of individuals with disabilities, whereas the 0.1% represents only the number of discouraged workers with disabilities among the universe of discouraged workers.  Id. at 58,706.

Fifth, Labor reasonably explained its decision not to exempt industries with physically-demanding jobs and safety-sensitive positions from the utilization goal.  Pl. Mot. at 10, 28-29;

see 78 Fed. Reg. at 58,707.  Labor stated that such exemption requests were ultimately based on

a flawed assumption that, taken as a group, individuals with disabilities are not capable of

working in such job positions.  Id.  And without arguing with Plaintiff's statement that the

employment of individuals with disabilities in safety-sensitive jobs can only be evaluated on a

case-by-case basis, Pl. Mot. at 29, the agency does not draw the same conclusion in this regard

that Plaintiff appears to draw, for two reasons.  First, neither Section 503 nor the Rule requires

contractors to hire any individual who cannot perform the essential functions of the job, nor to

hire any individual who poses a direct threat to the health and safety of that individual or other

people.  78 Fed. Reg. at 58,707.  Labor recognizes that some individuals with certain disabilities

may not be able to perform some jobs.  But it does not follow from this premise (and Plaintiff

has not demonstrated) that there is any job that could not be performed by some qualified

individual who happens to possess a disability.  In fact, a review of Survey data will illustrate

that for many occupations in the construction trades, the representation of individuals with

disabilities in the civilian labor force exceeds the 5.7% estimate of the percentage of the overall

civilian labor force comprised of individuals with disabilities.[16]  Second, as explained above, the

utilization goal is not a quota, and a failure to satisfy the goal will not, in and of itself, result in

any violation or enforcement action.  Id.  Thus, Labor reasonably concluded that the utilization

goal requirement will serve as a management tool from which contractors in all industries will be

able to benefit.  Id.

      Sixth, and finally, Labor has repeatedly made clear that the 7% utilization goal does not

represent a rigid and inflexible quota, and that a failure to meet this goal will not, in and of itself,

either result in a violation of Section 503 or the Rule or lead to a fine, penalty, or sanction.  See

---

[16] See U.S. Census Bureau, American Community Survey, *available at* http://www.census.gov/acs/www/; 2008-
2010 Disability Employment Tabulation (Disability Tab), *available at*
http://www.census.gov/people/disabilityemptab/.

78 Fed. Reg. at 58,683, 58,686, 58,706, 58,707, 58,708, 58,710.  Rather, the utilization goal is intended to serve as a management tool to help contractors measure their progress toward achieving equal employment opportunity for individuals with disabilities, and to assess whether barriers to equal employment opportunity remain.  Id. at 58,708.  Indeed, Labor made specific changes to the originally-proposed Rule to underscore this distinction.  For example, for purposes of clarity, and in response to commenters' expressed concern that the goal really was a quota, the agency deleted a sentence from the proposed rule relating to the utilization goal which had stated: "If individuals with disabilities are employed in a job group at a rate less than the utilization goal, the contractor must take specific measures to address this disparity."  See id. at 58,709.  And in response to commenters who claimed that the goal was equivalent to an inflexible quota because a contractor who fails to achieve the goal would be required to take specific measures to address the disparity, Labor amended the proposed rule to clarify that when the goal has not been met in one or more job groups, contractors must "determine whether and where impediments to equal employment opportunity exist."  See id. at 58,708.  But such a determination will be based on reviews that contractors (including construction contractors) are *already required* to perform as part of their annual reviews of their affirmative-action programs.  Id.  It is only if a problem or barrier to equal employment opportunity is identified that contractors must then develop and execute an action-oriented program to address the problem.  Id.  Additionally, contrary to Plaintiff's characterization, Pl. Mot. at 29, the fact that an affirmative-action requirement imposes costs on an employer does not thereby render that requirement an impermissible quota.[17]

---

[17] Nor do the cases cited by Plaintiff advance its argument.  See Pl. Mot. at 29 n.11.  In the portion of MD/DC/DE Broadcasters Ass'n v. FCC, 236 F.3d 13 (D.C. Cir. 2001), cited by Plaintiff, the D.C. Circuit states that in the FCC rule under review, the agency "promises to investigate any [radio or television station] that reports 'few or no' applications from women or minorities" and that "[i]nvestigation by the licensing authority is a powerful threat."  Id.

