## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| ASSOCIATED BUILDERS AND | ) | |
| CONTRACTORS, INC. | ) | |
|  | ) | **Case No. 1:13-cv-01806-EGS** |
| Plaintiff, | ) | |
|  | ) | |
| v. | ) | |
|  | ) | |
| PATRICIA A. SHIU, et. al | ) | |
|  | ) | |
| Defendants. | ) | |
|  | ) | |
|  | ) | |
|  | ) | |
| _____ | ) | |

## BRIEF OF *AMICUS CURIAE* HR POLICY ASSOCIATION
## IN SUPPORT OF PLAINTIFF

Pursuant to the concurrently filed Motion for Leave to File *Amicus Curiae* Brief, HR Policy Association ("HR Policy" or "Association") respectfully submits this brief in support of Plaintiff, Associated Builders and Contractors, Inc.'s ("ABC"), motion for summary judgment (Doc. 8) and memorandum in support of the same (Doc. 9).

### I.     INTRODUCTION

The U.S. Department of Labor's ("DOL") Office of Federal Contract Compliance Programs' ("OFCCP") final Section 503 Regulations,[1] published in the Federal Register on September 24, 2013, and scheduled to become effective March 24, 2014, should be enjoined and vacated because these new regulations create an arbitrary and unsupportable "goal" which will

---

[1] 78 Fed. Reg. 58682 et. seq. (Sept. 24, 2013).  The regulations entitled, "Affirmative Action and Nondiscrimination Obligations of Contractors and Subcontractors Regarding Individuals With Disabilities" are promulgated under Section 503 of the Rehabilitation Act of 1973.

result in unlawful quotas in hiring and other personnel decisions and require federal contractors to violate the Americans with Disabilities Act ("ADA").

The OFCCP affirmative action and non-discrimination regulations apply to all of a federal contractor's operations, not just those operations performing work under federal contracts, even if a relatively miniscule percentage of the company's workforce is engaged in that work. As a result, OFCCP's regulations and enforcement efforts govern a significant portion of the U.S. jobs and workplaces. OFCCP estimates that the number of regulated contractor establishments is 251,300 (employing one-fifth of the entire U.S. labor force, or 26.6 million American workers), although there are arguments that this number is higher.[2]

The new Section 503 regulations contain an arbitrary "goal" that seven percent of *every* job group in *each* establishment of a contractors' workforce be composed of individuals with disabilities.[3] This "goal" has no basis in fact, as OFCCP has admitted. To provide the basis for determining whether this goal is being met, federal contractors will be required to engage in significant data collection relating to their workforce selection and retention decisions, including asking every applicant for employment, at the pre-offer stage, whether the applicant *believes* that he or she has a disability.[4]

Because the Section 503 regulations include (i) an arbitrary goal of seven percent for individuals with disabilities in each job group and (ii) the "goal" will be enforced by OFCCP by imposing additional obligations on those federal contractors that fail to employ the required number of disabled individuals, the numerical requirement will operate as an unlawful quota that must be achieved in order that federal contractors can avoid enforcement proceedings by the

---

[2] 78 Fed. Reg. at 58714 (2013). Federal contractors estimate that the number of affected establishments was at least 10 percent greater.

[3] 78 Fed. Reg. at 58745 (2013). Smaller federal contractors, with a workforce of 100 or fewer employees, can have a goal of seven percent of their entire workforce instead of a goal for each job group. 78 Fed. Reg. at 58745 (2013).

[4] 78 Fed. Reg. at 58742 (2013).

OFCCP.  The Section 503 regulations should be enjoined so that federal contractors in radically

different industries with totally job skill requirements are not subject to inflexible, arbitrary, and

capricious quota requirements in making workforce hiring and selection decisions, requirements

that are not in accordance with applicable law.

Additionally, the solicitation of pre-offer information about applicants' disability status

violates employers' obligations under the ADA,[5] which explicitly prohibits employers from

making inquiries about disabilities at the pre-employment stage.  The avoidance of a conflict

with the statutory prohibitions in the ADA provides an additional, independent basis for

enjoining the Section 503 regulations.

### A.  The Amicus Party, HR Policy Association

HR Policy Association is the lead public organization of chief human resource officers of

major employers.  The Association consists of more than 350 of the largest corporations doing

business in the U.S. and globally, and these employers are represented in the organization by

their most senior human resource executive.  Collectively, Association member companies

employ more than 10 million employees in the U.S., nearly nine percent of the private sector

workforce, and 20 million employees worldwide.  They have a combined market capitalization

of more than $7.5 trillion.  Most HR Policy member companies are federal contractors and are

subject to OFCCP regulations.  HR Policy and its members strongly support affirmative action,

including the goal of hiring qualified individuals with disabilities into the workforces of

government contractors.  Indeed, HR Policy members have been at the forefront of employer

efforts to adopt and expand the basic principles of fundamental fairness and a "level playing

field" for all applicants and employees.  At every stage in the long history of affirmative action,

HR Policy members have been leaders in achieving the goals of affirmative action by recruiting

---

[5] 42 U.S.C. § 12112 (d)(2).

and hiring people on a non-discriminatory basis without regard to membership in any protected group.

HR Policy shares many of the same concerns presented by ABC in this matter and believes those as well as the additional concerns discussed here provide this Court with the bases to enjoin the OFCCP from enforcing the unlawful regulatory provisions discussed herein against the federal contractor community.

## II.    ARGUMENT

### A.  The Unsubstantiated Goal of Seven Percent of Applicants to Be Hired and Persons to be Employed Is Arbitrary and Capricious and an Improper Exercise of the OFCCP's Rulemaking Authority

The Association agrees with the general goal of the Section 503 regulations of advancing career opportunities for individuals with disabilities.  However, the OFCCP's creation of a specific numerical goal of seven percent for the utilization of individuals with disabilities by federal contractors throughout their workforce is arbitrary and capricious.

At the core of the Section 503 regulations is the establishment of an "aspirational" utilization goal for people with disabilities of seven percent for *each* of a federal contractor's job groups.[6]  This single, undifferentiated, numerical goal applies not just to applicants but to all federal contractors' entire workforces, regardless of the particular needs and singular realties of the different industries involved, effectively occupying every job level and every personnel action federal contractors makes.

Plaintiff, ABC, has already articulated the illicit manner in which OFCCP has exceeded its statutory authority in setting such an expansive utilization "goal."  Doc. 9 at 6.[7]  However, it is crucial to note, as well, that OFCCP repeatedly states that there is no reliable data regarding

---

[6] 78 Fed. Reg. at 58685 (2013).
[7] *See also, Catawba Cnty. v. EPA,* 571 F.3d 20, 36-38 (D.C. Cir. 2009) (discretion does not entitle agency to arrogate to itself purposes outside statutory provision it is applying).

the number of disabled people available for any position in any locality.  As was held in

*American Petroleum Institute v. Environmental Protection Agency,* 706 F. 3d 474, 476 (D.C. Cir.

2013), the combined lack of statutory authority and an admitted failure to "take [a] neutral aim at

accuracy" creates "an unreasonable exercise of agency discretion."

The EEOC, the OFCCP's sister agency responsible for enforcing the ADA, found in

2011 that  "[b]ased on the available data, it is impossible to determine with precision how many

individuals have impairments that will meet the current definition of substantially limiting a

major life activity or a record thereof."[8]  Echoing the early assessments of the EEOC, OFCCP

states in the final Section 503 regulation:

> After careful consideration of the available data and
> consultation with the U.S. Census Bureau regarding the
> level of geographic aggregation at which the disability data
> could be analyzed, OFCCP became convinced that
> replicating the supply and service goals framework would
> not be the most effective approach for the establishment of
> goals for individuals with disabilities.[9]

OFCCP goes on to state that federal contractors "would not be able to use the job groups

established under Executive Order 11246 to establish goals for individuals with disabilities, and

would often be unable to utilize the geographic recruitment areas established under the Executive

Order when determining the availability of individuals with disabilities . . . ."[10]  Despite these

acknowledged limitations and deficits and the total lack of reliable data, in the final rule, OFCCP

nonetheless arbitrarily imposes a national "goal" of seven percent on each of the job groups

established under Executive Order 11246 for each local establishment.  Thus, a contractor must

meet this "goal," with respect to all levels of jobs and personnel actions without regard to the

actual number of individuals with disabilities in the local labor force.  This is the very definition

---

[8] 76 Fed. Reg. at 16990 (March 25, 2011).
[9] 78 Fed. Reg. at 58704 (2013) .
[10] 78 Fed. Reg. at 58704 (2013).

of arbitrary: compelled adherence to an unsubstantiated, fictitious standard.  *See Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983) (agency's action may be set aside if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." (citations omitted)).

Further, the census data derived from the American Community Survey ("ACS"), which serves as a source for the OFCCP "goal," are based on standards so fundamentally different from those prescribed by the statutes prohibiting discrimination in employment on the basis of disability—Section 503 of the Rehabilitation Act that OFCCP enforces and the Americans with Disabilities Act, as amended—that the ACS data provides no useful information at all for evaluating federal contractors' compliance with Section 503.[11]

Finally, the self-identification responses to the ACS are unverified.  Thus, among other things, the medical conditions or personal difficulties of the applicants may have nothing to do with a disability, or the conditions may be temporary and may be cured and, therefore, are not subject to the statutory protections.  Moreover, OFCCP seeks to expand upon the ACS data to arrive at the seven percent goal by using a questionable procedure of converting unsubstantiated estimates about "discouraged" workers.[12]

At a minimum, to justify the seven percent standard, OFCCP must "articulate a satisfactory explanation for its action including a rational connection between the facts found and

---

[11] 78 Fed. Reg. at 58703 - 58706 (2013).  The ACS questions were:
> Is this person deaf or does he/she have serious difficulty hearing?
> Is this person blind or does he/she have serious difficulty seeing even when wearing glasses?
> Because of a physical, mental, or emotional condition, does this person have serious difficulty concentrating, remembering, or making decisions?
> Does this person have serious difficulty walking or climbing stairs?
> Does this person have difficulty dressing or bathing?
> Because of a physical, mental, or emotional condition, does this person have difficulty doing errands alone such as visiting a doctor's office or shopping?

The OFCCP recognizes the fundamental differences between the ACS data and the relevant statutes in its final rule where they point out "[t]he definition of disability used by the ACS, however, is clearly not as broad as that of the Rehabilitation Act and the ADA." 78 Fed. Reg. at 58703 (2013).

[12] 78 Fed. Reg. at 58704-58705 (2013).

the choice made." *Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43 (1983) (citations omitted).  Indeed, such an explanation, based on such a rational connection is expressly eschewed by OFCCP.  The agency's methodology serves no purpose other than to emphasize the utterly arbitrary nature of the seven percent goal.  The fictitious "goal" is wholly removed from the practical requirements it imposes.  The fictitious "goal" raises profound doubts as to the ability of the most willing contractors to even find an adequate pool of individuals with disabilities with the skills and talents needed for each of their job groups.  In fact, in a poll of its members, HR Policy learned that 80 percent of the companies who reported they were a federal contractor responded that the OFCCP's proposed goal of having seven percent of all employees in each of company's job groups be persons with disabilities would be "virtually impossible" to achieve.  Accordingly, because the OFCCP has flagrantly ignored its obligation to use a neutral, reliable methodology or to provide a rational explanation, the seven percent utilization requirements in the Section 503 regulation should be vacated and enjoined.

Although OFCCP attempts to minimize concerns over its arbitrary "goal" by referring to it as "a yardstick . . . to measure the effectiveness of . . . equal employment opportunity efforts,"[13] nothing OFCCP says alters the irremediable fact that the "goal" is an ***arbitrary and capricious*** "yardstick."  Further, denominating the "goal" as merely "aspirational," serves no purpose other than to emphasize the fictional nature of the seven percent figure.  As was noted in *American Petroleum Institute, supra,* "an outcome neutral methodology" should be adopted "over an aspirational one."[14]  The agency's admission that its concocted seven percent goal is simply aspirational provides a legally sufficient basis for vacating that provision in the Section 503 regulations.

