**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ASSOCIATED BUILDERS AND CONTRACTORS, INC., | |
| Plaintiff, | |
| v. | Case No. 1:13cv1806-EGS |
| PATRICIA A. SHIU, Director, Office of Federal Contract Compliance Programs, in her official capacity, *et al.,* | |
| Defendants. | |

**BRIEF FOR *AMICI CURIAE* AMERICAN ASSOCIATION OF PEOPLE
WITH DISABILITIES, THE JUDGE DAVID L. BAZELON CENTER
FOR MENTAL HEALTH LAW, THE EPILEPSY FOUNDATION
AND THE NATIONAL ORGANIZATION ON DISABILITY**

## INTRODUCTION

The United States Department of Labor, acting against the backdrop of a continuing problem of dramatic unemployment and underemployment of individuals with disabilities, in 2013 updated its regulations implementing Section 503 of the Rehabilitation Act of 1973. Section 503 requires federal government contractors receiving high dollar value contracts to take affirmative action to employ people with disabilities.   Having determined that its prior regulations had "resulted in little improvement in the unemployment and workforce participation rates of individuals with disabilities,"[1] the Labor Department appropriately promulgated new regulations that impose data collection requirements and set a utilization goal for certain government contractors in order to promote the employment of people with disabilities.  These small steps will, for the first time, provide contractors with a benchmark against which to

---

[1] U.S. Dep't of Labor, Office of Federal Contract Compliance Programs, Affirmative Action and Nondiscrimination Obligations of Contractors and Subcontractors Regarding Individuals with Disabilities, Notice of Proposed Rulemaking, 76 Fed. Reg. 77056, 777069 (Dec. 9, 2011).

measure affirmative action efforts.  They will also shed light on hiring and employment patterns such that the federal government and contractors themselves can identify when recruitment and retention strategies are not working and other measures should be explored.  Federal contractors' affirmative action obligations with respect to race and gender have long included such utilization goals and data collection; the new Section 503 regulations bring sorely needed updates to similar protections for individuals with disabilities.

This case demonstrates exactly why data collection and utilization goals are critical in furthering the goals of the Rehabilitation Act:  Despite Plaintiff Associated Builders and Contractors' ("ABC") assertion that it has a "longstanding commitment to affirmative action and nondiscrimination towards qualified individuals,"[2] ABC contends that there are so few individuals with disabilities qualified to work in the construction industry that not only the Labor Department's modest goal, but *any* goal, would be inappropriate.  This contention demonstrates ABC's stereotypically narrow view of the capabilities of people with disabilities, both in assuming that people with disabilities are unqualified and overlooking the millions of people with disabilities who already work in the construction industry and in other physically demanding and hazardous occupations.  Indeed, people with disabilities are employed by the federal government in many occupations that are physically demanding, hazardous, and/or transitory, and often at rates higher than the new regulations' utilization goal.

Furthermore, the arguments ABC makes today echo arguments made in past years against the Department of Labor's affirmative action regulations to promote the hiring of women.  In the late 1970's when the Department of Labor promulgated those regulations, the

---

[2] Plaintiff's Memorandum in Support of Motion for Summary Judgment, December 3, 2013 (Doc. 9) at 1 (hereinafter "ABC Brief").

construction industry vigorously opposed them.  Ultimately the Department of Labor rejected the construction industry's objections.

To set aside the utilization goal in the new rule based on the contention that there are not enough capable people with disabilities would yield to the very stereotypes about people with disabilities that the Rehabilitation Act was enacted to combat.

## STATEMENTS OF INTEREST OF *AMICI CURIAE*

### The American Association of People with Disabilities

The American Association of People with Disabilities (AAPD), founded in 1995 and headquartered in Washington, D.C., is the largest national nonprofit disability rights organization in the United States.  AAPD promotes equal opportunity, economic power, independent living, and political participation for people with disabilities.  Its members, including people with disabilities and family, friends, and supporters, represent a powerful force for change. AAPD and its members work to uphold the civil rights of all Americans with disabilities through the effective enforcement and implementation of civil rights laws including the Americans with Disabilities Act (ADA) and the Rehabilitation Act of 1973.

### The Judge David L. Bazelon Center for Mental Health Law

Founded in 1972 as the Mental Health Law Project, the Judge David L. Bazelon Center for Mental Health Law is a national nonprofit advocacy organization that provides legal assistance to individuals with mental disabilities.  Through litigation, public policy advocacy, training and education, the Center works to advance the rights and dignity of individuals with mental disabilities in all aspects of life, including employment.  The Center played an important role in securing the passage of the ADA and the 2008 amendments to the ADA and the

Rehabilitation Act.  The Center has extensive experience with advocacy under the ADA and the Rehabilitation Act concerning disability-based employment discrimination, and has participated as *amicus* in virtually every case heard by the U.S. Supreme Court concerning the employment rights of individuals with disabilities.