> **4.     The Job Groupings Required of Construction Contractors in Measuring Progress Against the Utilization Goal Are the Same Job Groupings Already Used by Construction Contractors in Measuring Progress Against Utilization Goals Pertaining to Racial Minorities and Women.**

Section 741.45(d)(2) of the Rule states that in measuring the representation of individuals within each job group in a contractor's workforce, or within the contractor's entire workforce, against the 7% utilization goal, "[t]he contractor must use the same job groups established for utilization analyses under Executive Order 11246, either in accordance with 41 CFR part 60-2, or in accordance with 41 CFR part 60-4, as appropriate." 78 Fed. Reg. at 58,745.  Plaintiff's argument that it is irrational for this provision to apply to construction contractors because construction contractors are not required to use job groups for utilization analyses under Executive Order 11,246 is based on a mistaken premise.  Pl. Mot. at 10, 13.  New Section 741.45(d)(2) specifies that the contractor must use the same job groups established for utilization analyses under the executive order, "either in accordance with 41 CFR part 60-2 [applicable to non-construction contractors], or in accordance with 41 CFR part 60-4 [applicable to construction contractors], as appropriate." 78 Fed. Reg. at 58,745.  Under 41 C.F.R. Part 60-4, the job-group construction goals are applied to each construction trade.  See 41 C.F.R. § 60-4.6 (stating that the utilization goals applicable to construction contractors "shall be applicable to each construction trade in a covered contractor's or subcontractor's entire workforce which is working in the [geographic] area covered by the goals and timetables").  In other words, Section

---

at 19.  Similarly, the FCC rule at issue in Lutheran Church-Missouri Synod v. FCC, 141 F.3d 344 (D.C. Cir. 1998), subjected radio  stations to a government audit if they failed to satisfy certain ratios for the employment of women and minority groups.  Id. at 352-53.   Plaintiff does not claim – nor could it – that Labor has promised to investigate any contractor or subject it to a government audit simply for failing to satisfy the utilization goal.  The quoted sentence from Chamber of Commerce v. U.S. Department of Labor, 174 F.3d 206 (D.C. Cir. 1999), is taken from the Court's discussion of whether an Occupational Safety and Health Administration ("OSHA") directive was a "standard" requiring conditions (and thus subject to immediate review by the D.C. Circuit) or a "regulation" establishing a general enforcement or detection procedure (and thus subject to initial review by a federal district court).  Id. at 209-10.  And contrary to Plaintiff's implication, Chamber of Commerce did not involve any claim that the OSHA directive imposed an impermissible quota.

741.45(d)(2) of the Rule does not require construction contractors to create new "job groups" for purposes of the utilization goal. Rather, construction contractors will simply use the same groupings – the construction trades – that they already use for their utilization analyses required by Labor's regulations implementing Executive Order 11,246.[18] Thus, Plaintiff is simply mistaken that this provision will require construction contractors to create new job groups that do not presently exist.

> **5.  Plaintiff Overstates the Novelty of a Provision Containing an Employment Utilization Goal in Regulations Implementing an Affirmative-Action Mandate That Applies to Construction Contractors.**