---

[13] 78 Fed. Reg. at 58706 (2013).
[14] 706 F.3d at 480.

OFCCP protestations notwithstanding, the seven percent "goal" is a rigid and inflexible national quota arbitrarily applied to local labor markets for federal contractors.  Although the enforcement of the seven percent standard clarifies how the arbitrary "goal" is a quota, how OFCCP chooses to enforce this arbitrary goal is, perhaps, secondary.  *Ab initio* and regardless of the nature of OFCCP enforcement, the seven percent "goal" is an arbitrary and capricious standard, with no basis in OFCCP's statutory authority or in the factual record.  Yet, this "goal" has extensive, foreseeable but unjustified ramifications throughout a federal contractor's workforce with respect to all employment decisions, from hiring to promotions.  The seven percent "goal" requirements of the Section 503 regulations should therefore be enjoined.

### B.  OFCCP's Section 503 Regulations Establish an Unlawful Quota

As noted, the Association agrees with the goal of the Section 503 regulations of advancing career opportunities for individuals with disabilities.  Nonetheless, the Association maintains that the OFCCP's creation of a seven percent "goal" for the employment and advancement of individuals with disabilities in practice will operate as a numerical target that results in an illegal quota applied at every level of a federal contractor's workforce.

The final rule requires that federal contractors shape their workforces in light of the "goal" of reaching certain numerical requirements, that seven percent of all persons in each of the company's job groups, at each establishment, will be individuals with disabilities.[15]

As noted above, in the final rule, the OFCCP sought to assuage employers' quota concerns by asserting that the "goal" is not a hard and fast quota, rather that it is "aspirational."[16] It is understandable why the OFCCP would want to purport that the goal is not a quota—there is no legal authority under Section 503 of the Rehabilitation Act permitting the federal government

---

[15] 78 Fed. Reg. at 58745 (2013).
[16] 78 Fed. Reg. at 58685 (2013).

to set numerical employment requirements.[17]  Moreover, affirmative action requirements which operate as quotas are generally unlawful and subject to the highest level of judicial scrutiny.[18]

As has been settled law for decades, threats of enforcement, threats of increased government oversight, threats of increased recordkeeping and threats of heightened monitoring combine to pressure federal contractors to seek proportional representation among all job groups within an entire workforce, that is, to meet a quota. And such coercive conduct has been uniformly found to be illicit.[19]  Notwithstanding the OFCCP's self-serving conclusions, it is clear that the new Section 503 regulations will operate as an unlawful quota.

In the final rule and its preamble, OFCCP recognized that whether the goal was in effect an illegal quota could largely be determined by how it is enforced, and stated:

> This goal is not a quota . . . .  Instead, the goal is a management tool that informs decision making and provides real accountability. Failing to meet the disability utilization goal, alone, is not a violation of the regulation and it will not lead to a fine, penalty, or sanction . . . .  More specifically, the final rule identifies steps for the contractor to take to ascertain whether there are impediments to equal employment opportunity and, if impediments are found, to correct any identified problems.  If no impediments are identified, then no corrective action is required.[20]

---

[17] *See* 29 U.S.C. § 793.

[18] *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) (ruling that affirmative action requiring a 10 percent set aside for minority contractors is subject to highest level of judicial scrutiny); *Richmond v. J. A. Croson Co.*, 488 U.S. 469 (1989) (invalidating 30 percent contract set aside for minority-owned businesses); *University of California v. Bakke*, 438 U.S. 265 (1978) (invalidating admission plan setting aside 16 slots for minorities).

[19] *See Bakke*, 438 U.S. at 289 (opinion of Powell, J.) (noting that regardless of whether the limitation at issue is described as "a quota or a goal," it is "a line drawn on the basis of race and ethnic status").  *Accord MD/DC/DE Broadcasters Associations, et al. v. FCC*, 236 F.3d 13 (D.C. Cir. 2001) (record-keeping and reporting of employment statistics were deemed a coercive and "powerful threat," almost certain to pressure companies to seek proportional representation); *Chamber of Commerce v. Dep't of Labor*, 174 F.3d 206, 210 (D.C. Cir. 1999) (noting that agency "is intentionally using the leverage it has by virtue solely of its power to inspect.  The Directive is therefore the practical equivalent of a rule that obliges an employer to comply or to suffer the consequences; the voluntary form of the rule is but a veil for the threat it obscures."); *Wessmann v. Gittens*, 160 F.3d 790,794 (1st Cir. 1998)(attractive labeling cannot alter the fact that any program which induces schools to grant preferences based on race and ethnicity is constitutionally suspect); *Lutheran Church-Mo. Synod v. FCC*, 141 F.3d 344, 354 (D.C. Cir. 1998)(articulating similar sentiments regarding employment preferences).

[20] 78 Fed. Reg. at 58683; 58686 (2013).

However, a careful reading of the final regulation and supporting materials makes clear that the OFCCP will assess a contractor's good faith efforts based on the resulting composition of the workforce, that is, on number of disabled applicants hired and utilized among all levels of a federal contractor's workforce, and little else.[21]  As the Director of the OFCCP has stated in her recent testimony before Congress in attempting to justify the 503 regulations, "What gets measured gets done."[22]  Falling short of the required seven percent requires a contractor to take steps to determine if impediments to equal employment opportunity exist, including an assessment of personnel processes, evaluation of outreach and recruitment efforts, and then to develop and execute action-oriented programs designed to correct identified problem areas.[23] Contractors are faced with engaging in a multitude of actions when the seven percent "goal" is not met and not meeting the goal will likely result in a formal Conciliation Agreement that requires a contractor to meet the seven percent target: effectively enforcing the "goal" as an unlawful quota.

The OFCCP has already acted on its intent and has enforced its *current* regulations, even in the absence of numerical targets, as quotas.  For example, in a recent OFCCP audit, a federal contractor was found to have failed to have made sufficient outreach efforts and, therefore, failed to hire a "sufficient" number of protected veterans.  *Absent any allegations of unlawful discrimination*, OFCCP required the contractor, G-A Masonry Corporation, to hire additional veterans before it could consider any other qualified applicants simply because there was an

---

[21] 78 Fed. Reg. at 58710 (2013).

[22] *See* Testimony of Director Patricia A. Shiu Before The House Committee on Education and the Workforce Subcommittee on Workforce Protections, December 4, 2013.  Available at http://edworkforcehouse.granicus.com/MediaPlayer.php?clip_id=224 (last visited January 10, 2014).

[23] 78 Fed. Reg. at 58745-58746 (2013).

"insufficient" number of veterans employed.[24]   Clearly, when the "aspirational" goals are not met, the result is enforcement as a quota.

The juxtaposition of the bland assurances that the seven percent goal is "not a quota" and the enforced quota in the OFCCP's *G-A Masonry* case leads to the inevitable conclusion that the seven percent goal is, in fact, an unlawful quota, and will be enforced that way.  OFCCP often proclaims that it will assess contractors' conduct, not words.  That same standard should apply to assessing the OFCCP's conduct.  The agency's conduct demonstrates that its reassurances about the seven percent "goal" are no more than hyperbole and that its enforcement of the regulation will be as if a quota can be imposed.

Further, if the seven percent goal is not, in fact, a quota, then the OFCCP has no reason to include a numerical standard within its Section 503 regulations.  As occurs now, the agency can assess a federal contractor's good faith efforts to employ individuals with disabilities without a stated numerical target and still achieve the acknowledged objectives of Section 503 of the Rehabilitation Act: to expand equal employment opportunities, *not* to guarantee outcomes to favored groups.

Above all else, contractors want to be compliant with their affirmative action and non-discrimination obligations but to do so, they need to understand those obligations.  The Section 503 regulations grossly fail to provide such guidance.  Instead, the OFCCP has masked a quota with the more attractive label of a "goal" in an effort to shield the enforcement of their regulatory scheme from judicial intervention.  By doing so, however, the agency has left federal contractors completely in the dark about the standards by which they are to be reviewed.  Federal contractors still have no idea how much "good faith effort" is enough, what assessment standards will be used, how those standards will be arrived at, and by whom.  Federal contractors still have no idea

---

[24] *See* Conciliation Agreement, G-A Masonry Corporation, Exhibit A attached.

if available census data regarding the availability of qualified disabled individuals will be a factor in determining compliance with OFCCP "goals."  All the OFCCP has said and all that contractors know is "seven percent."

The regulatory provision requiring a fixed utilization goal enforced across the job groups in a contractor's entire workforce, irrespective of the differences among the industries involved (*see* Doc. 9 at 12 *et seq.*) and irrespective of whether qualified individuals with disabilities are in fact available—a one size that fits none standard—is illicit and OFCCP should be enjoined from enforcing this provision of the Section 503 regulations.

It is respectfully submitted that federal contractors should not be subjected to the burdens and expense of OFCCP's heightened monitoring and enforcement under the guise of determining whether good faith efforts met the seven percent requirements in each job group at each workplace establishment.  An illegal quota by any other name is still an illegal quota.

## C.  OFCCP's Section 503 Regulations Requiring a Pre-Offer Disability Inquiry Expressly Conflicts with the ADA's Statutory Standards

HR Policy and its members have a proven record of support for affirmative action and the goal of increasing the employment of qualified individuals with disabilities in the workforces of government contractors.  The Association's members have achieved their success by strictly adhering to the core principle of the ADA: *don't ask* about disability as part of the initial hiring process.  Thus, an aspect of the Section 503 final rule that requires unlawful inquiries into precisely that area is profoundly troubling, as employers will now be required to ask job applicants whether they believe they have any disabilities prior to a job offer as a part of OFCCP's new data collection requirement.

Under the new Section 503 regulations, federal contractors are required to invite job applicants to identify themselves as having a disability, at the pre-offer stage, using a prescribed

form (which has yet to be issued by OFCCP).  This new obligation poses a direct conflict with the statutory prohibitions of the ADA on pre-employment inquiries.  Moreover, this illegal requirement will expose contractors to ADA lawsuits from applicants, notwithstanding the blandishments of the OFCCP and the Equal Employment Opportunity Commission ("EEOC") assuring contractors of the legality of these inquiries.

The ADA clearly states: "Pre-employment … [employers] shall not conduct a medical examination *or make inquiries of a job applicant* as to whether such applicant is an individual with a disability or as to the nature or severity of such disability."[25]  In addition, Section 503 of the Rehabilitation Act expressly prohibits inconsistent and conflicting standards with the ADA.[26]

Even the OFCCP's own website explains that pre-offer disability related-questions are not permissible under Section 503.  Under the website's section entitled, "Frequently Asked Questions for the Employer" ("FAQs"), the agency stated that "Section 503 and VEVRAA [the Vietnam Era Veterans Readjustment Assistance Act] prohibit employers from asking applicants disability-related questions (*i.e.*, questions that are likely to elicit information about a disability) and from conducting medical examinations of applicants until after a conditional job offer is made."[27]

The OFCCP seeks to dispel this statutory conflict by relying on non-regulatory declarations from the EEOC.  The preamble to the Section 503 regulations cites to a letter from the Legal Counsel of the EEOC, referencing EEOC regulations and its ADA Technical

---

[25] 42 U.S.C. § 12112 (d)(2) (emphasis added).

[26] *See* 29 U.S.C. § 793 (e) ("The Secretary shall develop procedures to ensure that administrative complaints filed under this section and under the Americans with Disabilities Act of 1990 [42 U.S.C. § 12101 et seq.] are dealt with in a manner that avoids duplication of effort and prevents imposition of inconsistent or conflicting standards for the same requirements under this section and the Americans with Disabilities Act of 1990 [42 U.S.C. § 12101 et seq.].").