**Epilepsy Foundation of America**

The Epilepsy Foundation of America (also known as the "Epilepsy Foundation") is a nonprofit corporation founded in 1968 to advance the interests of the 2.8 million Americans with epilepsy (chronic seizures). Together with its 47 affiliates throughout the nation, the Epilepsy Foundation maintains and disseminates up-to-date, accurate information about epilepsy/seizure disorders, promotes public understanding of the disorder, and supports research, invests and supports the development of new therapies, and advocates on behalf of people with seizure disorders. The term "epilepsy" evokes stereotyped images and fears which affect persons with this medical condition in all aspects of life. Since its inception, the Epilepsy Foundation of America has stood against the stigma and discrimination associated with seizures.  Our organization supports the development and full implementation of laws which promote the employment of people with disabilities like epilepsy (also called seizure disorders) who, as a result of stereotypes and misunderstanding about such conditions, have been historically underemployed.  Despite the passage of the Rehabilitation Act of 1973, as amended, and the ADA of 1990, as amended, studies document that 25 percent of people with epilepsy are unemployed.  Among those with frequent seizures, the unemployment rate approaches 50 percent.  At the same time, based on our experience with employment and other programs, the Foundation knows that people with epilepsy are able to successfully perform a wide variety of

jobs – including jobs and apprentice programs in the manufacturing and construction industries. The Foundation supports the vigorous implementation of the laws, including Section 503 of the Rehabilitation Act.  We support the Department of Labor's new regulations calling for collection of data on applicants and hiring for all government contractors to whom the law and regulations apply.

### National Organization on Disability[3]

The National Organization on Disability (NOD) is a District of Columbia non-profit corporation with its headquarters in New York City.  The mission of NOD is to expand the participation and contribution of America's tens of millions of men, women and children with disabilities in all aspects of life. For more than 30 years, NOD has built and sustained programs that raise disability awareness, encourage physical and attitudinal accessibility, make America's communities accessible, and provide opportunities for employment and growth. NOD joined with other disability organizations and advocates in the effort to enact the ADA. Through business and advocacy partnerships, including its Bridges to Business and Wounded Warriors Career programs, NOD strives to eliminate barriers and to improve work opportunities for Americans with disabilities.

### ARGUMENT

I.      **The purpose of Section 503 of the Rehabilitation Act was to ensure that federal contractors would be leaders in integrating people with disabilities into the workplace.**

In enacting the Rehabilitation Act, Congress recognized that stereotypes and prejudices prevented individuals with disabilities from achieving their full employment potential.  Indeed,

_____

[3] The National Organization on Disability requested to join as *amicus* after the other *amici* filed their Motion for Leave to File *Amicus Curiae* Brief, January 8, 2014 (Doc. 14).

Congress explicitly stated that the Rehabilitation Act was necessary because "individuals with disabilities constitute one of the most disadvantaged groups in society," because "individuals with disabilities continually encounter various forms of discrimination in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and public services;" and because the federal government was uniquely positioned to promote their "full inclusion and integration in the economic, political, social, cultural, and educational mainstream of American society." 29 U.S.C. §§ 701(a), 701(b)(2).

Consequently, an express purpose of the Act is "to empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society" by, *inter alia*, "the guarantee of equal opportunity." 29 U.S.C. § 701(b). Further, Congress confirmed that "[i]t is the policy of the United States that all programs, projects, and activities receiving assistance [under the Rehabilitation Act] shall be carried out in a manner consistent with the principles of . . . inclusion, integration, and full participation of [individuals with disabilities]." *Id.* § 701(c).

Thus, Section 503 orders contractors receiving high dollar value contracts from the federal government to "take affirmative action to employ and advance in employment qualified individuals with disabilities." *Id.* § 793(a). The Department of Labor's new regulations constitute a reasonable response of the federal government to this mandate, particularly in light of the Department's decades of experience with prior regulations that did not result in meaningful improvement in contractors' employment of people with disabilities.

**II.    The Department of Labor appropriately imposed a utilization goal for employment of people with disabilities in the construction industry.**

The Department of Labor's decision to include all industries, including the construction industry, in its new Section 503 regulations recognizes that people with all kinds of disabilities, including both physical and mental impairments, can and do perform the kinds of physically demanding, hazardous, and/or transitory work characteristic of some jobs in the construction industry.  The new utilization goals were necessary because people with disabilities have historically been kept out of and discouraged from entering the workforce due to precisely the kinds of stereotypes and assumptions ABC relies on here.  People with disabilities vary widely in terms of their capabilities and limitations; and similarly, construction industry jobs vary widely in terms of their demands.  The industry should thus not be exempted from rules that encompass a broad spectrum of jobs and businesses, and that are intended to remedy the historic exclusion of people with disabilities from the workforce.

**a.   People with disabilities can and do perform construction industry jobs.**

ABC's contention that the new Rule should be invalidated because it "fails to differentiate between physically hazardous occupations such as those in the construction industry and other types of jobs and industries," and because "the unique hazards present on construction jobsites" have a particular impact on the ability of people with disabilities to work in the construction industry, is unfounded.  *See* ABC Brief at 10-11, 12-13, 26.