Finally, Plaintiff overstates the novelty of an employment utilization goal provision in an affirmative-action program that applies to construction contractors. In fact, to comply with Labor's regulations implementing Executive Order 11,246, construction contractors must demonstrate good faith efforts to meet affirmative action goals for the employment of women and racial minorities. 41 C.F.R. § 60-4.2(d)(2) ("The Contractor's compliance with the Executive Order and the regulations in 41 CFR Part 60-4 shall be based on [inter alia], its efforts to meet the goals. . . . Compliance with the goals will be measured against the total work hours performed."). Labor has established utilization goals based on civilian labor force participation rates in each construction trade on all construction work performed in specific geographic areas. Id. § 60-4.6. To be in compliance with these requirements, construction contractors must document their good-faith efforts to follow the requirements of the equal-employment opportunity clause found in all federal construction contracts. See id. § 60-4.3(a). The

---

[18] Additionally, as with the utilization goals applicable to construction contractors under Labor's regulations implementing Executive Order 11,246, which are expressed as percentages of the total hours of employment and training of minority and female utilization that contractors are reasonably expected to be able to achieve, see 41 C.F.R. § 60-4.3(a).4, the utilization goals applicable to construction contractors under the Rule will be expressed as percentages of the total hours of employment and training of individuals-with-disabilities utilization, rather than as numbers of employees in the contractors' workforces.

Executive Order 11,246 regulations enumerate sixteen good faith steps that covered contractors must take to increase the utilization of racial minorities and women in the skilled trades.  Id. § 60-4.3(a).7.a-p.

These affirmative-action requirements involving workforce utilization goals in Labor's regulations implementing Executive Order 11,246 operate very similarly to the utilization goal in Labor's new Rule implementing Section 503's affirmative-action mandate.  In both instances, Labor provides the specific goal so that the contractor does not need to perform a utilization analysis to determine whether to adopt a goal and, if so, which specific goal to adopt.  And in both instances, construction contractors apply the goal to each of their skilled trades in the geographic area based on participation rates.

In sum, Labor has articulated a rational connection between the factual findings it made and its decision to include an employment utilization goal in its new Rule implementing Section 503(a)'s affirmative action mandate.

### B. Labor's Use of Data Analysis and Data Collection in the New Rule Is Rational.

#### 1. Because Labor Has Not Traditionally Exempted Construction Contractors from Otherwise-Applicable Affirmative Action Requirements Under Its Regulations Implementing Section 503(a), Not Exempting Construction Contractors from Data Collection and Utilization Analysis Requirements Is Not a Reversal in Policy.

Plaintiff incorrectly contends that by requiring construction contractors to utilize data collection and analysis to satisfy Section 503's affirmative-action mandate, Labor has made a reversal in policy.  As Labor has explained in the Final Rule: "Traditionally, construction and transportation contractors who meet the basic coverage thresholds. . . of section 503 have not been exempted from any of its provisions."  78 Fed. Reg. at 58,701.  Thus, Labor reasonably

43

decided not to exempt construction contractors from the provisions of the new Rule utilizing data collection and analysis that apply to all covered federal contractors.  And as explained above, see supra II.A.1, the mere fact that, to date, Labor's regulations implementing Section 503's affirmative-action mandate have not included a measure such as the specific data collection and analysis required by the new Rule does not somehow deprive the agency of the regulatory authority to include such a measure now.  Plaintiff is thus mistaken that new provisions in a regulation are tantamount to a reversal of agency policy.

Moreover, Plaintiff exaggerates the novelty of a requirement that construction contractors perform data collection and utilization analyses as part of an affirmative-action mandate.  First, *all* federal contractors have at least the following obligations relating to data collection and analysis: (1) filing an annual EEO-1 Job Report,[19] 41 C.F.R. § 60-1.7(a); (2) retaining all personnel or employment records "pertaining to hiring" for a period of two years,[20] in such a manner that for each record, the contractor must be able to identify the gender, race, and ethnicity of each employee (and, where possible, of each job applicant), id. § 60-1.12(a), (c); (3) maintaining records pursuant to the Uniform Guidelines on Employee Selection Procedures, 41 C.F.R. Part 60-3, disclosing the impact which the contractor's selection procedures have on the employment opportunities of persons by identifiable race, sex, or ethnic group, id. § 60-3.4; and (4) evaluating the components of selection processes if the overall process has an adverse impact on such persons, id.