[27] Department of Labor, Office of Federal Contractor Compliance Programs, Frequently Asked Questions for the Employer, "What Questions May Employers Ask on an Employment Application and What Questions Are Employers Prohibited From Asking?" available at http://www.dol.gov/ofccp/regs/compliance/faqs/emprfaqs.htm. (last visited January 10, 2014).  *See* FAQs, Exhibit **B** attached.

Assistance Manual, both indicating that, notwithstanding the language of the statute cited above, the ADA *really* does permit employers to "invite" applicants to voluntarily self-identify as disabled pursuant to a requirement under another Federal law or regulation and/or for purposes of the employer's affirmative action program.[28]  The letter is posted on OFCCP's website, although, interestingly, is not referenced in the aforementioned FAQs section.  Nor is a previous, contradictory letter from the *same* EEOC Legal Counsel! That letter states "a contractor cannot cite Section 503 as justification for making pre-offer inquiries regarding self-identification."[29]

While the latest letter from the EEOC *may* provide a defense for federal contractors against any actions brought by the EEOC, the ADA also allows a private right of action.  Not incidentally, private party suits comprise the significant majority of ADA cases in the courts.  As a matter of law and fact, no legal deference can be given to the EEOC's latest letter on this issue and not to its previous letter.  In sum, neither the OFCCP's assurances nor the EEOC Legal Counsel's letter provide federal contractors with a shield from private ADA litigants.[30]

The OFCCP's Section 503 regulations directly conflict with the statutory requirements of the ADA and the language of Section 503 of the Rehabilitation Act.  The letter from the EEOC's Legal Counsel does not trump the statutory provisions nor authorize the OFCCP to implement regulations that expressly conflict with the statutory language of the ADA and Section 503.

---

[28] EEOC Opinion on the Invitation to Self-Identify, available at http://www.dol.gov/ofccp/regs/compliance/sec503/OLC_letter_to_OFCCP_8-8-2013_508c.pdf. (last visited January 10, 2014).  *See* 2013 EEOC Opinion Letter, Exhibit C attached.

[29] Equal Employment Advisory Council, Re: Comments of the Equal Employment Advisory Council, on the Office of Federal Contract Compliance Programs' Notice of Proposed Rulemaking Pertaining to Affirmative Action and Nondiscrimination Obligations of Contractors and Subcontractors Regarding Individuals With Disabilities, February 21, 2012, available at http://www.regulations.gov/#!documentDetail;D=OFCCP-2010-0001-0398. (last visited January 10, 2014).  *See* 1996 EEOC Opinion Letter, Exhibit D attached.

[30]  In response to questions at the December 4, 2013 Congressional hearing, the OFCCP Director would not commit that OFCCP would seek to intervene as an amicus party and to defend its regulatory requirements that federal contractors must make pre-offer disability inquires if the federal contractor faced a judicial challenge for violating the ADA's statutory restriction on pre-offer inquiries.  The unwillingness of the OFCCP to defend its regulations in judicial proceedings that raise ADA compliance challenges raises further concerns about whether the OFCCP in fact believes its own assurances that compliance with the 503 regulations will not expose the federal contractor-employer to ADA liabilities.

Accordingly, it is respectfully submitted that the regulatory data collection provision requiring pre-offer inquiries regarding disability status is legally improper and the OFCCP should be enjoined from enforcing this provision of the Section 503 regulations.

## III.   CONCLUSION

For the reasons stated herein, *amicus curiae,* HR Policy Association, respectfully urges the Court to find in favor of Plaintiff, Associated Builders and Contractors, Inc., and to enjoin OFCCP from enforcing the unlawful provisions of its final Section 503 Regulations against the federal contractor community.

Dated: January 13, 2014.

Respectfully Submitted,

*/s/ David S. Fortney*
David S. Fortney [D.C. Bar #454943]
dfortney@fortneyscott.com
Burton J. Fishman [D.C. Bar # 290478]
bfishman@fortneyscott.com
FORTNEY & SCOTT, LLC
1750 K St., NW, Suite 325
Washington, D.C. 20006
Telephone:  (202) 689-1200
Facsimile:  (202) 689-1209

Daniel V. Yager, Of Counsel
dan.yager@hrpolicy.org
HR POLICY ASSOCIATION
1100 13th Street NW, Suite 850
Washington, D.C. 20005
Telephone:  (202) 789-8670
Facsimile:  (202) 789-0064

Attorneys for HR Policy Association

# EXHIBIT

# A

**Conciliation Agreement**
**Between the United States Department of Labor**
**Office of Federal Contract Compliance Programs**
**And**
**G-A Masonry Corporation**
**7014 Hughes Avenue**
**Crestwood, Kentucky 40014**

**PART I: General Provisions**

1.  This Agreement is between the Office of Federal Contract Compliance Programs (hereinafter OFCCP) and G-A Masonry Corporation (hereinafter G-A Masonry).

2.  The violation identified in this Agreement was found during a compliance evaluation of G-A Masonry at its construction project worksite located at Camp Lejeune, North Carolina which began on November 20, 2009, and it was specified in a Notice of Violation issued March 19, 2009. OFCCP alleges that G-A Masonry has violated the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended (38 U.S.C. 4212), and its implementing regulations at 41 CFR Chapter 60 due to the specific violation cited in Part II below.

3.  This Agreement does not constitute an admission by G-A Masonry of any violation the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended (38 U.S.C. 4212), as amended and its implementing regulations.

4.  The provisions of this Agreement will become part of G-A Masonry's Affirmative Action Program (AAP). Subject to the performance by G-A Masonry of all promises and representations contained herein and in its AAP, the named violation in regard to the compliance of G-A Masonry with all OFCCP programs will be deemed resolved. However, G-A Masonry is advised that the commitments contained in this Agreement do not preclude future determinations of noncompliance based on a finding that the commitments are not sufficient to achieve compliance.

5.  G-A Masonry agrees that OFCCP may review compliance with this Agreement. As part of such review, OFCCP may require written reports, inspect the premises, interview witnesses, and examine and copy documents, as may be relevant to the matter under investigation and pertinent to G-A Masonry's compliance. G-A Masonry shall permit access to its premises during normal business hours for these purposes.

6.  Nothing herein is intended to relieve G-A Masonry from the obligation to comply with the requirements of Executive Order 11246, as amended, Section 503 of the Rehabilitation Act of 1973, as amended, the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended (38 U.S.C. 4212), and their implementing regulations, or any other equal employment statute or executive order or its implementing regulations.

7.  G-A Masonry agrees that there will be no retaliation of any kind against any beneficiary of this Agreement or against any person who has provided information or assistance, or

**G-A Masonry Corporation**
**Conciliation Agreement**

who files a complaint, or who participates in any manner in any proceedings under Executive Order 11246, as amended, Section 503 of the Rehabilitation Act of 1973, as amended, and the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended (38 U.S.C. 4212).

8.     This Agreement will be deemed to have been accepted by the Government on the date of signature by the Regional Director for OFCCP, unless the Director, OFCCP, indicates otherwise within 45 days of the Regional Director's signature on this Agreement.

9.     If, at any time in the future, OFCCP believes that G-A Masonry has violated any portion of this Agreement during the term of this Agreement, G-A Masonry will be promptly notified of that fact in writing.  This notification will include a statement of the facts and circumstances relied upon in forming that belief.  In addition, the notification will provide G-A Masonry with 15 days from receipt of the notification to respond in writing, except where OFCCP alleges that such a delay would result in irreparable injury.

Enforcement proceedings for violation of this Agreement may be initiated at any time after the 15-day period has elapsed (or sooner, if irreparable injury is alleged) without issuing a Show Cause Notice.

Where OFCCP believes that G-A Masonry has violated this Conciliation Agreement, OFCCP may seek enforcement of this Agreement itself and shall not be required to present proof of the underlying violations resolved by this Agreement.

Liability for violation of this Agreement may subject G-A Masonry to sanctions set forth in 41 CFR 60-300.66 and/or other appropriate relief.

**PART II: Specific Provisions**

**VIOLATION**:   G-A Masonry failed to take affirmative action to employ qualified individuals without discrimination based on their status as disabled veterans, recently separated veterans, other protected veterans or Armed forces service medal veterans in all employment practices, specifically recruitment, advertising, job application procedures and hiring, as required by 41 CFR 60-300.5(a)1 and 41 CFR 60-300.20(a) and (b).  G-A Masonry failed to immediately list with the North Carolina Employment Security Commission (hereinafter NCESC) all employment openings that existed at the time of the execution of its federal contract and those which occurred during the performance of its contract, as required by 41 CFR 60-300.5(a) 2-3.

As a result, the NCESC was unable to refer to G-A Masonry for employment consideration 79 available qualified veteran Laborers during the period March 1, 2009 to through October 31, 2009.   When the 79 available veteran Laborers enrolled with NCESC are combined with G-A Masonry's walk-in applicants and those referred by other means for Laborer vacancies, we note the following:  From a pool of 114 non-veteran Laborer applicants, G-A Masonry hired 102 non-veterans (90%) for Laborer positions.  During the same period, from a pool of 80 available veterans (including 79 listed with the NCESC and one walk-in), G-A Masonry hired one veteran (1%) for a

**G-A Masonry Corporation**
**Conciliation Agreement**

Laborer position. This disparity in selection rates adverse to veteran applicants is statistically significant at the level of 12.21 standard deviations, with a shortfall of 41 veterans.

Additionally, the NCESC was unable to refer to G-A Masonry for employment consideration five available qualified veteran Brick Layers/Masons during the period March 1, 2009 through October 31, 2009. When the five available veteran Brick Layer/Masons enrolled with NCESC are combined with G-A Masonry's walk-in applicants and those referred by other means for Brick Layer/Mason vacancies, we note the following: From a pool of 104 Brick Layer/Mason non-veteran applicants, G-A Masonry hired 77 non-veterans (74%) for Brick Layer/Mason positions. During the same period, from a pool of eight available veterans (including five listed with the NCESC and three who applied onsite), G-A Masonry hired three Veterans (38%) for Brick Layer/Mason positions. This disparity in selection rates adverse to veteran applicants is statistically significant at the level of 2.20 standard deviations, with a shortfall of two veterans.

Accordingly, OFCCP finds that G-A Masonry's failure to comply with its mandatory job listing requirements and its failure to recruit and provide employment to qualified veterans had a discriminatory affect against 84 available veterans not recruited for or hired into Laborer and Brick Layer/Mason positions, in violation of 41 CFR 60-300.5(a) 1, 2 and 3.

**REMEDY**: On November 20, 2009 G-A Masonry began listing its openings with the NCESC. On November 30, 2009 G-A Masonry confirmed in written communication its agreement to list, recruit and make offers of employment from available veterans through the NCESC. G-A Masonry agreed to make offers to 41 veteran Laborers and two veteran Brick Layers/Masons.

G-A Masonry will list its job openings with the State Employment Security Commission (SESC) during such time as it is a covered federal contractor in all of the areas where it is conducting work. G-A Masonry will recruit and make offers of employment to qualified veterans until a total of 43 qualified veterans have accepted job offers for 41 Labor vacancies and two Brick Layer/Mason vacancies or until G-A Masonry is no longer a covered federal contractor, whichever occurs first. G-A Masonry will make job offers to qualified veterans in the order that the SESC refers them. Employment is contingent upon each referred veteran's successfully completing G-A Masonry's post-offer selection and screening process. The criteria for selecting or rejecting any veteran will be no more stringent than those used by G-A Masonry during the review period March 1, 2009 through October 31, 2009. G-A Masonry will provide each veteran referred for a Laborer vacancy, post offer, with a copy of Attachment A—Laborer, "Release of Claims under the Vietnam Era Veterans' Readjustment Assistance Act." G-A Masonry will provide each veteran referred for a Brick Layer/Mason vacancy, post offer, with a copy of Attachment B—Brick Layer/Mason, "Release of Claims under the Vietnam Era Veterans' Readjustment Assistance Act."