ABC's contention that there are not enough qualified individuals with disabilities to work in the industry's physically demanding and hazardous jobs is based on a limited understanding of the capabilities of people with disabilities.  First, ABC ignores the fact that a vast number of people with disabilities are unlimited in the ability to perform "physically demanding" work, including work in the construction industry.  For example, a person with an auditory processing

disorder would typically need no accommodation to work as carpenter.  A person with a significant stutter would ordinarily need no accommodation to operate machinery.  And many other people with disabilities can perform work in the construction industry with a reasonable accommodation, as required by law.  *See* 42 U.S.C. § 12112; 29 U.S.C. § 791(g).  For example, a wheelchair user might not be able to climb a ladder, but he may be able to reach items at the top of the ladder by using a scissor lift.

Indeed, the number of workers with disabilities already in the construction industry demonstrates that the Labor Department's 7% utilization goal is appropriate as a benchmark for affirmative action efforts.  According to the U.S. Census Bureau's 2012 American Community Survey (ACS), 5.5% of construction industry employees are people with disabilities, and the construction industry ranks sixth out of the thirteen industries surveyed in terms of the percentage of people with disabilities employed.[4]  These numbers are not significantly different from the 5.7% of individuals with disabilities the Department of Labor estimates are in the workforce in general, a percentage the Department seeks to increase across industries through the promulgation of the new Section 503 regulations.  *See* Defendants' Combined Memorandum in Support of Their Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment, December 20, 2013 (Doc. 11-1) at 34.

Indeed, people with disabilities can and do perform a wide variety of "physically demanding," "hazardous," and "transitory" jobs throughout the workforce.[5]  The United States Census Bureau reports that nearly three million people with disabilities worked in the highly-

---

[4] *See* United States Census Bureau, 2012 American Community Survey 1-Year Estimates, Selected Economic Characteristics for the Civilian Noninstitutionalized Population by Disability Status (available at factfinder2.census.gov /faces/tableservices/jsf/pages/productview.xhtml? src=bkmk as of January 2, 2014).

[5] *See* ABC Brief at 10 (describing jobs in the construction industry as "uniquely physical and transitory"); *id.* (describing jobs in the construction industry as "physically hazardous").

physical job categories "craft workers," "laborers and helpers," "operatives," and "technicians" between 2008-2010.[6]  *See also* EEO-1 Job Classification Guide (available at www.eeoc.gov/employers/eeo1survey/jobclassguide.cfm as of January 2, 2014) (the term "Craft Workers" includes "Brickmasons, Blockmasons, and Stonemasons," "Carpenters," "Miscellaneous Construction Equipment Operators," "Painters, Construction and Maintenance," "Electricians," "Hazardous Materials Removal Workers," "Elevator Installers," "Security and Fire Alarm Systems Installers," "Heating, Air Conditioning, and Refrigeration Mechanics and Installers," and "Crane and Tower Operators," among many others; "Laborers and Helpers" include "Construction Laborers," "Helpers, Construction Trades," and "Helpers – Installation, Maintenance, and Repair Workers;" "Operatives" include "Welding, Soldering, and Brazing Workers," "Painting Workers," and "Truck Drivers;" and "Technicians" include "Drafters" and "Engineering Technicians.").

The federal government's own employment of people with disabilities further undermines ABC's claim that there are not enough individuals with disabilities qualified to work in construction.  Data from the Office of Personnel Management shows that the federal government directly employs significant percentages of people with disabilities in jobs that are "physically demanding," "hazardous," and "transitory."[7]  For example, 17% of elevator mechanics employed by the federal government in 2012, as well as 8% of forklift operators, 12% of people working in hazardous waste disposal, and 7% of park rangers, were people with disabilities.  *Id.*

---

[6] Disability Employment 3: EEO-1 Job Categories by Disability Status, Sex, and Race/Ethnicity, Total Population, Number Universe, DOL Disability Employment Tabulation 2008-2010 (3-year ACS data) (available at http://factfinder2.census.gov/faces/ tableservices/jsf/pages/productview. xhtml?src=bkmk as of January 2, 2014).
[7] Data based on communications between *amici* and Office of Personnel Management in January 2014.  *See* Exhibit A for underlying data and further examples.