Second, construction contractors already must perform certain data collection and monitoring of their compliance with the requirements of 41 C.F.R. Part 60-4 in order to comply

---

[19] See infra at 34 n.13.

[20] Contractors with fewer than 150 employees or a government contract of less than $150,000 must retain these records for at least one year.  Id. § 60-1.12(a), (c).

with Labor's Executive Order 11,246 regulations that apply specifically to construction

contractors.  See 41 C.F.R. § 60-1.40(b) ("Construction contractors should refer to [41 C.F.R.]

part 60-4 for specific affirmative action requirements.").[21]  As noted above, see supra II.A.5, to

be in compliance with these requirements, construction contractors must "document . . . fully"

their implementation of sixteen affirmative action steps.  See id. § 60-4.3(a).7.  Among the data

that construction contractors must collect and maintain are current lists of minority and female

recruitment sources and a record of these organizations' responses to notifications of

employment opportunities, id. § 60-4.3(a)7.a; current files of identifying information of certain

minority and female applicants and referrals for employment, id. § 60-4.3(a)7.c; and

documentation of annual inventories and evaluations at least of all minority and female

personnel for promotional opportunities and encouragement to seek or to prepare for such

opportunities, id. § 60-4.3(a)7.l.

Finally, Plaintiff's discussion of Labor's Executive Order 11,246 regulations relating to

written affirmative-action programs is simply beside the point because Labor's current

regulations implementing *Section 503(a)* already require federal contractors – including

construction contractors – to develop written affirmative-action programs.  See 41 C.F.R. § 60-

741.40-44 (requiring *all* federal contractors that have 50 or more employees and a contract of

$50,000 or more to develop written affirmative-action programs); see also supra at Background,

§ II (listing required contents of these written affirmative action programs) (citing 41 C.F.R. §

60-741.44).

In short, the new Rule implements Section 503's affirmative-action mandate by requiring

certain data collection and utilization analysis on the part of all federal contractors.  Labor's

---

[21] These requirements apply regardless of the number of the construction contractor's employees as long as the
federal contract awarded is more than $10,000.  See 41 C.F.R. § 60-4.1.

decision not to exempt construction contractors from otherwise-applicable provisions of Labor's Rule implementing Section 503's affirmative-action mandate is consistent with the fact that Labor has not exempted construction contractors from its existing rules implementing Section 503. Thus, Plaintiff errs in its contention that requiring construction contractors to undertake data collection and utilization analysis in complying with Section 503's affirmative-action mandate represents a reversal of policy by the agency.[22]

## 2. Labor Rationally Required Federal Contractors to Use Data Collection and Analysis.

The Final Rule also adequately explains the reasons for requiring data collection and utilization analysis of covered federal contractors. Labor explained that "existing regulations implementing section 503 do not provide contractors with adequate tools to assess whether they are complying with their nondiscrimination and affirmative action obligations to recruit and employ qualified individuals with disabilities." 78 Fed. Reg. at 58,683. Specifically, "no

---

[22] In any event, even if the agency were somehow deemed to have moved away from a prior interpretation of its governing statute, the Supreme Court has recently reiterated that the APA does not prohibit an agency from adopting a new regulation or interpretation of its governing statute that differs from a previous interpretation. "We find no basis in the Administrative Procedure Act or in our opinions for a requirement that all agency change be subjected to more searching review." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 514 (2009); see also id. at 515 (agency must show that its rule change "is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better"); id. at 536 (Kennedy, J., concurring) ("The question in each case is whether the agency's reasons for the change . . . . suffice to demonstrate that the new policy rests upon principles that are rational, neutral, and in accord with the agency's proper understanding of its authority.").