**G-A Masonry Corporation**
**Conciliation Agreement**

G-A Masonry will make all job offers in writing as vacancies occur, but no later than 180 days after the Regional Director, OFCCP signs this Agreement. New hires must agree upon a start date no more than 14 days from the date of receiving the written job offer. Any new hire who fails to report to work on the start date and time scheduled, without prior approval by G-A Masonry, will be treated as having rejected the job offer. All hiring decisions, including job offers made and documentation of reasons for rejection, will be available for review by OFCCP.

G-A Masonry will hire referred veterans at the current starting rates of pay for the Laborer and Brick Layer/Mason positions into which they are hired. G-A Masonry will provide veterans hired as Brick Layers/Masons with benefits, which are valued at 9% of the daily pay rate, subject to standard eligibility requirements.

G-A Masonry will disburse $32,800.00 in back pay and $1,486.45 in interest, for a total financial settlement of $34,286.45, provided that the 41 referred veterans for Labor vacancies, post-offer, execute the "Release of Claims under the Vietnam Era Veterans' Readjustment Assistance Act." The money will be divided equally among referred veterans and paid to each in two lump sums, less appropriate legal deductions; the first lump sum will be the back pay and the second lump sum will be interest.

G-A Masonry will disburse $2,763.36 in back pay, $248.70 in benefits and $125.21 in interest, for a total financial settlement of $3,137.27, provided that the two veterans referred for Brick Layer/Mason vacancies, post-offer, execute the "Release of Claims under the Vietnam Era Veterans' Readjustment Assistance Act." The money will be divided equally between two referred Veterans and paid to each in two lump sums, less appropriate legal deductions; the first lump sum will be comprised of back pay and back benefits and the second lump sum will be interest.

Each veteran's share of this payment will be reduced by withholdings for federal income tax, state, and/or local income tax, and the veteran's share of FICA. Each veteran shall receive an IRS Form W-2 for his or her share of the back pay and benefits and an IRS Form 1099 for his or her share of the interest amount.

G-A Masonry will distribute the monetary settlement as described above, to the veterans no sooner than 45 days and no later than 180 days after the Regional Director signs this Agreement and all efforts to have veterans referred have been exhausted. G-A Masonry will complete the process of monetary disbursement and hires, and will provide OFCCP with evidence of job offers, hires, copies of pay slips showing legal deductions and cancelled checks, as indicated in Part III of this Agreement.

G-A Masonry will not retaliate, harass, or engage in any form of reprisal or other adverse action against any referred veteran based on or in relation to the terms or provisions of this Agreement.

G-A Masonry will review, at least annually, and revise, as needed, its selection procedures to ensure that this violation does not recur.

Page 4 of 6

**G-A Masonry Corporation**
**Conciliation Agreement**

**FUTURE CONDUCT:**  G-A Masonry will not repeat the above violation.

**PART III: Reporting**

G-A Masonry shall submit **three reports**, as stated below, to Carley Hicks, Jr., Assistant District Director—Raleigh, United States Department of Labor, Office of Federal Contract Compliance Programs, 4407 Bland Road, Suite 270, Raleigh, North Carolina, 27609.

The **first report** shall be due 60 days after the date on which the Regional Director, OFCCP signs this Agreement.  The **second report** shall be due 120 days after the date on which the Regional Director, OFCCP signs this Agreement.  The **third report** shall be due 180 days after the date on which the Regional Director, OFCCP signs this Agreement.  Each report shall contain the following information:

1. Documentation of listings with the SESC for vacancies.
2. Documentation of all referred veterans and job offers.
3. Documentation of any declined job offer by a referred veteran.
4. Documentation of monies disbursed to each veteran who executed a "Release of Claims under the Vietnam Era Veterans' Readjustment Assistance Act," including copies of the canceled checks and pay slips showing gross amount of back pay and legal deductions.

**TERMINATION DATE:**  This Agreement will expire 90 calendar days after OFCCP receives the third and final report required in Part III above or on the date that the District Director gives notice to G-A Masonry that it has satisfied its reporting requirements, whichever occurs earlier, unless OFCCP notifies G-A Masonry in writing prior to the end of the 90-day period that G-A Masonry has not satisfied its reporting requirements pursuant to this Agreement.

**G-A Masonry Corporation**
**Conciliation Agreement**

## PART IV:  Signatures

The person signing this Conciliation Agreement on behalf of G-A Masonry Corporation
personally warrants that he is fully authorized to do so, that G-A Masonry Corporation has
entered into this Conciliation Agreement voluntarily and with full knowledge of the effect
thereof, and that execution of this Agreement is fully binding on G-A Masonry Corporation.
This Conciliation Agreement is hereby executed by and between the Office of Federal Contract
Compliance Programs and G-A Masonry Corporation.

Date:  4/23/2010

**Mr. Eugene George**
President
G-A Masonry Corporation
7014 Hughes Avenue
Crestwood, Kentucky 40014

Date:  4-26-2010

Compliance Officer—Raleigh
Office of Federal Contract Compliance
Programs

Date:  4/27/2010

**Carley Hicks, Jr.**
Assistant District Director—Raleigh
Office of Federal Contract Compliance
Programs

Date:  4/27/2010

**Bradley A. Anderson**
District Director—Charlotte
Office of Federal Contract Compliance
Programs

Date:  29 April 2010

**Evelyn Teague**
Regional Director—Southeast
Office of Federal Contract Compliance
Programs

Page 6 of 6

**G-A Masonry Corporation**                                                 **Attachment A**
**Conciliation Agreement**                                                   **Laborer**

## RELEASE OF CLAIMS
## UNDER THE VIETNAM ERA VETERANS' READJUSTMENT ASSISTANCE ACT

In consideration of the payment to me of at least $836.00 (less deductions required by law) by G-A Masonry Corporation (hereinafter G-A Masonry), which I agree is acceptable, and also in consideration of the Conciliation Agreement between G-A Masonry and the Office of Federal Contract Compliance Programs (hereinafter OFCCP), I, _____ agree to the following:

### I.

I understand that the amount of $836.00 set forth above is the minimum gross amount of my portion of the monetary settlement between OFCCP and G-A Masonry, and that the actual payment to me will be reduced, in part, to account for legally required payroll deductions such as income tax withholding and Social Security contributions.  I understand that this payment will be reflected on an Internal Revenue Service Form W-2 and a Form 1099 at the end of the calendar year in which the payment is made. Monies reported on the Form 1099 will not be reduced for taxes or other payroll deductions and I understand that I may owe income taxes on the amounts reported to me on the Form 1099.

### II.

In exchange for the monetary amount set forth above, I hereby waive, release and forever discharge G A Masonry, its predecessors, related entities, subsidiaries, and organizations, and its and their directors, officers, employees, agents, successors, and assigns, of and from any and all actions, causes of action, damages, liabilities, and claims arising out of the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended (38 U.S.C. 4212), which I or my representatives (heirs, executors, administrators, or assigns) have or may have which relate in any way to my selection for employment by G A Masonry at any time prior to the effective date of the Release.

### III.

I understand that G-A Masonry denies that it treated me unlawfully or unfairly in any way and that G-A Masonry entered into the above-referenced Conciliation Agreement with OFCCP in the spirit of conciliation and to bring closure to the Compliance Evaluation initiated by OFCCP on November 20, 2009.  I further agree that the payment of the aforesaid sum by G-A Masonry to me is not to be construed as an admission of any liability by G-A Masonry.

### IV.

I declare that I have read this Release and that I have had a full opportunity to consider and understand its terms and to consult with my advisors.  I further declare that I have decided of my own free will to sign this Release.

### V.

I understand that, if I do not sign this Release, I will not be entitled to receive any of the financial or other relief provided in the Conciliation Agreement.

IN WITNESS WHEREOF, I have set my hand to this _____ day of _____, _____.
                                                      Day                          Month         Year

_____
Signature

G-A Masonry Corporation                                                 **Attachment B**
Conciliation Agreement                                            **Brick Layer/Mason**

## RELEASE OF CLAIMS
## UNDER THE VIETNAM ERA VETERANS' READJUSTMENT ASSISTANCE ACT

In consideration of the payment to me of at least $1,568.00 (less deductions required by law) by G-A Masonry Corporation (hereinafter G-A Masonry), which I agree is acceptable, and also in consideration of the Conciliation Agreement between G-A Masonry and the Office of Federal Contract Compliance Programs (hereinafter OFCCP), I, _____ agree to the following:

I.

I understand that the amount of $1,568.00 set forth above is the minimum gross amount of my portion of the monetary settlement between OFCCP and G-A Masonry, and that the actual payment to me will be reduced, in part, to account for legally required payroll deductions such as income tax withholding and Social Security contributions. I understand that this payment will be reflected on an Internal Revenue Service Form W-2 and a Form 1099 at the end of the calendar year in which the payment is made. Monies reported on the Form 1099 will not be reduced for taxes or other payroll deductions and I understand that I may owe income taxes on the amounts reported to me on the Form 1099.

II.

In exchange for the monetary amount set forth above, I hereby waive, release and forever discharge G A Masonry, its predecessors, related entities, subsidiaries, and organizations, and its and their directors, officers, employees, agents, successors, and assigns, of and from any and all actions, causes of action, damages, liabilities, and claims arising out of the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended (38 U.S.C. 4212), which I or my representatives (heirs, executors, administrators, or assigns) have or may have which relate in any way to my selection for employment by G A Masonry at any time prior to the effective date of the Release.

III.

I understand that G-A Masonry denies that it treated me unlawfully or unfairly in any way and that G-A Masonry entered into the above-referenced Conciliation Agreement with OFCCP in the spirit of conciliation and to bring closure to the Compliance Evaluation initiated by OFCCP on November 20, 2009. I further agree that the payment of the aforesaid sum by G-A Masonry to me is not to be construed as an admission of any liability by G-A Masonry.

IV.

I declare that I have read this Release and that I have had a full opportunity to consider and understand its terms and to consult with my advisors. I further declare that I have decided of my own free will to sign this Release.

V.

I understand that, if I do not sign this Release, I will not be entitled to receive any of the financial or other relief provided in the Conciliation Agreement.

IN WITNESS WHEREOF, I have set my hand to this _____ day of _____, _____.
                                               Day                      Month         Year

_____
Signature

99

# EXHIBIT

# B



UNITED STATES
DEPARTMENT OF LABOR

● All DOL  ● OFCCP    Advanced Search

[SEARCH]

A to Z | Site Map | FAQs | Forms | About DOL | Contact Us | Español

**Office of Federal Contract Compliance Programs**

SHARE

⭐ Was this page helpful?

DOL Home > OFCCP > FAQs > Employer

**Compliance Assistance**

**Regulatory Library**

**About OFCCP**

**Contact Us**

**Subscribe to E-mail Updates**

# Office of Federal Contract Compliance Programs (OFCCP)

## Frequently Asked Questions for the Employer

### Who is Covered

- Are all construction contractors and subcontractors subject to the laws enforced by OFCCP?
- We don't do any government work here. Federal Government work is performed in some other division in another state. Are we subject to the equal employment laws enforced by OFCCP?
- Our business operates as a fund depository, and an issuing and paying agent for U.S. Saving Bonds and savings notes: therefore, are we required to comply with the Affirmative Actions Program (AAP) obligations under Executive Order (E.O.) 11246, as amended, the Vietnam Era Veterans' Readjustment Assistance Act of 1974 (VEVRAA), as amended, 38 U.S.C. 4212 and Section 503 of the Rehabilitation Act of 1973 (Section 503), as amended?
- Is a hospital or other health care provider covered under the laws enforced by OFCCP as a result of the reimbursements it receives for medical services provided to Federal employees, retirees, or their dependents from a health insurance carrier that participates in the Federal Employee Health Benefits Program (FEHB)?
- Is a financial institution that is covered by the Federal Deposit Insurance Corporation (FDIC) or the National Credit Union Association (NCUA) with deposit insurance subject to the Affirmative Actions Program (AAP) requirements under Executive Order 11246, as amended, the Vietnam Era Veterans' Readjustment Assistance Act of 1974 (VEVRAA), as amended, 38 U.S.C. 4212 and Section 503 of the Rehabilitation Act of 1973 (Section 503), as amended?