Courts considering employees' disability discrimination claims under the Americans with Disabilities Act and the Rehabilitation Act have rejected numerous arguments by employers based on unfounded assumptions that people with disabilities cannot perform physically demanding or hazardousjobs. *See, e.g., Rodriguez v. ConAgra Grocery Products Co.*, 436 F.3d 468 (5th Cir. 2006) (reversing district court's grant of summary judgment to employer based on evidence that applicant with diabetes could work in production at food manufacturing plant; noting that applicant had previously "performed heavy manual labor, including unloading delivery trucks and lifting heavy sacks" at same plant); *Echazabal v. Chevron USA, Inc.,* 336 F.3d 1023 (9th Cir. 2003) (reversing district court's grant of summary judgment to employer based on evidence that applicant with asymptomatic hepatitis C could perform maintenance position at oil refinery plant); *Gillen v. Fallon Ambulance Serv., Inc.,* 283 F.3d 11 (1st Cir. 2002) (reversing district court's grant of summary judgment to employer based on evidence that applicant with genetically amputated arm could perform Emergency Medical Technician position, including lifting patients; noting that applicant successfully worked as EMT for different ambulance service during pendency of litigation); *Lowe v. Alabama Power Co.,* 244 F.3d 1305 (11th Cir. 2001) (reversing district court's grant of summary judgment to employer based on evidence that employee with double leg amputations could perform mechanic position at steam plant); *Holiday v. City of Chattanooga,* 206 F.3d 637 (6th Cir. 2000) (reversing district court's grant of summary judgment to employer based on evidence that applicant with HIV could work as police officer).  With the exception of *Lowe v. Alabama Power Co.,* the plaintiffs in these cases did not request or need reasonable accommodations to perform the positions at issue – the defendants denied them employment based on stereotypes and assumptions about their ability to perform the jobs in question – but many people with disabilities can also perform

physically demanding, hazardous, and transitory jobs as long as the reasonable accommodations required by the Rehabilitation Act and the ADA are provided. *See* 42 U.S.C. § 12112; 29 U.S.C. § 791(g).

> **b. Contractors made similar arguments concerning utilization goals for employment of women, and those arguments were rejected as unfounded.**

More than thirty years ago, the construction industry made similar arguments when it opposed the imposition of a utilization goal for the hiring of women in regulations promulgated pursuant to Executive Order 11246. 43 Fed. Reg. at 14888 (1978) (regarding 41 C.F.R. 60-4.6). Those arguments were rejected as unfounded.

In imposing a utilization goal for federal construction contractors' employment of women, the Department of Labor contrasted the near-total exclusion of women from the construction industry workforce with women's significant and untapped interest in construction industry jobs. 43 Fed. Reg. at 14893 (noting the "gross disparity between the percentage of women in the labor force and the percentage of women in the construction trades"). But the construction industry claimed, as ABC does here, that there were not enough qualified women to meet the utilization goals. *Id.* at 14892-93. The construction industry's comments in response to the proposed rule at that time "characterize the goal levels as quotas and state that the goals would require contractors to hire unqualified persons, that qualified women craft workers are not available, that contractors would be required to displace other workers with women because of high unemployment in the industry, and that the required actions, particularly the recordkeeping requirements, placed an additional cost burden on contractors which would be difficult for small contractors to absorb." *Id.* at 14888.

The Department rejected these arguments and promulgated 41 C.F.R. 60-4, citing census data and testimony that demonstrated that the underrepresentation of women in the construction

industry was not the result of a lack of interest among women.  43 Fed. Reg. at 14888.  Based on

these findings, the Department concluded that "unless specific affirmative action steps are

prescribed, construction employment opportunities will not reach the female workforce of this

country."  *Id.*[8]  The same out-moded thinking that led to the construction industry's resistance to

a utilization goal for hiring women underpins ABC's arguments here.  As the Department did

then, the Court should reject these arguments now.

      **c.  Differences among industries do not make a utilization goal inappropriate.**

Although, as discussed above, the construction industry is not unique with respect to its

employment of people with disabilities, eliminating utilization goals for every industry that

claims to be unique or have physically demanding, hazardous, or transitory jobs would quickly

render the Rehabilitation Act's requirements meaningless.

Many industries include physically demanding, hazardous, and transitory jobs, but are not

exempt from compliance with Section 503 of the Rehabilitation Act.  *See, e.g.,* Occupational

Safety and Health Administration (OSHA), 2012 Survey of Occupational Injuries and Illnesses,

November 7, 2013 (available at www.bls.gov/iif/oshwc/osh/os/ osch0049.pdf as of January 4,

2014) (listing "Construction" below "Health care and social assistance," "Manufacturing,"

"Retail trade," "Accommodation and food services," and "Transportation and warehousing" in

rates of "nonfatal occupational injuries and illnesses.").

Ironically, industries with relatively few "hazardous" or "physically demanding" jobs

also objected to the new Rule, based on their "unique" status.  For example, Thomas Shanahan,

---

[8] Before 41 C.F.R. 60-4 was promulgated, the federal government's rules implementing
Executive Order 11246 initially failed to include goals for women in the construction industry.
In 1977, after President Carter took office, the Department of Labor settled a lawsuit brought by
women challenging the absence of such goals and promulgated 41 C.F.R. 60-4.  The Labor
Department, in promulgating this rule, rejected the reasoning of the prior Administration
concerning the setting of goals for women.