To be sure, Justice Kennedy's concurring opinion in Fox Television indicated that "an agency's decision to change course may be arbitrary and capricious if the agency ignores or countermands its earlier factual findings without reasoned explanation for doing so." Id. at 537 (Kennedy, J., concurring). But the concurrence bases that principle on State Farm, where an agency reversed course without even mentioning its earlier factual findings. Id. at 537-38. Nothing in the concurrence suggests that the "reasoned explanation" an agency offers should be subject to more exacting judicial review than the arbitrary and capricious standard applied in State Farm itself and numerous other cases. See id. at 538 (upholding agency action because "[t]he present case does not raise the concerns addressed in State Farm."). Nor has the D.C. Circuit treated Justice Kennedy's concurrence in Fox Television as imposing any special burden on agency action. See Air Transport Ass'n v. Nat'l Mediation Bd., 663 F.3d 476, 484 (D.C. Cir. 2011) (Fox "held that the APA allows an agency to adopt an interpretation of its governing statute that differs from a previous interpretation and that such a change is subject to no heightened judicial scrutiny"); Nat'l Cable & Telecomm. Ass'n v. FCC, 567 F.3d 659, 669 (D.C. Cir. 2009) ("In other words, the existence of contrary agency precedent gives us no more power than usual to question the Commission's substantive determinations."); Westar Energy, Inc. v. FERC, 568 F.3d 985, 989 (D.C. Cir. 2009) (change in agency policy "require[s] no additional or special explanation."). "Thus, for purposes of APA review, the fact that the new rule reflects a change in policy matters not at all." Air Transport Ass'n, 663 F.3d at 484.

structured data regarding the number of individuals with disabilities who are referred for or apply for jobs with Federal contractors is currently maintained." Id. at 58,701. In turn, this absence of data "makes it nearly impossible for the contractor and [Labor] to perform even rudimentary evaluations of the availability of individuals with disabilities in the workforce, or to make any sort of objective, data-based assessments of how effective contractor outreach and recruitment efforts have been in attracting individuals with disabilities as candidates." Id. Thus, Labor reasonably concluded that requiring contractors to "maintain several quantitative measurements and comparisons for the number of individuals with disabilities who apply for jobs and the number of individuals with disabilities they hire" will address this problem, "enabl[ing] contractors and [Labor] to evaluate the effectiveness of contractors' outreach and recruitment efforts, and examine hiring and selection processes related to individuals with disabilities." Id. at 58,683.

Because Labor has adequately explained the rationality of requiring covered federal contractors to undertake such data collection and utilization analysis, it has satisfied its burden under the APA.

**C.      Plaintiff Has Otherwise Failed to Demonstrate That the Labor Rule Is Arbitrary and Capricious.**

**1.      Labor Has Adequately Explained Its Rationale for Requiring Contractors to Invite Employment Applicants to Voluntarily Self-Identify as Individuals with a Disability.**

One provision of the Rule requires contractors to invite all employment applicants to voluntarily self-identify as individuals with disabilities whenever the applicant applies for or is considered for employment. 78 Fed. Reg. at 58,742. The primary purpose of this requirement is to collect important data relating to the participation of individuals with disabilities in the contractor's applicant pools and workforces. Id. at 58,691. In turn, this data is expected to

enable the contractor and Labor to better monitor and evaluate the contractor's hiring and

selection practices with respect to individuals with disabilities.  Id.  Moreover, Labor concluded

that data related to the pre-offer stage of the employment process will be particularly helpful

because it will provide the contractor and Labor with valuable information pertaining to the

number of individuals with disabilities who apply for job positions with contractors.  Id.  And

Labor reasoned that such information will assist Labor and the contractor in assessing the

effectiveness of the contractor's recruiting efforts over time, and in refining and improving the

contractor's recruitment strategies, where necessary.  Id.

Plaintiff errs in contending that this data will not be meaningful because without a case-

by-case analysis of each applicant's alleged disability and the job to which he or she is applying,

the contractor and Labor will be unable to determine whether the applicant is qualified to

perform a particular job position.  Pl. Mot. at 7.  Determining whether applicants are qualified is

not the purpose of the data to be collected under this provision.  Rather, its purpose is to supply

the contractor and Labor with the ability to determine the effectiveness of the outreach and

recruitment strategies with respect to individuals with disabilities.  Thus, Plaintiff's objection is

based on a misunderstanding of the purpose underlying this provision.