### Requirements

- Under Executive Order 11246, when are Federal contractors and subcontractors required to develop a written affirmative action program (AAP)?
- As a Prime Contractor, am I required to make sure that the vendors and suppliers with whom I am doing business develop a written AAP?
- What does OFCCP look for in a contractor's internal audit and reporting system?
- What is the correct procedure for a contractor to obtain the ethnic information of its employees and applicants?
- Do Federal construction contractors need to file a Monthly Employment Utilization Report (form CC-257)?
- Is the EEO poster a requirement for Federal contractors? Where can contractors obtain a copy?
- What are the notice posting requirements under regulations issued by OFCCP?
- Can a contractor meet its notice-posting obligations by posting the notice electronically rather than in physical paper format?

### Monitoring

- What is a compliance evaluation?
- Please describe the process for selecting companies for on-site inspections
- Once a compliance evaluation has been completed, when can our Company expect to be evaluated again?
- Does OFCCP offer any guidance about how employers may self-audit their own employment practices to make sure that they comply with the laws enforced by OFCCP?

### Overriding Self-Identification

- May an employer override an individual's self-identification of race, gender or ethnicity based on the employer's visual observation?

### Compliance Assistance

- Will OFCCP come out to contractors' facilities and assist them in the development of their AAPs?
- Does the government provide or sell publications that explain how to create an Affirmative Action Program?
- Have the proposed changes to the racial categories for 2002 been adopted?
- What is the EEO-1 "Job Classification Guide"? Where can contractors find a copy?
- What are the EEO-1 and VETS 100 reports and where can information regarding these reports be found?
- How can I learn more about OFCCP?
- What questions may employers ask on an employment application and what questions are employers prohibited from asking?
- What documents are employers required to retain related to the application process?

### Who Is Covered

**Are all construction contractors and subcontractors subject to the laws enforced by OFCCP?**

All contractors and subcontractors who hold a Federal or federally-assisted construction contract in excess of $10,000 will be subject to regulatory requirements under one or more of the laws enforced by OFCCP depending upon the amount of the contract. Once it has been determined that a contractor or subcontractor is subject to OFCCP jurisdiction, the regulations implementing the civil rights requirements enforced by OFCCP apply to all of the contractor's or subcontractor's employees who are engaged in on site construction, including those construction employees who work on a non-Federal or non-federally assisted construction site.

 Back to Top

**We don't do any government work here. Federal Government work is performed in some other division in another state. Are we subject to the equal employment laws enforced by OFCCP?**

Yes. Generally speaking, once it has been determined that a business or organization is subject to the civil rights requirements enforced by OFCCP, all of the business's or organization's establishments or facilities will be subject to the same regulatory requirements, regardless of where the Federal contract is to be performed.

In addition, some businesses or organizations that do not independently hold Government contracts/subcontracts may still be covered under the laws enforced by OFCCP if they are considered a "single entity" with a related business or organization that holds such contracts. In such instances, OFCCP uses a "single entity" test to determine whether the businesses or organizations are so closely related that they may constitute a single entity for purposes of OFCCP jurisdiction. The test requires OFCCP to consider whether:

1. the entities have common ownership;
2. the entities have common directors and/or officers;
3. one entity has de facto day-to-day control over the other through policies, management or supervision of the entity's operations;
4. the personnel policies of the entities emanate from a common or centralized source; and
5. the operations of the entities are dependent on each other, e.g., services are provided principally for the benefit of one entity by another and/or both entities share management, offices, or other services.

The test focuses primarily on whether the ownership, management, and operations of the separate entities are, in fact, sufficiently interrelated to warrant treating them as an integrated enterprise or a single entity. A business or organization need not meet all five factors to be considered a single entity with a covered Federal contractor. However, there is growing recognition that centralized control over labor relations and personnel functions is the most important factor. By way of example, say that two entities are under common ownership, with a common board of directors, and have a central corporate office that determines and issues personnel policy for both entities, and generally manages most personnel-related issues for both entities. At the same time, the operations of the two entities are not particularly dependent on each other. Despite the fact that one of the factors did not apply, the four factors that did outweigh the one that did not, so that the two entities being analyzed will most likely be considered a single entity.

 **Back to Top**

---

**Our business operates as a fund depository, and an issuing and paying agent for U.S. Saving Bonds and savings notes; therefore, are we required to comply with the Affirmative Actions Program (AAP) obligations under Executive Order (E.O.) 11246, as amended, the Vietnam Era Veterans' Readjustment Assistance Act of 1974 (VEVRAA), as amended, 38 U.S.C. 4212 and Section 503 of the Rehabilitation Act of 1973 (Section 503), as amended?**

The E.O. 11246 implementing regulations at 41 CFR 60-1.40(a) and 60-2.1(b) state, in relevant part, that any nonconstruction (Supply and Service) contractor that serves as a depository of Government funds in any amount or a financial institution which is an issuing and paying agent for U.S. saving bonds and saving notes in any amount must develop an affirmative action program.

Under Section 503, a Government contractor with 50 or more employees and a Government contract of $50,000 or more must develop a Section 503 affirmative action program. 41 CFR 60-741.40(a). The Section 503 regulations define a Government contract as "any agreement or modification thereof between any contracting agency and any person for the purchase, sale or use of personal property or nonpersonal services." 41 CFR 60-741.2(i). The term "nonpersonal services" as used in this section includes fund depository. 41 CFR 60-741.2(i)(4). Thus, the agreement to serve as a Federal funds depository is a "Government contract."

Under Section 503, however, all government contracts must meet the dollar threshold amount of $50,000 for coverage. Therefore, if you serve as a depository for Federal funds of $50,000 or more, or have an agreement valued at $50,000 or more to be an issuing and paying agent for savings bonds and notes, you would be obligated to develop and maintain a Section 503 affirmative action program.

The same holds true under VEVRAA as under Section 503 for any Government contractor with 50 or more employees and a contract of $50,000 or more to serve as a depository of Federal funds or as an issuing and paying agent for savings bonds and notes, if the Government contract was entered into before December 1, 2003.

However, the Jobs for Veterans Act (JVA) amended VEVRAA by raising the dollar threshold amount required for contract coverage to $100,000. The new threshold applies to contracts entered on or after December 1, 2003. Accordingly, if your business or organization became a fund depository or an issuing and paying agent for savings bonds and notes on or after December 1, 2003, it would also be subject to the written AAP requirement under VEVRAA if the contract is for $100,000 or more.

For your additional information, there is an interactive electronic tool called the Federal Contract Compliance Advisor, also referred to as Elaws Advisor, to assist Federal contractors and subcontractors in understanding basic coverage and the requirements for compliance with the laws administered by OFCCP. You may wish to consult the Elaws Advisor if you have additional questions about coverage."

 **Back to Top**

---

**Is a hospital or other health care provider covered under the laws enforced by OFCCP as a result of the reimbursements it receives for medical services provided to Federal employees, retirees, or their dependents from a health insurance carrier that participates in the Federal Employee Health Benefits Program (FEHB)?**

OFCCP's policy is that the receipt of reimbursements from a health insurance carrier that provides a health benefits plan under the FEHB Program, for the medical services provided to Federal employees or their dependents, will not provide a basis for coverage of the hospital or other health care provider under the laws enforced by OFCCP. This policy is based on the decision of DOL's Administrative Review Board (ARB) in **OFCCP** v. **Bridgeport Hospital**, ARB Case No. 00-234, (January 31, 2003), which involved the question of whether the hospital was covered under the laws enforced by OFCCP by virtue of its agreement with an insurance carrier that had contracted with the U.S. Office of Personnel Management (OPM) to provide Federal employees a fee-

for-services health benefits insurance policy. The ARB determined that the reimbursement agreement did not provide a basis for coverage of the hospital under the laws enforced by OFCCP.

The decision in **Bridgeport Hospital** concerned only the contractual obligations assumed by an insurance carrier that has contracted to provide a fee-for-service health benefits plan to Federal employees; it does not address the contractual obligations assumed by providers of other types of plans under the FEHB Program, (e.g., a Health Maintenance Organization). Further, a hospital or health care provider may have other contracts that provide a basis for coverage under the laws enforced by OFCCP. For example, a hospital may be a covered contractor as a result of a contract with the Department of Veterans' Affairs or the Department of Defense requiring the provision of medical services to active or retired military personnel. Likewise, a teaching hospital doing research for a university that has a contract with the Federal government may be a covered Federal contractor.

 Back to Top

---

**Is a financial institution that is covered by the Federal Deposit Insurance Corporation (FDIC) or the National Credit Union Association (NCUA) with deposit insurance subject to the Affirmative Actions Program (AAP) requirements under Executive Order 11246, as amended, the Vietnam Era Veterans' Readjustment Assistance Act of 1974 (VEVRAA), as amended, 38 U.S.C. 4212 and Section 503 of the Rehabilitation Act of 1973 (Section 503), as amended?**

Yes. Financial institutions with federal share and deposit insurance are considered to be government contractors within the meaning of the regulations implementing Executive Order 11246, as amended, the Vietnam Era Veterans' Readjustment Assistance Act of 1974 (VEVRAA), as amended, 38 U.S.C. 4212 and Section 503 of the Rehabilitation Act of 1973 (Section 503), as amended. These three programs enforced by the Office of Federal Contract Compliance Programs (OFCCP) require equal employment opportunity by government contractors.

The implementing regulations for Executive Order 11246 at 41 CFR 60-1.3 have consistently defined a government contract as any agreement or agreement modification between any contracting agency and any person for the purchase, sale or use of personal property or nonpersonal services. The term "nonpersonal services" includes, but is not limited to, the following services: utilities, construction, transportation, research, insurance, and fund depository. This definition thus explicitly includes agreements for insurance.

The implementing regulations for VEVRAA and Section 503, found at 41 CFR 60-250.2, 60-300.2 and 60-741.2, respectively, also define a government contract as any agreement or agreement modification between any contracting agency and any person for the purchase, sale or use of personal property or nonpersonal services. Like the Executive Order regulations, these regulations also state that the term "nonpersonal services" includes, but is not limited to the following services: utilities, construction, transportation, research, insurance, and fund depository. Therefore, financial institutions with federal share and deposit insurance are considered to be government contractors.

 Back to Top

---

## Requirements

**Under Executive Order 11246, when are Federal contractors and subcontractors required to develop a written affirmative action program (AAP)?**

Each non-construction contractor/subcontractor with 50 or more employees is required to develop a written Affirmative Action Program (AAP) for each of its establishments within 120 days from the start of the Federal contract, if it:

- Has a Federal contract or subcontract of $50,000 or more;
- Has government bills of lading which in any 12-month period total, or can reasonably be expected to total, $50,000 or more;
- Serves as a depository of Federal funds in any amount; or
- Is a financial institution that is an issuing and paying agent for U.S. savings bonds and savings notes in any amount.

 Back to Top

---

**As a Prime Contractor, am I required to make sure that the vendors and suppliers with whom I am doing business develop a written AAP?**

No.  You are not required to ensure that your vendors and suppliers develop and maintain written AAPs. The regulations require that each contractor and subcontractor include the EO clause in each subcontract or purchase order. Whether a vendor or supplier is subject to the written AAP requirements, would depend on, among other things, whether the vendor or supplier has a subcontract that is necessary to the performance of the Government contract, the dollar value of any such subcontract, and the number of employees in the vendor's or supplier's workforce.