General Counsel at the University of North Carolina, testified before the House Education and the Workforce Committee in opposition to the new Rule based on the "unique" nature of the higher education workforce.  *See* Statement by Thomas C. Shanahan, Vice President for Legal Affairs and General Counsel, The University of North Carolina, Before the House Education and the Workforce Committee, Subcommittee on Workforce Protections, Hearing on Examining Recent Actions by the Office of Federal Contract Compliance Programs, December 4, 2013, at 9, http://edworkforce.house.gov/uploadedfiles/shanahan_testimony.pdf (objecting to the utilization goal for "organizations of the size, complexity, and multiple occupational categories" typical of higher education); *id.* at 10 (objecting to the new Rule based on the "nature of our workforce"); *id.* at 8 (describing "some of the unique characteristics and organization of university employment and organization").

If the Department of Labor were to exempt higher education or the construction industry from these regulations, it would open the flood gates to requests for exemptions from every industry.  If such differences were permitted to exempt industries from the utilization goal, the goal would apply to almost no one.

### d.  The 7% utilization goal provides flexibility and should not be difficult to meet.

#### 1.  Section 503 covers a broad group of people with disabilities

Meeting a utilization goal of 7% should not be difficult for ABC's members.  Indeed, this goal was derived from estimates using Census Bureau data encompassing a narrow group of individuals with disabilities: those who are deaf or have serious difficulty hearing; who are blind or have serious difficulty seeing; who have serious difficulty concentrating, remembering or making decisions due to a physical, mental or emotional condition; who have serious difficulty walking or climbing stairs; who have difficulty dressing or bathing; or who have difficulty doing

errands alone due to a physical, mental or emotional condition.[9]  By contrast, under Section 503, a far broader group of individuals with disabilities count toward the 7% goal.  The affirmative action provisions of Section 503 apply to *all* individuals with a disability as that term is defined in the ADA: anyone with a physical or mental impairment that substantially limits a major life activity (including a major bodily function), or with a history of such an impairment.  29 U.S.C. §§ 793, 705(20)(B); 42 U.S.C. § 12102.  Section 503's definition of disability was significantly broadened by Congress in the ADA Amendments Act of 2008, which specified that the standard is to be "construed in favor of *broad coverage* . . . to the maximum extent permitted by the terms of [the ADA and the Rehabilitation Act]." 42 U.S.C. § 12102(4)(A); 29 C.F.R. § 1630.2(j)(1)(i).

The group of individuals with disabilities covered by Section 503 is broader than the group covered by the Census Bureau data in other ways as well.  As the Department has pointed out, the individuals counted toward the 7% goal include people whose impairments substantially limit major bodily functions (such as kidney, liver, endocrine, or immune function) even if they do not substantially limit activities such as hearing, seeing, walking, bathing, climbing stairs or other activities captured by the Census Bureau data.  The individuals counted toward the 7% goal also include people whose limitations are partially or completely controlled by mitigating measures (such as medication, therapies, and other interventions); by contrast, the Census Bureau does not ask people whether they would meet the definition of disability absent mitigating measures.[10]

_____

[9] The Department of Labor based its 7% goal on the American Community Survey, which captures data on individuals in these categories.  *See* www.census.gov/acs/www/Downloads/QbyQfact/disability.pdf.

[10] *See* Dep't of Labor, Office of Federal Contract Compliance Programs, Final Rule, Affirmative Action and Nondiscrimination Obligations of Contractors and Subcontractors Regarding Individuals With Disabilities, 78 Fed. Reg. 58682, 58703-04 (Sept. 24, 2013), www.gpo.gov/fdsys/pkg/FR-2013-09-24/pdf/2013-21228.pdf.

Indeed, because the group of individuals that count toward Section 503's utilization goal is so broad, disability groups had recommended that the Department adopt a *higher* utilization goal, of 10%, rather than 7%.[11]  The U.S. Equal Employment Opportunity Commission (EEOC) estimates that somewhere between 20% and 64% of individuals covered by the ADA (and thus Section 503, which covers the same group of individuals with disabilities) participate in the labor force.[12]  Moreover, the EEOC estimated that even a *subset* of the individuals covered by the ADA and Section 503 (those whose impairments will virtually always be disabilities under these laws, but were not clearly covered before the 2008 amendments to the ADA and the Rehabilitation Act) constitutes approximately 60 million people, or about 20% of the population.[13]  Thus the entire group of individuals covered by Section 503 should be well above 20% of the population.

Furthermore, failure to meet the goal does not constitute a violation of Section 503 as long as a contractor is undertaking the measures required by the regulations.  The goal is simply a benchmark thatis used to determine whether a contractor's practices deserve greater scrutiny. Even if ABC were correct that it is difficult to find individuals with disabilities who are qualified to do construction jobs, a 7% benchmark with no consequences for failing to meet it is not an unreasonable benchmark for the Department to use to measure the employment of people with disabilities, including in the construction industry.