> **2.**     **Labor Reasonably Expects That Construction Contractors Will
> Be Able to Comply with the Same General Requirements to
> Preserve Data Related to the Hiring and Employment of
> Individuals with Disabilities Generally Applicable to Other Federal
> Contractors.**

It is reasonable to expect construction contractors to comply with general requirements of

maintaining data regarding hiring and employment data related to individuals with disabilities.

Indeed, like other federal contractors, construction contractors are already required to retain (for

at least two years) records pertaining to hiring, assignment, promotion, demotion, transfer,

layoffs, termination, rates of pay, or other terms of compensation.  See 41 C.F.R. § 60-1.12(a).[23]
And federal contractors must also maintain any "other records having to do with requests for
reasonable accommodation."  Id.  Moreover, for all such records, the contractor must be able to
identify the gender, race, and ethnicity of each employee and (where possible) the gender, race,
and ethnicity of each job applicant.  Id. § 60-1.12(c)(1).  Thus, federal contractors must already
have in place particular systems and personnel to retain such employment-related records in
order to comply with their obligations under Executive Order 11,246.[24]  Moreover,
individualized hiring decisions, see Pl. Mot. at 12-13, 26, are not unique to the construction
industry.  Decisions in the nature of those involving which applicants are qualified for job
positions are made all the time by employers across the range of those covered by these
regulations.

*       *       *       *       *       *       *

In sum, Plaintiff has failed to demonstrate that in issuing the Rule, Labor acted in an
arbitrary and capricious manner.

## III.    Labor Has Fully Complied with the Regulatory Flexibility Act.

The third count of Plaintiff's Complaint alleges that Labor failed to comply with the
Regulatory Flexibility Act, 5 U.S.C. §§ 601 et seq. ("RFA"), by failing to adequately consider

---

[23] Federal contractors with fewer than 150 employees or a government contract of less than $150,000 must retain
these records for at least one year.  Id. § 60-1.12(a), (c).

[24] Moreover, contrary to Plaintiff's representation, 15 U.S.C. § 637(d) does not require small businesses to be given
preference in the award of government contracts without being subject to the same requirements that apply to larger
businesses.  See Pl. Mot. at 13-14.  Rather, Section 637(d) states that it is the policy of the United States that small
business concerns "shall have the maximum practicable opportunity to participate" in the performance of federal
contracts.  It does not provide that small businesses should be exempted from otherwise-applicable regulatory
requirements.  In any event, because Section 637(d) does not require Labor to perform the specific, discrete action
that Plaintiff contends the agency should have taken,  it cannot form the basis of an APA claim for failure to act.
See Norton v. Southern Utah Wilderness Alliance ("SUWA"), 542 U.S. 55, 63-67 (2004).

the economic burden of the Rule on construction contractors.  Compl. ¶¶ 53-54.  This claim lacks

merit and should be dismissed.

The RFA provides, in relevant part: "When an agency promulgates a final rule under [5

U.S.C. § 553], after being required by that section or any other law to publish a general notice of

proposed rulemaking, . . . the agency shall prepare a final regulatory flexibility analysis."  5

U.S.C. § 604(a).  The analysis must include a description and estimate of the "number of small

entities to which the rule will apply or an explanation of why no such estimate is available" and

"a description of the steps the agency has taken to minimize the significant economic impact on

small entities. . . ."  Id. § 604(a)(4) & (6).  If, however, the "head of the agency certifies that the

rule will not . . . have a significant economic impact on a substantial number of small entities,"

then no final regulatory flexibility analysis need be published.  Id. § 605(b); see, e.g., Nat'l Tel.