 Back to Top

---

**What does OFCCP look for in a contractor's internal audit and reporting system?**

The internal audit and reporting system is the contractor's way to assess the overall effectiveness of the contractor's Affirmative Action Program (AAP) and advise senior management of the effectiveness of the AAP. The system should monitor records of all personnel activity (including hires, promotions, transfers and terminations) and compensation at all levels to ensure that non-discriminatory practices have been followed. It is suggested that reporting be performed on a periodic basis and reviewed by appropriate management. In addition, top officials should be notified of the program's effectiveness and any recommendations for improvement. The AAP should contain a narrative description of how the system works.

Some larger contractor establishments may find it necessary and helpful to conduct internal audits and reports more frequently (i.e., quarterly), while smaller contractors may find that an annual review is sufficient. Our regulations only require "periodic" reviews, which OFCCP has historically considered to mean at least once per AAP year.

OFCCP is working on providing self-audit guidance for contractors to enhance their internal audit procedures.

 **Back to Top**

### What is the correct procedure for a contractor to obtain the ethnic information of its employees and applicants?

OFCCP regulations 41 CFR 60-1.12(c) indicate that for any personnel or employment record a contractor maintains, it must be able to identify the gender, race, and ethnicity of each employee and, where possible, the gender, race and ethnicity of each applicant.

OFCCP has not mandated a particular method of collecting the information. Self-identification is the most reliable method and preferred method for compiling information about a person's gender, race and ethnicity. Contractors are strongly encouraged to rely on employee self-identification to obtain this information. Visual observation is an acceptable method for identifying demographic data, although it may not be reliable in every instance. If self-identification is not feasible, post-employment records or visual observation may be used to obtain this information. Contractors should not guess or assume the gender, race or ethnicity of an applicant or employee.

A contractor's invitation to an employee or applicant to self-identify his or her gender, race, and ethnicity should indicate to individuals that supplying such information is voluntary. OFCCP would not hold a contractor responsible for applicant data when the applicant declines to self-identify and there are no other acceptable methods of obtaining this information.

 **Back to Top**

### Do Federal construction contractors need to file a Monthly Employment Utilization Report (form CC-257)?

No. Federal construction contractors do not need to file a Monthly Employment Utilization Report (form CC-257). The requirement for covered construction contractors to submit the form CC-257 was rescinded effective December 8, 1995. See Federal Register, Volume 60, Number 236, and Page 63061.

 **Back to Top**

### Is the EEO poster a requirement for Federal contractors? Where can contractors obtain a copy?

Yes.  Contractors and subcontractors who hold a single Federal contract or subcontract in excess of $10,000 or who hold contracts or subcontracts with the Government in any 12 month period which have an aggregate total value exceeding $10,000 are required to post the EEO notice in accordance with the laws administered by OFCCP. In addition, Federal contractors and subcontractors who (1) hold Government bills of lading: (2) serve as a depository of Federal funds in any amount: or (3) act as issuing and paying agent for U.S. savings bonds and notes must post the EEO notice. The notice must be posted prominently, where it can be readily seen by employees and applicants for employment, e.g., personnel office, work-out facility, lunchroom, or company bulletin board. An approved copy of the OFCCP poster is available.

 **Back to Top**

### What are the notice posting requirements under regulations issued by OFCCP?

The regulations implementing the laws enforced by OFCCP - Executive Order 11246, Section 503 of the Rehabilitation Act, and the affirmative action provisions of the Vietnam Veterans' Readjustment Assistance Act - require contractors "to post in conspicuous places available to employees and applicants for employment" notices setting forth the provisions of the nondiscrimination clauses. See 41 CFR 60-1.4(a) (1), 60-250.5(a) 9 and 60-741.5(a) 4. The EEO notice provision in the regulations implementing Section 503 further states that applicants and employees with disabilities "are to be informed of the content of the notice," and that this could be accomplished, for example, by having the notice read to a visually impaired person, or lowering a posted notice so that it might be read by a person in a wheelchair. Affixing the "Equal Opportunity is the Law Poster" prepared by either OFCCP or the Equal Employment Opportunity Commission (EEOC) in a physical location (e.g., a wall or bulleting board) where it can be readily seen by employees and applicants will satisfy the notice posting requirements under OFCCP laws.

An approved copy of the EEO poster prepared by OFCCP is available on-line. The order form for the EEO poster prepared by EEOC is available on-line.

 **Back to Top**

### Can a contractor meet its notice-posting obligations by posting the notice electronically rather than in physical paper format?

The requirement in the current regulations is that the EEO notices be "post[ed] in conspicuous places, available to employees and applicants for employment." "Posting in a conspicuous place" has a well-accepted interpretation, and the requirement is usually met when a paper copy of the notice is affixed to a wall or bulletin board customarily used for workplace notices. The Department of Labor agencies with workplace poster requirements and other Federal agencies are currently studying whether electronic means could be used to satisfy notice posting obligations. At present, however, physical posting of paper notices is required.

**Back to Top**

## Monitoring

### What is a compliance evaluation?

OFCCP conducts compliance evaluations of Federal contractors to ascertain their compliance with equal opportunity and non-discrimination requirements. A compliance evaluation consists of any one or any combination of the following four investigative procedures:

- Compliance review — a comprehensive analysis and evaluation of each aspect of hiring and employment practices, policies and conditions, including such things as hiring, training, employment benefits, promotion, etc. This particular review begins with a

desk audit which is a review of the Affirmative Action Plan (AAP) and supporting documentation; and it may also include an on-site review, conducted at the contractor's establishment, to investigate problem areas identified during the desk audit.

- Off-site review — a review of records that may consist of a full desk audit, which is a review of the contractor's AAP or portions thereof, or a review of particular records such as personnel data.
- Focused review — an on-site review restricted to one or more components of the contractor's organization or one or more aspects of the contractor's employment practices.
- Compliance check — a determination of whether the contractor has maintained records consistent with 41 CFR 60-1.12; at the contractor's option the documents may be provided either on-site or off-site.

 **Back to Top**

---

### Please describe the process for selecting companies for on-site inspections

OFCCP is focusing its enforcement activities on finding and resolving what might be called "systemic" discrimination. What we mean by "systemic" discrimination, sometimes called class discrimination or a pattern or practice of discrimination, concerns a recurring practice or continuing policy rather than an isolated act of discrimination. OFCCP has adopted this strategy for four reasons: (1) it prioritizes OFCCP's enforcement resources for the worst offenders, those who allow discrimination to be their "standard operating procedure" or allow illegitimate employment standards to adversely impact a significant number of women or minority workers or job applicants; (2) it encourages employers to engage in self audits of their employment practices, by increasing the tangible consequences of not self auditing; (3) it achieves maximum leverage of OFCCP resources to protect the greatest number of workers from discrimination; and (4) it complements OFCCP's compliance assistance strategy, which assists contractors that want to comply voluntarily. To improve OFCCP's focus on systemic discrimination, OFCCP is using the initial stage of its compliance evaluation process, the desk audit, to determine if significant investigative resources should be devoted to a compliance review. If the desk audit reveals significant indicators of systemic discrimination, OFCCP will continue the investigation. If the desk audit does not reveal such indications, OFCCP will close the review unless there is another basis to believe that an on-site review would be appropriate. However, to ensure compliance with all laws enforced by OFCCP, OFCCP will conduct a certain number of on-site reviews on a random basis.

In general, OFCCP seeks to maximize the impact of its enforcement resources by focusing on the cases with significant statistical indicators and large class cases. This is not to say that OFCCP will not pursue evidence of racial or sexual harassment or of discrimination that does not involve large numbers of affected persons, but rather that OFCCP's focus will be on those cases which have the greatest potential impact.

 **Back to Top**

---

### Once a compliance evaluation has been completed, when can our Company expect to be evaluated again?

It is OFCCP's policy not to revisit an establishment within 24 months after the completion of a compliance evaluation. (Note: A compliance check conducted within the last 12 months only exempts the contractor establishment from another compliance check; it does not exempt the contractor establishment from being scheduled for a compliance evaluation.)

 **Back to Top**

---

### Does OFCCP offer any guidance about how employers may self-audit their own employment practices to make sure that they comply with the laws enforced by OFCCP?

OFCCP has published a technical assistance guide for construction contractors, and has published the Federal Contract Compliance Manual (FCCM). Both have sections that address techniques for performing contractor self audits. The FCCM is available on our web site. We are working on a new technical assistance guide and other compliance assistance materials that will provide additional guidance on performing self audits of a variety of personnel practices. OFCCP offers compliance assistance seminars on how to self audit as well. You can find a regional calendar of compliance assistance seminars on our web site.

 **Back to Top**

---

### Overriding Self-Identification

**May an employer override an individual's self-identification of race, gender or ethnicity based on the employer's visual observation?**

No. OFCCP's policy is that deference should be given to an individual's self-identification and it should not be questioned or overridden by an employer based on the employer's visual observation.

 **Back to Top**

---

### Miscellaneous

**Will OFCCP come out to contractors' facilities and assist them in the development of their AAPs?**

Generally, OFCCP does not come out to contractor facilities. However, OFCCP conducts numerous compliance assistance seminars and other activities that include assistance on developing AAPs. Contractors can find a calendar of compliance assistance seminars. You may also contact the nearest OFCCP District Office for additional information.

 **Back to Top**

---

### Does the government provide or sell publications that explain how to create an Affirmative Action Program?

OFCCP does not sell publications nor do the regulations require contractors to use any specific format in the development of their AAPs. However, OFCCP regulations 41 CFR Parts 60-2, 60-250 and 60-741 outline the specific content requirement for AAPs under each program. As part of its compliance assistance initiative OFCCP has posted a sample AAP on its website, which

contractors should find helpful. Also, Federal contractors may contact the local District Office to make a compliance assistance appointment and/or learn about the periodic seminars that these offices conduct which are designed to share compliance assistance information with contractors and keep them informed of the latest OFCCP developments. Information on how to contact your local OFCCP District Office is located on the on our website.

 Back to Top

### Have the proposed changes to the racial and ethnic categories for 2002 been adopted?

The EEOC has proposed revisions to the EEO-1 and published the initial notice required under the Paperwork Reduction Act on June 11, 2003. See Agency Information Collection Activities: Revision of the Employer Information Report (EEO-1), 68 FR 334965, June 11, 2003. The initial notice proposed changes to the ethnic and racial categories on the EEO-1 report, and also to the job categories. OFCCP intends to coordinate its data collection requirements with the changes made to the EEO-1 to avoid duplicative and inconsistent burdens on the Federal contractor community. OFCCP also intends to provide a reasonable transition period before any further changes by OFCCP become effective.

 Back to Top

### What is the EEO-1 "Job Classification Guide"? Where can contractors find a copy?

The EEO-1 Job classification guide, published in 1996, is a pamphlet provided by the Equal Employment Opportunity Commission (EEOC) to assist employers in the correct assignment of employees according to the nine (9) EEO-1 categories. The current "Job Classification Guide" for the EEO-1 report can be found by accessing the website for the EEOC.