---

[11] *See, e.g.,* Comments of Consortium of Citizens with Disabilities members submitted Feb. 21, 2012 in response to the Department's Notice of Proposed Rulemaking, available at www.bazelon.org/ portals/0/employment/503%20comments%20CCD%202%2021%2012.pdf as of January 15, 2014.
[12] Regulatory Impact Analysis, Final Rule implementing the ADA Amendments Act of 2008, 76 Fed. Reg. 16991 (March 25, 2011).
[13] *Id*. at 16990-91.

**2. People with disabilities now represent almost 12% of employees across the federal government, including in physically demanding jobs.**

Moreover, the percentage of federal government employees who have disabilities demonstrates that a 7% utilization goal is reasonable. Perhaps due to the federal government's efforts to implement Executive Order 13548, which in 2010 set specific goals for federal agencies' recruitment and hiring of people with disabilities, people with disabilities now represent almost 12% of employees across the federal government.[14] This number is increasing – 16.31% of new hires in 2012 were people with disabilities. *Id.* Moreover, as noted above, hundreds of thousands of people with disabilities who work for the federal government perform jobs that entail significant physical demands. It is clear that 7% is an eminently achievable goal.

In sum, the construction industry is not so unique, and people with disabilities are not so incapable, as to invalidate the Labor Department's utilization goal with respect to the construction industry. Effective affirmative action requirements for federal contractors, including in the construction industry, are critical to furthering the goals of inclusion and integration adopted by Congress in the Rehabilitation Act.

**III. The Department of Labor appropriately imposed data collection requirements on the construction industry.**

**a. Collecting data pertaining to employees and applicants with disabilities is not difficult, as ABC contends.**

ABC claims that "[t]he tracking and analysis of hiring and employment data by construction contractors is more problematic with regard to disabled workers and applicants than for minorities and women or even protected veterans, because disabilities come in many forms."

---

[14] OPM, Employment of People with Disabilities in the Federal Executive Branch FY 2012 Report (Dec. 19, 2013), available at www.opm.gov/policy-data-oversight/diversity-and-inclusion/reports/disability-report-fy2012.pdf as of January 15, 2014.

ABC Brief at 12-13.  But all that the regulations require contractors to do is collect data that is self-reported by applicants and employees.  The Department of Labor will provide a standard form, which simply invites applicants and employees to self-identify as having a disability.  The type of disability is irrelevant.  The federal government uses a similar method of self-reporting in gathering employee data, and is expected to start inviting job applicants to self-identify as people with disabilities soon.  Indeed, the OPM data cited in this brief is based on self-reporting.

Although the construction industry claims that the data collection requirements are unduly burdensome, ABC Brief at 26-27, the industry is already required to document the hiring and recruitment of women and minorities.  For example, 41 C.F.R. § 60-4.3(a) states that contractors must:

> Maintain a current file of the names, addresses and telephone numbers of each minority and female off-the-street applicant and minority or female referral from a union, a recruitment source or community organization and of what action was taken with respect to each such individual. If such individual was sent to the union hiring hall for referral and was not referred back to the Contractor by the union or, if referred, not employed by the Contractor, this shall be documented in the file with the reason therefor, along with whatever additional actions the Contractor may have taken.

Like disabilities, race and veteran status may come in many forms.  The construction industry already relies on self-reporting to comply with the existing affirmative action regulations.  The industry can use the same administrative infrastructure to comply with the data collection and reporting requirements as to people with disabilities.

### b. Collecting data concerning applicants and employees with disabilities is critical to effective affirmative action efforts.

The Department of Labor appropriately concluded that a utilization goal was important after decades of experience with the prior Section 503 regulation brought little improvement in the employment of people with disabilities among federal contractors.

17

People with disabilities had low employment rates at the time that the Rehabilitation Act was passed and, more than 40 years later, continue to be employed at a fraction of the rate of employment of people without disabilities.  In 2010 people with disabilities had a labor force participation rate of 21.8%, compared with 70.1% for people without disabilities.[15]  The 2009 American Community Survey, which uses the same definition of disability as the CPS, shows similar results, with 23% of people with disabilities participating in the labor force compared to 65.8% of people without disabilities.  This stagnation has occurred despite the protections of the Rehabilitation Act, the ADA and the existing Section 503 regulations.

The agency acted reasonably in determining that affirmative action efforts should include the collection of basic data so that contractors and the Department of Labor can analyze whether particular outreach, recruitment, and retention strategies are working.  Common sense dictates that meaningful efforts include data collection that looks at applicant flow and overall employment rates of people with disabilities to determine whether such strategies are succeeding or whether they should be modified.  And history has shown that without such data collection, little progress will be made.  Employment rates for people with disabilities remain abysmal.  The construction industry should not be excluded from data collection requirements based on the nature of construction jobs or the nature of disability versus other areas of data collection (like race, gender, or veteran status).