Co-op. Ass'n v. FCC, 563 F.3d 536, 540 (D.C. Cir. 2009).  Here, Labor issued the required

certification at the time the Rule was published.  See 78 Fed. Reg. at 58,727-28.

As the D.C. Circuit has conclusively held:

> [T]he Act's requirements are "[p]urely procedural."  U.S. Cellular Corp. v. FCC, 254
> F.3d 78, 88 (D.C. Cir. 2001); see also Aeronautical Repair Station  Ass'n, Inc. v. FAA,
> 494 F.3d 161, 178 (D.C. Cir. 2007) ("The RFA is a  procedural statute setting out precise,
> specific steps an agency must take.").  Though it directs agencies to state, summarize, and
> describe, the Act in and of itself imposes no substantive constraint on agency
> decisionmaking.  In effect, therefore, the Act requires agencies to publish analyses that
> address certain legally delineated topics.  Because the analysis at issue here undoubtedly
> addressed all of the legally mandated subject areas, it complies with the Act.  Cf. U.S.
> Cellular Corp., 254 F.3d at 88–89 ("Petitioners dispute neither that the Commission
> included a FRFA [final regulatory flexibility analysis] . . . nor that this statement
> addresses all subjects required by the RFA.").

Nat'l Tel. Co-op. Ass'n, 563 F.3d at 540.  Although National Telephone Co-op Association

arose under Section 604 of the statute which requires a fairly full-blown analysis, while in the

present case only a minimal statement was required because of Labor's conclusion that the Rule

would have no significant impact on a substantial number of small entities, the fact remains that Labor complied with the procedural requirements of the Act. Under National Telephone Co-op Association, that is enough to warrant dismissal of this claim. See also Nat'l Restaurant Ass'n v. Solis, 870 F. Supp. 2d 42, 60 (D.D.C. 2012) ("Here, [Labor] complied with the requirements of the RFA when it concluded that no regulatory flexibility analysis was necessary because the rule would not have an impact on a substantial number of small entities.").

And in any event, Labor's determination that the Rule would not have a significant economic impact on a substantial number of small entities was reasonable, and should be upheld by this Court under the "highly deferential" review standard under the RFA, "'particularly with regard to an agency's predictive judgments about the likely economic effects of a rule.'" Helicopter Ass'n Int'l, Inc. v. Fed. Aviation Auth., 722 F.3d 430, 438 (D.C. Cir. 2013) (quoting Nat'l Tel. Co-op. Ass'n, 563 F.3d at 541). Labor began by estimating that approximately 44% of the total number of federal contractors are small entities with between 50 and 500 employees. 78 Fed. Reg. at 58,727. The agency then considered the financial effect of compliance with the Rule on two different sets of contractors: those with 50 to 100 employees and those with 100 to 500 employees. Id.[25]

As to contractors with 50 to 100 employees, Labor estimated the first-year cost of compliance with the Rule, which is the year with the highest compliance costs because the contractor will be incurring the start-up costs of compliance. Id. Labor estimated the number of hours that contractors would spend conducting data analysis and utilization analysis, and having a manager review the Rule's new requirements. Id. at 58,728. To this estimate, Labor added the estimated costs of printing pre-offer invitations to applicants to self-identify as individuals with

_____

[25] Contractors with less than 50 employees are not subject to the new affirmative-action requirements of the Rule. See 78 Fed. Reg. at 58,727.

disabilities, and of providing reasonable accommodations to at least five newly-hired individuals with disabilities.  Id.  Adding these figures together, Labor estimated the total first-year compliance costs for contractors with 50 to 100 employees to be approximately $3318 per business entity.  Id. at 58,727, 58,728.   Using data from the Small Business Administration, Labor determined that entities with 50 to 100 employees average yearly receipts of approximately $14 million per year.  Id. at 58,728.  Comparing these average receipts with the estimated first-year compliance costs, Labor determined that the Rule would not result in a significant economic impact on contractors with 50 to 100 employees because the compliance cost equated to 0.02 percent of the average value of receipts for these entities.  Id.