 Back to Top

### What are the EEO-1 and Vets 100 reports and where can information regarding these reports be found?

An Employment Information Report (EEO-1), also known as a Standard Form 100, is filed annually with the EEO-1 Joint Reporting Committee and provides a demographic breakdown of the employer's work force by race and gender. Standard Form 100 must be filed by covered Federal contractors who:

1.  have 50 or more employees, and
2.  are prime contractors or first-tier subcontractors, and
3.  have a contract, subcontract, or purchase order amounting to $50,000 or more; or
4.  serve as a depository of Government funds in any amount, or is a financial institution which is an issuing and paying agent for U.S. Savings Bonds and Notes. The Federal Contractor Veterans' Employment Report (VETS-100) provides data on the number of veteran employees in the contractor's workforce by job category, hiring location, the number of new hires (veterans and nonveterans), and the maximum and minimum number of employees, among other things. The report must be filed by any Federal contractor or subcontractor who entered into a covered contract(s) or subcontract(s) before December 1, 2003 for at least $25,000 or more. The Jobs for Veterans Act changed the threshold for this requirement from $25,000 to $100,000 for all covered contracts and subcontracts entered into on or after December 1, 2003.

For additional information, individuals are encouraged to visit the following websites for the: EEO-1 Report and VETS 100 Reports.

 Back to Top

### How can I learn more about OFCCP requirements?

We recommend that you attend a seminar conducted by your local OFCCP office to obtain answers to any questions and receive one-on-one compliance assistance. OFCCP is committed to providing compliance assistance to all Federal contractors. Compliance assistance can be provided in a variety of ways, e.g., training seminars for individuals or groups, printed brochures and pamphlets, web-based information and tools, telephone consultations, and on-site consultations.

 Back to Top

### What questions may employers ask on an employment application and what questions are employers prohibited from asking?

Note that this answer is limited to the laws enforced by the Office of Federal Contract Compliance Programs (OFCCP). OFCCP is responsible for enforcing Executive Order 11246, Section 503 of the Rehabilitation Act of 1973 (Section 503), and the Vietnam Era Veterans' Readjustment Assistance Act of 1973 (VEVRAA). Together, these laws prohibit covered federal contractors and subcontractors from discriminating on the basis of race, color, religion, sex, national origin, and status as an individual with a disability or protected veteran and require that affirmative steps be taken to ensure equal employment opportunity in employment practices.

It is the general rule that employers are given wide latitude in questions that they may ask an applicant and are not expressly prohibited from asking questions about race, color, religion, sex, or national origin. However, the employer may not use the information obtained in the application process to unlawfully discriminate against an applicant or employee. It is, therefore, prudent both to avoid asking for information that will not be used in evaluating an applicant's qualifications and to determine ahead of time whether the requested information would be used in a lawful manner. Since it is illegal to make employment decisions on the basis of race, color, religion, sex or national origin, asking questions related to these protected statuses is not advised.

In addition, Section 503 and VEVRAA prohibit employers from asking applicants disability-related questions (i.e., questions that are likely to elicit information about a disability) and from conducting medical examinations of applicants until after a conditional job offer is made. This ensures that an applicant's possible hidden disability will not be considered prior to the employer evaluating the applicant's non-medical qualifications. Once a conditional job offer is made, the employer may ask disability-related questions and require medical examinations, regardless of whether they are related to the job, as long as this is done for all

entering employees. However, if an individual is screened out because of a disability, the employer must show that the exclusionary criterion is job-related and consistent with business necessity. Once an employee begins employment, an employer's ability to make disability-related inquiries and require medical examinations is limited. Such inquiries generally may be made or medical examinations required only if they are job-related and consistent with business necessity.

  Back to Top

### What documents are employers required to retain related to the application process?

With regard to recordkeeping responsibilities, OFCCP regulations require that federal contractors maintain for a period of two years from the making of the record or the personnel action, all job postings and advertisements, applications received, any interview notes, test and test results, records of job offers, and the applications themselves. Contractors with fewer than 150 employees or a contract of less than $150,000 need only keep these records for a period of one year. See 41 CFR 60-1.12(a). In addition, OFCCP regulations and the Uniform Guidelines on Employee Selection Procedures (UGESP) obligate covered federal contractors to compile and maintain applicant data in order to ensure that the selection process used during hiring does not result in discrimination against a particular protected group. See 41 CFR 60-1.12, 41 CFR 60-3.4, and 60-3.15. Accordingly, a contractor must be able to identify the race, gender, and ethnicity (Hispanic or non-Hispanic) status of all applicants. Self-identification is the most reliable method and the preferred method for compiling such information about an individual. Contractors are encouraged to use tear-off sheets, post cards, or short forms to request demographic information from applicants that can be maintained separate and apart from the applications themselves. For more information on how to comply with OFCCP's regulations regarding the collection of race, gender, and ethnicity data, see OFCCP's directive entitled "Contractor Data Tracking Responsibilities" dated April 21, 2004. Note that OFCCP is currently engaged in rulemaking to address recordkeeping requirements regarding internet applicants and has issued a proposed rule. See Obligation to Solicit Race and Gender Data for Agency Enforcement Purposes, 69 Fed. Reg. 16446 (March 29, 2004), which can be found on-line. In addition, the agencies that issued the UGESP (including the Department of Labor) also published proposed guidance regarding recordkeeping and internet applicants. See Agency Information Collection Activities: Adoption of Additional Questions and Answers to Clarify and Provide a Common Interpretation of the Uniform Guidelines on Employee Selection Procedures as They Relate to the Internet and Related Technologies, 69 Fed. Reg. 10152 (March 4, 2004), which can be found at the Government Printing Office's website. http://edocket.access.gpo.gov/2004/04-4090.htm.

In addition to the requirement to collect demographic data for applicants, the regulations implementing Section 503 require employers to invite individuals to self-identify so that they can take advantage of the company's Affirmative Action Program for individuals with disabilities. For the same reasons that disability-related questions may not be asked prior to extending a job offer, the invitation to self identify must be given after an individual is made a job offer, but prior to the individual starting work. For more information regarding the invitation to self identify and when the invitation must be made, see 41 CFR 60-741.42. For a sample invitation to self identify, go on-line. Note that similar regulations exist under VEVRAA governing when employers may invite disabled veterans to self identify. See 41 CFR 60-250.42, available on-line.

In addition, VEVRAA requires that contractors invite applicants to self identify as a protected veteran regardless of whether s/he has a disability. Such invitation may be done at any time before the applicant begins employment. For a sample invitation to self identify for both specially disabled and other covered veterans, go on-line.

  Back to Top

**Freedom of Information Act  |  Privacy & Security Statement  |  Disclaimers  |  Important Web Site Notices  |  Plug-ins Used by DOL**

U.S. Department of Labor | Frances Perkins Building, 200 Constitution Ave., NW, Washington, DC 20210
www.dol.gov | Telephone: 1-800-397-6251 | TTY | Contact Us

# EXHIBIT

## C



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C.  20507**

Office of
Legal Counsel

August 8, 2013

Patricia A. Shiu, Director
Office of Federal Contract Compliance Programs
U.S. Department of Labor
Frances Perkins Building
200 Constitution Avenue, NW
Washington, DC  20210

Dear Director Shiu:

You have asked whether federal contractors may invite applicants to voluntarily self-identify as individuals with disabilities for affirmative action purposes without running afoul of the general rule under Title I of the Americans with Disabilities Act (ADA) prohibiting employers from making disability-related inquiries prior to an employment offer.  The EEOC's regulations implementing Title I of the ADA, the interpretive guidance accompanying those regulations, and two sub-regulatory documents published after the regulations and interpretive guidance make it clear that, for several independent reasons, compliance with a U.S. Department of Labor (DOL) regulation requiring contractors to invite applicants *pre-offer* to voluntarily self-identify as individuals with disabilities for affirmative action purposes cannot violate Title I of the ADA.

<u>First</u>, EEOC ADA regulations, at 29 C.F.R. § 1630.15(e), provide that no employer is liable for a violation of Title I of the ADA for an action that it is required to take by another federal statute or regulation:

> (e) *Conflict with other Federal laws.*  It may be a defense to a charge of discrimination under this part that a challenged action is required or necessitated by another Federal law or regulation, or that another Federal law or regulation prohibits an action … that would otherwise be required by this part.

This "other federal laws" defense insulates federal contractors from ADA liability for *any* actions that DOL regulations *require* them to take.  The EEOC's Title I Technical Assistance Manual, www.askjan.org/LINKS/ADAtam1.html, issued in 1992, makes the same point.  It explains that the reason private employers who are federal contractors can invite their employees to voluntarily self-identify as individuals with disabilities without otherwise violating the ADA's disability-related inquiry provision because they are required under Section 503 of the Rehabilitation Act to engage in affirmative employment efforts:

> *5.5(c) Exception for Federal Contractors Covered by Section 503 of the Rehabilitation Act and Other Federal Programs Requiring Identification of Disability.* Federal contractors and subcontractors who are covered by the affirmative action requirements of Section 503 of the Rehabilitation Act may invite individuals with disabilities to identify themselves on a job application form or by other pre-employment inquiry, to satisfy the affirmative action requirements of Section 503 of the Rehabilitation Act. Employers who request such information must observe Section 503 requirements regarding the manner in which such information is requested and used, and the procedures for maintaining such information as a separate, confidential record, apart from regular personnel records. (For further information, see Office of Federal Contract Compliance Programs listing in Resource Directory.)

In the same section of the Technical Assistance Manual, the Commission also provided examples of how such surveys were permissible if mandated by another federal law or regulation:

> A pre-employment inquiry about a disability also is permissible if it is required or necessitated by another Federal law or regulation. For example, a number of programs administered or funded by the U.S. Department of Labor target benefits to individuals with disabilities, such as, disabled veterans, veterans of the Vietnam era, individuals eligible for Targeted Job Tax Credits, and individuals eligible for Job Training Partnership Act assistance. Pre-employment inquiries about disabilities may be necessary under these laws to identify disabled applicants or clients in order to provide the required special services for such persons. These inquiries would not violate the ADA.

Moreover, the appendix to the EEOC's regulation concerning pre-employment disability-related inquiries and medical examinations, though not referencing the "other federal laws" defense, also recognizes the ability of contractors to comply with Section 503 by making pre-employment inquiries as to whether someone is an individual with a disability. *See* 29 C.F.R. 1630.14(a) ("collecting information and inviting individuals to identify themselves as individuals with disabilities as required to satisfy the affirmative action requirements of section 503 of the Rehabilitation Act is not restricted by this part").

Second, the EEOC has from early in its ADA enforcement made explicit in formal policy, and repeated in numerous policy and technical assistance materials ever since, that *any* employer may invite applicants or employees to voluntarily self-identify as individuals with disabilities for affirmative action purposes, whether pursuant to a federally-mandated affirmative action requirement such as Section 503 or a voluntarily adopted program. *See* Enforcement Guidance: Preemployment Disability-Related Questions & Medical Examinations (1995), www.eeoc.gov/policy/docs/preemp.html. The 1995 Enforcement Guidance states:

* May an employer ask applicants to "self-identify" as individuals with disabilities for purposes of the employer's affirmative action program?

Yes.   An employer may invite applicants to voluntarily self-identify for purposes of the employer's affirmative action program if:

* the employer is undertaking affirmative action because of a federal, state, or local law (including a veterans' preference law) that requires affirmative action for individuals with disabilities (that is, the law requires some action to be taken on behalf of such individuals); or

* the employer is voluntarily using the information to benefit individuals with disabilities.

Employers should remember that state or local laws sometimes permit or encourage affirmative action.   In those cases, an employer may invite voluntary self-identification only if the employer uses the information to benefit individuals with disabilities.

* Are there any special steps an employer should take if it asks applicants to "self-identify" for purposes of the employer's affirmative action program?

Yes.  If the employer invites applicants to voluntarily self- identify in connection with providing affirmative action, the employer must do the following:

* state clearly on any written questionnaire, or state clearly orally (if no written questionnaire is used), that the information requested is used solely in connection with its affirmative action obligations or efforts; and

* state clearly that the information is being requested on a voluntary basis, that it will be kept confidential in accordance with the ADA, that refusal to provide it will not subject the applicant to any adverse treatment, and that it will be used only in accordance with the ADA.