ABC further contends that there is insufficient data showing that the construction industry has failed to meet its affirmative action obligations.  ABC Brief at 30.  But this

---

[15] Bureau of Labor Statistics, Table A, Employment status of the civilian noninstitutional population by disability status and age, 2009 and 2010 annual averages, available at www.bls.gov/news.release/disabl.a.htm as of January 15, 2014 (note that this data is based on the Current Population Survey (CPS), which captures a narrower group of individuals with disabilities than Section 503 and the ADA).

contention, taken with the statistics cited above, actually supports the imposition of new data

collection regulations.  It is clear that individuals with disabilities continue to be

underrepresented in the workforce in general, and in the construction industry in particular.  With

the current state of data collection, as ABC recognizes, it is impossible to discern with precision

the contours of that underrepresentation.  And rather than supporting ABC's challenge to the

new regulations, this fact justifies the imposition of data collection requirements.  Section 503

requires that affirmative action be taken to integrate people with disabilities into the workforce.

Until the Department of Labor knows whether people with disabilities are applying for particular

jobs in particular industries, and whether they are being accepted or rejected, it cannot

understand the full extent of any discrimination, and its efforts to integrate people with

disabilities into the workforce, as required by Section 503, will be hindered.  Data collection is

the first, critical, step toward truly effective affirmative action.

   c.   **Requests for voluntary self-identification are consistent with the ADA.**

The claims of ABC and *amicus* HR Policy Association[16] that requiring contractors to

invite applicants with disabilities to voluntarily self-identify would violate the ADA are simply

wrong.  The EEOC, charged with enforcing and interpreting the ADA's requirements with

respect to employment discrimination, has *always* maintained that the ADA permits employers

to invite job applicants with disabilities to voluntarily self-identify before receiving a job offer as

part of an affirmative action program, including affirmative action taken pursuant to Section 503.

*See, e.g.*, 29 C.F.R. Part 1630 App. § 1630.14(a), "Medical Examinations and Inquiries

Specifically Permitted" ("As previously noted, collecting information and inviting individuals to

identify themselves as individuals with disabilities as required to satisfy the affirmative action

---

[16] Brief of *Amicus* HR Policy Association in Support of Plaintiff, January 13, 2014 (Doc. 18-1) (hereinafter "HR Policy Ass'n. Brief").

requirements of section 503 of the Rehabilitation Act is not restricted by [the ADA's provisions concerning pre-employment inquiries]").  *See also* U.S. Equal Emp. Opp. Comm'n, *Enforcement Guidance:  Preemployment Disability-Related Questions and Medical Examinations*, No. 915.002 (Oct. 10, 1995), http://www.eeoc.gov/policy/docs/preemp.html (employer may ask applicants to "self-identify" as individuals with disabilities pre-offer if "the employer is undertaking affirmative action because of a federal, state, or local law . . . that requires affirmative action for individuals with disabilities. . . or the employer is voluntarily using the information to benefit individuals with disabilities.").[17]

Furthermore, the EEOC's regulations provide a defense to a charge of employment discrimination under the ADA where "a challenged action is required or necessitated by another Federal law or regulation."  29 C.F.R. § 1630.15(e).  *See also* U.S. Equal Emp. Opp. Comm'n, Technical Assistance Manual (1992) (available at http://askjan.org/LINKSADAtam1.html as of January 16, 2014) ("Federal contractors and subcontractors who are covered by the affirmative action requirements of Section 503 of the Rehabilitation Act may invite individuals with disabilities to identify themselves on a job application form or by other pre-employment inquiry, to satisfy the affirmative action requirements of Section 503 of the Rehabilitation Act. . . .  A

---

[17] This is consistent with Congress's intent in passing the ADA.  See S. Rep. No. 101-116, at 38 (1989) ("Consistent with the section in the legislation pertaining to preemployment inquiries, it is the Committee's intent that a covered entity may invite applicants for employment to indicate whether and to what extent they have a disability under the following circumstances only: (1) when a covered entity is taking remedial action to correct the effects of past discrimination, (2) when a recipient is taking voluntary action to overcome the effects of conditions that resulted in limited employment opportunities, or (3) when a recipient is taking affirmative action pursuant to section 503 of the Rehabilitation Act of 1973. . . ); H.R. Rep. No. 101-485 (II) (House Comm. on Educ. and Labor), at 53-54 (same); H.R. Rep. No. 101-485(III) (House Comm. on Judiciary), at 21 (same).

pre-employment inquiry about a disability also is permissible if it is required or necessitated by another Federal law or regulation.").

Finally, the ADA provides that "Nothing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of any Federal law or law of any State or political subdivision of any State or jurisdiction that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter." 42 U.S.C. § 12201(b). "Thus, for example, title I of the ADA would not be a defense to failing to prepare and maintain an affirmative action program under section 503 of the Rehabilitation Act." 29 C.F.R. Part 1630, App. § 1630.1(b).