Labor performed a similar economic analysis with respect to contractors with 100 to 500 employees.  78 Fed. Reg. at 58,728.  Adding together the estimated cost of hours spent in complying with the Rule's requirements with the costs of printing pre-offer invitations, providing reasonable accommodations to at least five newly-hired individuals with disabilities, and modifying human resources information systems, Labor estimated the total first-year compliance costs for contractors with 100 to 500 employees to be $5197 per business entity.  Id. Using Small Business Administration data, Labor determined that entities with 100 to 500 employees average yearly receipts of approximately $43.5 million.  Id.  Comparing these average receipts with the estimated first-year compliance costs, Labor determined that the Rule would not result in a significant economic impact on contractors with 100 to 500 employees because the compliance cost equated to 0.01 percent of the average value of receipts for these entities.  Id.

In light of these efforts, Plaintiff's arguments that Labor has not complied with the RFA are not persuasive.  First, as noted previously, Plaintiff is simply incorrect in its contention that federal contractors are not already required to have in place particular systems and personnel to

retain employment-related records, and to be able to identify particular characteristics of each employee (and where possible, each job applicant) in these records.  See supra II.C.2.  Moreover, the case law cited by Plaintiff in support of its claim is not persuasive.  See Pl. Mot. at 31.  North Carolina Fisheries Association, Inc. v. Daley, 27 F. Supp. 2d 650 (E.D. Va. 1998), is an out-of-Circuit district court decision issued long before the conclusive holding of the D.C. Circuit in National Telephone Co-op Association, and cannot overcome that holding.  Additionally, contrary to Plaintiff's contention, the D.C. Circuit has recently made clear that judicial review under the RFA is "highly deferential, particularly with regard to an agency's predictive judgments about the likely economic effects of a rule."  Helicopter Ass'n, 722 F.3d at 438 (citation and internal punctuation omitted).  Finally, Thompson v. Clark, 741 F.2d 401 (D.C. Cir. 1984), interpreted language in a provision of the RFA that Congress removed in 1996, and its holding has thus been superseded.  See id. at 404-08 (interpreting pre-1996 version of 5 U.S.C. § 611); Pub. L. No. 104-121, Title II, § 242, 110 Stat. 847, 865 (1996) (amending Section 611). Finally, as explained above, 15 U.S.C. § 637(d) simply makes clear the policy of the United States that small business concerns shall have the maximum practicable opportunity to participate in federal contracts.  See supra at 49 n. 24.  Because that statute does not require Labor to perform the specific, discrete action that Plaintiff contends the agency should have taken, it cannot form the basis of an APA claim for failure to act.  See SUWA, 542 U.S. at 63-67.

Because the RFA is a procedural statute, as long as an agency complies with the Act by taking the procedural steps required under that Act, a plaintiff cannot obtain relief for a violation. And in any event, Labor's predictive judgments that the Rule will not have a significant economic impact on a substantial number of small entities are reasonable, and should be upheld by this Court.  Count III of Plaintiff's Complaint should therefore be dismissed.

## CONCLUSION

For the reasons stated herein, the Court should dismiss this case or grant Defendants'

motion for summary judgment, and should deny Plaintiff's motion for summary judgment.

Dated: December 20, 2013                       Respectfully submitted,



                                               STUART F. DELERY
                                               Assistant Attorney General

                                               RONALD C. MACHEN, JR.
                                               United States Attorney

                                               JUDRY L. SUBAR
                                               Assistant Branch Director (DC Bar #347518)

                                               */s/ Daniel Riess*
                                               DANIEL RIESS (Texas Bar # 24037359)
                                               United States Department of Justice
                                               Civil Division, Federal Programs Branch
                                               20 Massachusetts Ave., N.W.
                                               Washington, D.C. 20530
                                               202-353-3098
                                               Daniel.Riess@usdoj.gov

                                               *Attorneys for Defendants*

54