In order to ensure that the self-identification information is kept confidential, the information must be on a form that is kept separate from the application.

Third, as DOL explained in the preamble to its Notice of Proposed Rulemaking when publishing its proposed rule for notice and comment, the EEOC ADA regulations, 29 C.F.R. 1630.1(c)(2), also permit employers to comply with any laws that afford individuals with disabilities equal or greater rights. Indeed, the appendix to the EEOC ADA regulations at 29 CFR 1630.14(a) quoted above expressly recognizes such a situation. Because complying with a DOL rule requiring contractors to invite voluntary pre-offer identification would allow applicants to self-identify for the purpose of benefitting from potential affirmative action in a hiring decision, the contractors' invitation for this purpose would not violate the ADA.

If you have any further questions, please feel free to contact me.

Sincerely,

Peggy R. Mastroianni
Legal Counsel

# EXHIBIT

# D



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Washington, D.C. 20507

DEC 17 1996

Jeffrey A. Norris
President
Equal Employment Advisory Council
1015 Fifteenth Street, N.W.
Suite 1200
Washington, D.C. 20005

Dear Mr. Norris:

This is in response to your inquiry dated August 26, 1996, asking us to review an EEAC Memorandum dated August 16, 1996. Subsequently, on September 3, 1996, you asked us to review a second EEAC Memorandum dated August 30, 1996. Both Memoranda addressed new regulations from the Office of Federal Contract Compliance Programs (OFCCP) and their effect on procedures for inviting self-identification under section 503 of the Rehabilitation Act of 1973, 29 U.S.C. § 793, and the Vietnam Era Veterans' Readjustment Assistance Act, 38 U.S.C. § 4212.

As you know, the OFCCP intended its section 503 self-identification regulations to be consistent with Title I of the Americans with Disabilities Act, 42 U.S.C. § 12112(c), and the EEOC's guidance on preemployment disability-related inquiries. To the extent that your Memoranda suggest that the two laws are inconsistent, we disagree. We believe that the laws can be interpreted consistently. Below we address several issues raised in the Memoranda regarding the overlap between the section 503 regulations, 41 C.F.R. § 60-741.42, and the regulations implementing the preemployment inquiry provisions of Title I of the Americans with Disabilities Act, 29 C.F.R. § 1630.13, .14 (ADA).

<u>Request for Reasonable Accommodation -- Post Offer</u>[1]

Page four of the August 16 Memorandum reviews the procedures federal contractors must follow under section 503 in requesting information on reasonable accommodation

---

The section titles used in this letter are the same as those used in your August 16 Memorandum. We note, however, that the matters you discuss in this section pertain to an employer's inquiries about the need for reasonable accommodation rather than to an individual's request for a reasonable accommodation. This distinction is important because the ADA's rules on preemployment inquiries affect employers' inquiries about the need for reasonable accommodation. They do not affect individuals' requests for reasonable accommodation.

during the post-offer period.  The section 503 regulations state that, at the post-offer stage, if an individual self-identifies as a person with a disability, the federal contractor should inquire whether the individual needs reasonable accommodation.  41 C.F.R. § 60-741.42(b).  The OFCCP Sample Invitation to Self-Identify provides guidance on this point by suggesting that such an invitation summarize the contractor's affirmative action program, explain that applicants may request inclusion in the affirmative action program, and then invite such individuals to inform the employer if they need reasonable accommodation.  Appendix B to 41 C.F.R. Part 60-741.  The section 503 regulations and Sample Invitation are consistent with the ADA.

1.     Under the ADA, an employer may ask any disability-related question or require any type of medical examination during the post-offer period as long as such questions or examinations are required of all applicants going into the same job.  However, an employer is permitted to ask follow-up questions, or require follow-up medical examinations, of a specific individual as long as such questions or examinations are medically related to information received during the initial inquiry or examination.  See EEOC Enforcement Guidance: Preemployment Disability-Related Questions and Medical Examinations at 20 (Oct. 10, 1995) (Enforcement Guidance).

       When a federal contractor, pursuant to the section 503 regulations, extends a post-offer invitation to self-identify, it is making a disability-related inquiry of all applicants going into the same job.  Where an applicant identifies him/herself as a person with a disability, the contractor's subsequent inquiry as to whether the individual needs reasonable accommodation is permissible under the ADA because it is medically related to the information already disclosed (i.e., the existence of a disability).

2.     The Memorandum also raises concerns about a contractor's right to ask individuals at the post-offer stage to describe or demonstrate how they would perform a job function.  A federal contractor who learns at the post-offer stage that an individual needs a reasonable accommodation may have legitimate reasons to make further inquiries, consistent with both the ADA and section 503.

       The EEOC has stated that, at the pre-offer stage, when an employer could reasonably believe that a particular applicant will not be able to perform a job function because of a known disability, the ADA permits the employer to ask the applicant to describe or demonstrate how s/he would perform the function.  Enforcement Guidance at 5.  This rationale also would apply when an employer learns at the post-offer stage that an individual will need reasonable accommodation because of a disability, and reasonably believes that the person could have difficulty performing a specific job function.  In this limited circumstance, an employer could ask the individual to describe or demonstrate how s/he would perform the function.

2

<u>Invitation to Self-Identify -- Pre-Offer</u>

Page five discusses the section 503 regulations as they pertain to pre-offer invitations to self-identify.  The section 503 regulations and the ADA are consistent regarding the requirements that a federal contractor must meet in order to lawfully ask applicants to self-identify at the pre-offer stage.

Generally under the ADA, an employer cannot ask disability-related questions at the pre-offer stage.  However, the Commission has construed the statute to allow employers to ask applicants at the pre-offer stage whether they wish to self-identify as individuals with disabilities for affirmative action purposes.  The Enforcement Guidance lays out the specific requirements employers must meet to make such inquiries:

(1)     the employer is undertaking affirmative action because of a federal, state, or local law that requires affirmative action for individuals with disabilities (that is, the law requires some action to be taken on behalf of such individuals); or

(2)     the employer is voluntarily using the information to benefit individuals with disabilities.

Enforcement Guidance at 12.  If an employer wishes to invoke either of these requirements, it must provide affirmative action at the pre-offer stage that necessitates the identification of individuals with disabilities.

Since the section 503 regulations do not require that federal contractors take any affirmative action at the pre-offer stage which would necessitate inviting applicants to self-identify at this stage, a contractor cannot cite section 503 as justification for making pre-offer inquiries regarding self-identification.  <u>See</u> 41 C.F.R. § 60-741.42(a).  Under both the ADA and OFCCP's regulations, if a federal contractor wishes to request self-identification at the pre-offer stage, it may do so if:

(1)     <u>another</u> federal law, or a state or local law, requires the employer to provide affirmative action to persons with disabilities at the pre-offer stage which necessitates inviting applicants to self-identify; or

(2)     the employer is voluntarily using the information to benefit individuals with disabilities at the pre-offer stage.

Request for Reasonable Accommodation -- Pre-Offer[2]

Page 6 of the Memorandum reviews the section 503 regulations and ADA requirements regarding pre-offer inquiries about the need for reasonable accommodation.  As the Memorandum notes, the OFCCP states that employers should omit the reasonable accommodation paragraph from the Sample Invitation to Self-Identify when extending the invitation pre-offer.  Again, the section 503 regulations and Appendix B to Part 60-741 are consistent with the ADA.

Generally under the ADA, an employer cannot ask pre-offer questions about the need for reasonable accommodation because such questions are likely to elicit whether the applicant has a disability (i.e., such questions are disability-related).  However, when an employer could reasonably believe that an applicant will need reasonable accommodation to perform the functions of the job, the employer may ask that applicant certain limited questions about the need for reasonable accommodation and what type of accommodation would be required.  The Enforcement Guidance offers three situations in which an employer would be permitted to ask these limited questions:

(1)     the employer reasonably believes the applicant will need reasonable accommodation because of an obvious disability;

(2)     the employer reasonably believes the applicant will need reasonable accommodation because of a hidden disability that the applicant has voluntarily disclosed to the employer; or

(3)     the applicant has voluntarily disclosed to the employer that s/he needs reasonable accommodation to perform the job.

Enforcement Guidance at 6-7.

A federal contractor may make pre-offer inquiries about the need for reasonable accommodation only under these limited circumstances.  However, these circumstances are not present when a contractor invites self-identification for affirmative action.  When making this invitation, a contractor does not know if a particular applicant has a disability and therefore cannot have reason to believe that a particular applicant needs a reasonable accommodation.  Accordingly, OFCCP correctly instructs contractors to delete the

---

We note that the matters you discuss in this section pertain to an employer's inquiries about the need for reasonable accommodation rather than to an individual's request for reasonable accommodation.  This distinction is important because the ADA's rules on preemployment inquiries affect employers' inquiries about the need for reasonable accommodation.  They do not affect individuals' requests for reasonable accommodation.

reasonable accommodation paragraph from the Sample Invitation to Self-Identify when contractors use it at the pre-offer stage.

EEAC Model Forms

All of our comments up to this point address the ADA's general principles regarding preemployment inquiries and their application to specific questions raised in your Memorandum. Those same principles apply to EEAC's Model Forms. We also address two specific issues raised by the Model Forms.

1.    Poster or Handout Provided to All Employees or Applicants with Disabilities, Special Disabled Veterans, and Veterans of the Vietnam Era (Attachment 4 as Revised in the August 30 Memorandum)

The display or distribution of Attachment 4 must conform with the ADA's requirements on preemployment disability-related inquiries, as discussed above. Furthermore, you may wish to consider revising paragraph three to remove any discussion about accommodations that may be needed to perform the job. As presently written, this paragraph could cause confusion as to whether the employer, at the pre-offer stage, is inquiring whether an applicant needs reasonable accommodation to perform the job. As discussed above, this type of inquiry is illegal except in very limited situations that would not be present here. Thus, we suggest that you confine your discussion to reasonable accommodations needed to complete the job application process.

We also suggest that you delete the reference to "employees" because the invitation to self-identify required by § 60-741.42 is to be extended only to applicants.         Finally, the form should be directed to all applicants, and not just those with disabilities. An invitation to self-identify must be extended at the appropriate time to all applicants regardless of whether they are known to be individuals with disabilities.

2.    Record of Request for Reasonable Accommodation (Attachment 6 in the August 16 Memorandum)

The EEAC has drafted a model form to be used at the pre- or post-offer stage to record a request for reasonable accommodation. We wish to point out that use of this form at the pre- or post-offer stage must conform with ADA requirements regarding the employer's right to ask questions about the need for reasonable accommodation. Thus, a federal contractor may use this form at the pre-offer stage only in the limited circumstances noted in the Enforcement Guidance.

We hope this information is helpful to you.  This letter is an informal discussion of the issues raised in your Memoranda and is not an official opinion of the Equal Employment Opportunity Commission.  In addition, please be aware that our silence on any other matters raised in the August 16 and August 30 Memoranda and the accompanying Attachments should not be construed as agreement with statements or analysis related to those matters.

Sincerely,

*Peggy R. Mastroianni*

Peggy R. Mastroianni
Associate Legal Counsel

6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

ASSOCIATED BUILDERS AND
CONTRACTORS, INC.

        Plaintiff,

        v.

PATRICIA A. SHIU, et. al

        Defendants.

_____

**Case No. 1:13-cv-01806-EGS**

**[PROPOSED] ORDER**

Upon consideration of the Motion for Leave to File *Amicus Curiae* Brief in Support of Plaintiff filed by HR Policy Association, and any opposition thereto,

IT IS HEREBY ORDERED, DIRECTED AND DECREED that the Motion is GRANTED and that the Brief of *Amicus Curiae* in Support of Plaintiff shall be entered on the Court's docket for this case.

SO ORDERED this ____ day of January, 2014.

_____
Honorable Emmet G. Sullivan
U.S. District Judge