In 2013, the EEOC issued a letter specifically clarifying that the Labor Department's regulations requiring contractors to invite job applicants to voluntarily self-identify pre-offer as having a disability are consistent with the ADA.[18] The letter explains the three bases laid out above. While *amicus* HR Policy Association tries to make much of an EEOC letter from seventeen years ago that it claims is inconsistent with the EEOC's 2013 letter, to the contrary, the letters are perfectly consistent with each other and with the EEOC's longstanding position on this issue. The 1996 letter reiterates that employers may invite applicants to voluntarily self-identify as having disabilities at the pre-offer stage if "(1) the employer is undertaking affirmative action because of a federal, state, or local law that requires affirmative action for individuals with disabilities; or (2) the employer is voluntarily using the information to benefit individuals with disabilities."[19]  *Amicus* HR Policy Association points to one partial sentence

---

[18] *See* Exhibit C to HR Policy Ass'n. Brief, Letter from Peggy Mastroianni, Legal Counsel, Equal Employment Opportunity Commission to Patricia Shiu, Director, Office of Federal Contract Compliance Programs (August 8, 2013).
[19] Exhibit D to HR Policy Ass'n Brief, Letter from Peggy Mastroianni to Equal Employment Advisory Council (Dec. 17, 1996).

taken out of context.[20]   The full text of the cited sentence in the 1996 letter states, "*Since the section 503 regulations do not require that federal contractors take any affirmative action at the pre-offer stage . . .* a contractor cannot cite section 503 as justification for making pre-offer inquiries regarding self-identification."[21]   In 1996, the Section 503 regulations were revised to limit pre-offer invitations to self-identify to situations where contractors were using that information for pre-offer affirmative action purposes.[22]   In contrast, the new regulations at issue now *require* exactly the type of pre-offer affirmative action that justifies such requests.  The 1996 EEOC letter is therefore consistent with the 2013 letter.

## CONCLUSION

After earlier regulations "resulted in little improvement in the unemployment and workforce participation rates of individuals with disabilities,"[23] the Department appropriately promulgated the regulations at issue, which impose data collection requirements and set a utilization goal for government contractors in order to promote the employment of people with disabilities.  Federal contractors' affirmative action obligations with respect to race and gender have long included such utilization goals and data collection; the new Section 503 regulations bring sorely needed updates to similar protections for individuals with disabilities.  These are important steps in the right direction, and *amici* strongly urge the Court not to set them aside based on Plaintiff ABC's outdated and narrow view of the capabilities of people with disabilities, who, contrary to Plaintiff's assertions, can and do work in many occupations that are physically

---

[20] HR Policy Ass'n. Brief at 14.

[21] *See* Exhibit D to HR Policy Ass'n Brief, Letter from Peggy Mastroianni to Equal Employment Advisory Council (Dec. 17, 1996) (emphasis added).

[22] *See* Interim and Final Rules at www.gpo.gov/fdsys/pkg/FR-1996-05-01/html/96-9661.htm and www.gpo.gov/fdsys/pkg/FR-1996-08-23/html/96-21541.htm.

[23] U.S. Dep't of Labor, Office of Federal Contract Compliance Programs, Affirmative Action and Nondiscrimination Obligations of Contractors and Subcontractors Regarding Individuals with Disabilities, Notice of Proposed Rulemaking, 76 Fed. Reg. 77056, 777069 (Dec. 9, 2011).

demanding, hazardous, and/or transitory.  To hold otherwise would be to undermine the intent of

Congress, as set forth in the Rehabilitation Act, to promote the "full inclusion and integration in

the economic, political, social, cultural, and educational mainstream of American society" of

people with disabilities.  29 U.S.C. § 701(b)(2).


                              Respectfully submitted,


                              /s/ Laura Ginsberg Abelson
                              Laura Ginsberg Abelson (MD29363)
                              Daniel F. Goldstein *(admitted pro hac vice)*
                              Brown, Goldstein, & Levy
                              120 Baltimore Street, Suite 1700
                              Baltimore MD 21202
                              (410) 962-1030
                              labelson@browngold.com

                              Jennifer Mathis (D.C. Bar No. 444510)
                              Emily B. Read (D.C. Bar No. 492773)
                              The Judge David L. Bazelon
                              Center for Mental Health Law
                              1101 15th Street NW, Suite 1212
                              Washington DC 20005
                              (202) 467-5730
                              jenniferm@bazelon.org
                              emilyr@bazelon.org


                              *Counsel for Amici*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ASSOCIATED BUILDERS AND
CONTRACTORS, INC.,

       Plaintiff,

v.

PATRICIA A. SHIU, Director, Office of Federal
Contract Compliance Programs, in her official
capacity, *et al.*,

       Defendants.

Case No. 1:13cv1806-EGS

**Certificate of Service**

I hereby certify that on this 17th day of January, 2014, I filed the foregoing Brief of Amici Curiae American Association of People with Disabilities, the Judge David L. Bazelon Center for Mental Health Law, the Epilepsy Foundation and the National Organization on Disability with the Clerk of the United States District Court for the District of Columbia, using the CM/ECF system.  The CM/ECF system will automatically serve all counsel in this case.

January 17, 2014                    /s/ Laura Ginsberg Abelson