**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                )
ASSOCIATED BUILDERS &           )
CONTRACTORS, INC.,              )
                                )
            Plaintiff,          )
                                )
        v.                      ) Civil Action No. 13-1806 (EGS)
                                )
PATRICIA A. SHIU, et al.,       )
                                )
            Defendants.         )
_____)

**MEMORANDUM OPINION**

Plaintiff, the Associated Builders and Contractors, brings this lawsuit to challenge a final rule promulgated by the Department of Labor's Office of Federal Contract Compliance Programs ("OFCCP"). *See* Affirmative Action and Nondiscrimination Obligations of Contractors and Subcontractors Regarding Individuals with Disabilities ("Final Rule"), 78 Fed. Reg. 58,682 (Sept. 24, 2013). The Rule, which goes into effect on March 24, 2014, implements Section 503 of the Rehabilitation Act, which requires that government contractors "take affirmative action to employ and advance in employment qualified individuals with disabilities." 29 U.S.C. § 793(a). Plaintiff asks the Court to enjoin portions of the Rule that it alleges: (1) are contrary to Section 503; (2) are arbitrary and capricious in violation of 5 U.S.C. § 706; and (3) violate the Regulatory Flexibility Act, 5 U.S.C. § 601, *et seq.* Pending

before the Court are the parties' cross motions for summary
judgment. Upon consideration of the motions, the responses and
replies thereto, the applicable law, and the administrative
record, the Court **DENIES** plaintiff's motion and **GRANTS**
defendants' cross motion.

**I.   Background**

**A.   Section 503 of the Rehabilitation Act**

In 1973, Congress enacted the Rehabilitation Act, 29 U.S.C. §
701, *et seq.*, "to empower individuals with disabilities to
maximize employment, economic self-sufficiency, independence,
and inclusion and integration into society." *Id.* § 701(b).
Section 503 applies this policy to government contractors:

> Any contract in excess of $10,000 entered into by any
> Federal department or agency for the procurement of
> personal property and nonpersonal services (including
> construction) for the United States shall contain a
> provision requiring that the party contracting with
> the United States shall take affirmative action to
> employ and advance in employment qualified individuals
> with disabilities. The provisions of this section
> shall apply to any subcontract in excess of $10,000
> entered into by a prime contractor in carrying out any
> contract for the procurement of personal property and
> nonpersonal services (including construction) for the
> United States. The President shall implement the
> provisions of this section by promulgating regulations
> within ninety days after September 26, 1973.

*Id.* § 793(a).[1]

---

[1] The President's authority under Section 503 has been delegated
to OFCCP. *See* Exec. Order No. 11,758, 39 Fed. Reg. 2075 (Jan.
17, 1974); 41 C.F.R. § 60-1.2.

The current regulations implementing Section 503, which are not challenged here, "apply to every Government contractor that has 50 or more employees and a contract of $50,000 or more." 41 C.F.R. § 60-741.40(a). All such contractors must "prepare and maintain an affirmative action program." *Id.* § 60-741.40(b). This program must include, among other things, a review of job qualification standards that may exclude qualified individuals with disabilities; procedures for internal and external publication of the program; steps to engage in outreach and recruitment of qualified individuals with disabilities; and regular audits to measure the program's effectiveness. *See id.* § 60-741.44. The regulations also require contractors to invite newly hired employees "to inform the contractor whether the applicant believes that he or she may be covered by the act and wishes to benefit under the affirmative action program." *Id.* § 60-741.42(a).

**B.    Executive Order 11,246**

Executive Order 11,246 creates affirmative-action obligations with respect to race and gender. *See* Exec. Order 11,246, 30 Fed. Reg. 12319 (Sept. 28, 1965); Exec. Order 11,375, 32 Fed. Reg. 14,303 (Oct. 17, 1967). OFCCP's regulations implementing this Order require most contractors to develop formal affirmative-action programs, 41 C.F.R. § 60-2.10, but construction contractors need only take various affirmative-action steps. *See*

41 C.F.R. pt. 60-4. The primary reason for this distinction is "the fluid and temporary nature of the construction workforce." Office of Federal Contract Compliance Programs, *Technical Assistance Guide for Federal Construction Contractors* at 7 (2009), *available at* http://www.dol.gov/ofccp/TAguides/consttag.pdf.

The regulations, nonetheless, impose similar requirements on all contractors to strive to meet benchmarks for workforce diversity. Non-construction contractors must group their workforce by "job group"—jobs with similar duties and wages—and use these groups to "compar[e] . . . the representation of minorities and women in its workforce with the estimated availability of minorities and women qualified to be employed." 41 C.F.R. § 60-2.12. Construction contractors must group their workforce by "construction trade" and use those groups to follow "goals and timetables for minority and female utilization." *Id.* § 60-4.6; *see also id.* § 60-4.2(d). Construction contractors are also required to engage in various affirmative-action steps enumerated in the regulations. *See id.* § 60-4.3(a).

The regulations also require all contractors to collect and compile data and records related to the gender and race of employees and job applicants. *See, e.g.*, *id.* § 60-1.7(a) (requiring annual filing of reports containing the number of employees by gender and race); *id.* § 60-1.12 (requiring

4

contractors to keep "[a]ny personnel or employment record" so
that the contractor is "able to identify . . . [t]he gender,
race, and ethnicity of each employee; and . . . [w]here
possible, the gender, race, and ethnicity of each applicant").

**C.    The Rulemaking Process**

OFCCP became concerned that the regulations implementing
Section 503 have not sufficiently advanced the employment of
qualified individuals with disabilities because "the percentage
of people with disabilities in the labor force in March 2010 was
22.5 compared with 70.2 for persons with no disability" and
"[t]he unemployment rate for those with disabilities was 13.9
percent, compared with 10.1 percent for persons with no
disability." *See* Evaluation of Affirmative Action Provisions of
Contractors and Subcontractors Under Section 503 of the
Rehabilitation Act, 75 Fed. Reg. 43,116, 43,117 (July 23, 2010).
Accordingly, in July 2010, it invited input on ways to
strengthen the regulations. *See id.* Commenters responded "that
quantitative and measurable analyses similar to those for
minorities and women were needed to make affirmative action for
individuals with disabilities 'more than a paperwork exercise.'"
Affirmative Action and Nondiscrimination Obligations of
Contractors and Subcontractors Regarding Individuals With
Disabilities, 76 Fed. Reg. 77,056, 77,057 (Dec. 9, 2011).

Accordingly, OFCCP proposed three major changes to its Section 503 regulations: (1) requiring contractors to gather information on the disability status of job applicants; (2) requiring contractors to compile that data and related data on new employees, along with the total number of job openings, job applicants, and jobs filled; and (3) establishing a utilization goal to provide a benchmark against which contractors can measure the efficacy of their affirmative-action steps. *See id.* at 77,062–77,071. After receiving over 400 comments on these proposals, OFCCP issued its final rule on September 24, 2013. Final Rule, 78 Fed. Reg. at 58,682. The Rule becomes effective on March 24, 2014. *Id.*

The Rule clarifies that affirmative action "is more than a paperwork exercise" and "includes measurable objectives, quantitative analyses, and internal auditing and reporting systems that measure the contractor's progress toward achieving equal employment opportunity for individuals with disabilities." *Id.* at 58,742. The Rule imposes three major requirements:

Data Collection: Contractors must "invite applicants to inform the contractor whether the applicant believes that he or she is an individual with a disability." *Id.* This supplements the contractor's preexisting obligation to invite new employees to do the same. *See id.*

Data Analysis: Contractors must document the number of job applicants and newly hired employees who self-identify as having a disability, as well as the total number of job openings, job applicants, and jobs filled. *See id.* at 58,745.

Utilization Goal: Contractors must strive to meet a numerical goal for the employment of qualified individuals with disabilities. *See id.* at 58,745–58,746. This goal "is not a rigid and inflexible quota which must be met"; the point is "to establish a benchmark against which the contractor must measure the representation of individuals [with disabilities]." *Id.* at 58,745. For employers with 100 or fewer employees, the goal is 7% of the employer's entire workforce. *Id.* Employers with over 100 employees should strive to have 7% of employees in each job group—defined as "the same job groups established for utilization analyses under Executive Order 11246, either in accordance with 41 CFR part 60-2, or in accordance with 41 CFR part 60-4, as appropriate"—be individuals with disabilities. *Id.* Contractors must evaluate their utilization annually to identify any problem areas and must "develop and execute action-oriented programs designed to correct any identified problem areas," but "[a] contractor's determination that it has not attained the utilization goal . . . does not constitute either a finding or admission of discrimination . . . ." *Id.* at 58,746.

**D.   This Lawsuit**

Associated Builders and Contractors is a trade association
that represents over 19,000 construction-industry firms. *See*
Burr. Aff. ¶ 1, ECF No. 9 at 41. Many of its members perform
work on government construction contracts and are subject to
Section 503. *Id.* Many of them will have to comply with the Rule
because they have more than 50 employees. *Id.* ¶ 2. Plaintiff
claims that the Rule not only harms its members, but also
violates "one of ABC's core principles . . . to advance and
protect the free enterprise system and open competition in both
public and private procurements in the construction industry."
*Id.* ¶ 5.

Plaintiff filed this lawsuit on November 19, 2013. *See* Compl.,
ECF No. 1. The Court granted the parties' joint request for an
expedited briefing schedule in advance of the Rule's March 24,
2014 effective date and held oral argument on the parties' cross
motions for summary judgment on March 14, 2014. These motions
are ripe for the Court's decision.

## II.  Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, summary
judgment should be granted only if the moving party has shown
that there are no genuine issues of material fact and that it is
entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56;
*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Courts in
this Circuit have repeatedly recognized that summary judgment is

an appropriate procedure when a court reviews an agency's
administrative record. *See, e.g.*, *Bloch v. Powell*, 227 F. Supp.
2d 25, 30–31 (D.D.C. 2002); *AFL-CIO v. Chao*, 496 F. Supp. 2d 76,
81 (D.D.C. 2007). "Under the APA, it is the role of the agency
to resolve factual issues to arrive at a decision that is
supported by the administrative record, whereas the function of
the district court is to determine whether or not as a matter of
law the evidence in the administrative record permitted the
agency to make the decision it did." *Sierra Club v. Mainella*,
459 F. Supp. 2d 76, 90 (D.D.C. 2006) (quotation marks omitted).
In ruling on cross-motions for summary judgment, the court shall
grant summary judgment only if one of the moving parties is
entitled to judgment as a matter of law upon material facts that
are not genuinely disputed. *See Citizens for Responsibility &
Ethics in Wash. v. Dep't of Justice*, 658 F. Supp. 2d 217, 224
(D.D.C. 2009) (citing *Rhoads v. McFerran*, 517 F.2d 66, 67 (2d
Cir. 1975)).

**III. The Plaintiff Has Standing to Challenge the Rule.**

In its opening brief, the plaintiff argued that it has
standing to challenge the Rule under *Hunt v. Washington State
Apple Advertising Comm'n*, 432 U.S. 333 (1977), which held that
an organization has standing when "its members would otherwise
have standing to sue in their own right[,] the interests it
seeks to protect are germane to the organization's purpose[,]

and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 343; *see* Pl.'s Mem. at 14-16. While the defendants did not initially challenge this argument, after questioning by the Court during oral argument the defendants argued that the plaintiff may not have standing to challenge the Rule's utilization goal. The Court directed the parties to brief the issue on an expedited basis.[2]

To satisfy Article III's standing requirement, "a plaintiff ordinarily must establish that (1) he or she has 'suffered an injury-in-fact'; (2) there is a 'causal connection between the injury and the conduct complained of'; and (3) the injury will likely be redressed by a favorable decision." *In re Polar Bear Endangered Species Act Listing*, 627 F. Supp. 2d 16, 24 (D.D.C. 2009) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)). According to defendants, the utilization goal produces no injury-in-fact because failure to meet the goal does not subject a contractor to punishment, cannot factor into the agency's investigative decisions, and triggers only obligations that are already required of contractors independently. *See*

---

[2] The Court must address this issue even though the defendants did not raise it in their briefs. *See Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1160 (D.C. Cir. 2013) ("[b]ecause Article III standing is a prerequisite to a federal court's exercise of jurisdiction, [the court] cannot proceed at all in any cause unless [it] first determine[s] that a party seeking to be heard" has standing) (quotation marks omitted).

Def.'s Supp. Br., ECF No. 26 at 1-8. The plaintiff counters that its members must engage in a costly annual utilization analysis to track their compliance with the goal and to fix any problems that are identified, and that failure to engage in this analysis would place them in violation of the Rule and subject to its penalties. *See* Pl.'s Supp. Br., ECF No. 27 at 1-8.

The Court agrees with the plaintiff that the utilization goal creates an injury-in-fact that is "concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l*, 133 S. Ct. 1138, 1147 (2013) (quotation marks omitted). Defendants are correct that failure to meet the utilization goal cannot form the basis for a finding that an employer has violated the Rule, Final Rule, 78 Fed. Reg. at 58,746, but contractors are still required to "annually evaluate [their] utilization of individuals with disabilities." *Id.* at 58,745. A contractor that finds that it has not met the utilization goal must then "take steps to determine whether and where impediments to equal employment opportunity exist." *Id.* at 58,746. Although this is "based on reviews of the contractor's personnel processes and affirmative action efforts that the contractor is already required to perform," *id.* at 58,708, a contractor that identifies an impediment must "develop and execute action-oriented programs designed to correct any identified problem areas." *Id.* at 58,746. Even if these requirements are also imposed by

independent portions of the Rule, at a minimum, the utilization-goal portion of the Rule requires contractors to assess annually whether they have met the goal. The agency estimated that this analysis alone will cost the government-contracting industry a nationwide total of $7 million to $14 million. *See id.* at 58,716. This creates an injury-in-fact. Because no other portion of the test for Article III standing under *Lujan*, 504 U.S. 555, or the test for organizational standing under *Hunt*, 432 U.S. 333, is at issue, the Court concludes that plaintiff has standing to challenge the Rule.

## IV.  OFCCP's Interpretation of Section 503 Was Permissible.

Plaintiff's first challenge to the Rule is that it was promulgated in excess of OFCCP's authority under Section 503. In reviewing an agency's interpretation of a statute it is charged with administering, the Court follows the two-step framework provided in *Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). Before applying this framework, however, the Court must "determin[e] whether Congress has delegated interpretive authority to the agency." *Prime Time Int'l Co. v. Vilsack*, 930 F. Supp. 2d 240, 248 (D.D.C. 2013). This so-called Step Zero is satisfied where there is an "express congressional authorization[] to engage in the process of rulemaking." *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001). Of this there can be no real dispute; Section 503 grants

the President authority to "implement the provisions of this
section by promulgating regulations." 29 U.S.C. § 793(a).

Having determined that *Chevron*'s two-step framework applies,
the Court proceeds to Step One, which asks "whether Congress has
directly spoken to the precise question at issue." *Chevron*, 467
U.S. at 842. If so, "that is the end of the matter; for the
court, as well as the agency, must give effect to the
unambiguously expressed intent of Congress." *Id.* at 842–43. If
not, the Court must proceed to *Chevron*'s Step Two, which
mandates deference to any "permissible construction of the
statute." *Id.* at 843. Throughout this analysis, the Court
determines Congress's intent using the "'traditional tools of
statutory construction.'" *Serono Labs., Inc. v. Shalala*, 158
F.3d 1313, 1319 (D.C. Cir. 1998) (quoting *Chevron*, 467 U.S. at
843 n.9). This "include[s] examination of the statute's text,
legislative history, and structure, as well as its purpose."
*Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997)
(citations omitted).

### A. The Text of the Rehabilitation Act Indicates a Broad Delegation of Authority to Define How Contractors Must "Take Affirmative Action."

Section 503 decrees that covered contracts "shall contain a
provision requiring that the party contracting with the United
States shall take affirmative action to employ and advance in
employment qualified individuals with disabilities" and directs

the President to "implement the provisions of this section by promulgating regulations." 29 U.S.C. § 793(a).

The plaintiff proposes that Section 503 permits the President to insert into government contracts a requirement that the contractor "take affirmative action," but not to define the phrase. *See* Pl.'s Reply at 5-6. "This argument confuses 'plain meaning' with literalism." *Bell Atl.*, 131 F.3d at 1045. In the absence of a statutory definition of "take affirmative action," the agency may define the scope of the affirmative-action requirement. Otherwise, contractors would have no guidance as to their legal obligations.

Plaintiff argues alternatively that Section 503 forbids OFCCP from using data collection, data analysis, and utilization goals. *See* Pl.'s Reply at 6. This argument has no basis in the language of Section 503 either. The term "affirmative action" encompasses the use of benchmarks to gauge progress and tools to gather and analyze data to track such progress. *See, e.g.*, Black's Law Dictionary (9th ed. 2009), affirmative action ("A set of actions designed to eliminate existing and continuing discrimination, to remedy lingering effects of past discrimination, and to create systems and procedures to prevent future discrimination"); *Johnson v. Transportation Agency*, 480 U.S. 616, 620-21 (1987) (evaluating a county "Affirmative Action Plan," which analyzed data regarding employees by job category

14

and sought "to achieve 'a statistically measurable yearly improvement in hiring, training and promotion of . . . minorities and women'").

Nor has OFCCP attempted to "presume a delegation of power" solely because Congress has not expressly withheld the power. Pl.'s Mem. at 17 (citing *Ry. Labor Execs. Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 659 (D.C. Cir. 1994) (en banc)). Section 503 expressly grants the President unqualified authority to implement the Section by regulation. This is accompanied by silence on the particular tools that OFCCP should use. "[W]hen a statute is silent with respect to all potentially relevant factors, it is eminently reasonable to conclude that the silence is meant to convey nothing more than a refusal to tie the agency's hands." *Catawba Cnty. v. EPA*, 571 F.3d 20, 37 (D.C. Cir. 2009) (quotation marks, alterations, and emphasis omitted).[3]

---

[3] The cases plaintiff relies on are easily distinguishable because they all involved regulations that conflicted with related statutory provisions. *See, e.g.*, *Ry. Labor*, 29 F.3d at 658, 664 (agency with "very limited authority to investigate representation disputes" that arise "among a [railroad] carrier's employees" only "upon request of either party to the dispute" exceeded its authority when it promulgated a rule giving itself and railroad carriers the ability to initiate such investigations) (quotation marks omitted); *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 959 (D.C. Cir. 2013) (rule requiring employers to post an official notice of employee rights and making failure to do so an unlawful labor practice exceeded NLRB's authority in part because the underlying statute prohibited the Board from finding that noncoercive speech was an unfair labor practice). By contrast, no other provision of the Rehabilitation Act forecloses the tools OFCCP has chosen to use.

Indeed, the Fourth Circuit has noted that the President's authority under Section 503(a) is "broad rulemaking authority." *Phillip Morris, Inc. v. Block*, 755 F.2d 368, 370 (4th Cir. 1985).

Plaintiff's reliance on *Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) is similarly misplaced. In that case, OFCCP issued regulations permitting the public disclosure of reports and affirmative-action plans submitted by contractors pursuant to Executive Order 11,246. *See id.* at 286–87. Chrysler brought suit under a law that would prevent disclosure that was not "authorized by law." *Id.* at 295. In concluding that the disclosure regulation was not authorized by law, the Supreme Court noted that the statutory bases for the regulation were "not concerned with public disclosure of trade secrets or confidential business information" so "it is simply not possible to find . . . a delegation of the disclosure authority." *Id.* at 306. In this case, OFCCP's Rule relates directly to Section 503's affirmative-action mandate because the Rule provides a benchmark for contractors' affirmative-action efforts and seeks to compile data to track their progress.

Plaintiff argues that the language of Section 503 speaks in terms of *qualified* individuals with disabilities and thus bars any rule that is not tailored to those who are "qualified." This argument wrongly assumes that the Rule promotes the hiring of

16

individuals with disabilities into jobs for which they are
unqualified. The Rule makes clear that contractors are not
required to hire any unqualified individual, Final Rule, 78 Fed.
Reg. at 58,706, 58,746, and the utilization goal is a benchmark
for the employment of *qualified* individuals with disabilities.
*Id.* at 58,745. The data-collection and data-analysis
requirements are not limited to qualified individuals with
disabilities, but this is not because they seek to promote the
employment of unqualified workers. OFCCP wrote the regulations
this way to "enable the contractor and OFCCP to better monitor
and evaluate the contractor's hiring and selection practices"
and to "provide the contractor and OFCCP with valuable
information regarding the number of individuals with
disabilities who apply for jobs with contractors." *Id.* at
58,691.

**B.    The Data-Collection Requirement Does Not Violate the
       Americans with Disabilities Act.**

Plaintiff next argues that the data-collection requirement
exceeds OFCCP's authority because it violates the Americans with
Disabilities Act, 42 U.S.C. § 12101, *et seq. See* Pl.'s Reply at
11. That act prohibits employers from "mak[ing] inquiries of a
job applicant as to whether such applicant is an individual with
a disability . . . ." 42 U.S.C. § 12112(d)(2). This provision,
however, does not apply to "medical information that was

voluntarily offered by an employee." *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1047 (10th Cir. 2011); *see also Cash v. Smith*, 231 F.3d 1301, 1307 (11th Cir. 2000) (Section 12112(d) "do[es] not govern voluntary disclosures initiated by the employee").

The legislative history of Section 12112(d) confirms that Congress intended to permit "a covered entity [to] invite applicants for employment to indicate whether and to what extent they have a disability . . . when a recipient is taking affirmative action pursuant to section 503 of the Rehabilitation Act of 1973." S. Rep. No. 101-116, at 40 (1989); *see also* H.R. Rep. No. 101-485, at 75 (1989). The EEOC also agrees with this interpretation. *See* Letter from Peggy R. Mastroianni, EEOC Office of Legal Counsel, to Patricia A. Shiu, Director, Office of Federal Contract Compliance Programs, at 1 (Aug. 8, 2013), *available at* http://www.dol.gov/ofccp/regs/compliance/sec503/ OLC_letter_to_OFCCP_8-8-2013_508c.pdf.

Plaintiff conceded at oral argument that no court has interpreted the Americans with Disabilities Act to the contrary. Instead, plaintiff argues that the data-collection requirement is not truly voluntary because employers must ask applicants for the information. This ignores the legislative history cited above, which specifically contemplates employers inviting applicants to volunteer information pursuant to Section 503. It also misconstrues the Rule's requirements. Contractors merely

18

"invite" applicants to volunteer information. *See* Final Rule, 78
Fed. Reg. at 58,742. Applicants are free to decline and they
suffer no loss if they do so. *Cf. Doe v. U.S. Postal Serv.*, 317
F.3d 339, 344 (D.C. Cir. 2003) (distinguishing cases involving
voluntary disclosure from a situation where an employer required
an employee to disclose medical information in order to be
eligible for leave under the Family and Medical Leave Act).

### C.   The Legislative History of the Rehabilitation Act and Related Statutes Provides No Contrary Guidance.

Although the text of Section 503 supports a broad delegation
of authority to the agency to define the affirmative-action
requirement and nothing in the Rehabilitation Act or any other
law forbids the tools OFCCP has chosen, plaintiff directs the
Court to two subsequent congressional actions, which it argues
reveal that Congress understood Section 503 to foreclose the use
of data collection, data analysis, and utilization goals.[4]

First, plaintiff argues that Congress has regularly reenacted
Section 503 without mandating the use of data collection, data
analysis, and utilization goals. Plaintiff relies on the canon
that "a court may accord great weight to the longstanding

---

[4] The direct legislative history of Section 503 provides no help
to either party. *See, e.g., Howard v. Uniroyal, Inc.*, 719 F.2d
1552, 1557 (11th Cir. 1983) ("The legislative history of the
Rehabilitation Act of 1973 contains little reference to
Congress' intention regarding section 503."); *Rogers v. Frito-
Lay, Inc.*, 611 F.2d 1074, 1078 (5th Cir. 1980) ("The statute's
muteness . . . is not given meaning by the voices in the
legislative background.").

interpretation placed on a statute by an agency charged with its administration"—"especially so where Congress has re-enacted the statute without pertinent change." *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274-75 (1974). By failing to utilize data collection, data analysis, and utilization goals in the past, plaintiff claims, OFCCP forfeited those tools and Congress acceded by reenacting the Rehabilitation Act without requiring the use of those tools. *See* Pl.'s Mem. at 22; Pl.'s Reply at 8.

This argument presumes that Congress ratifies everything it does not specifically disclaim. That argument is not legally sustainable. "To freeze an agency interpretation, Congress must give a strong affirmative indication that it wishes the present interpretation to remain in place." *AFL-CIO v. Brock*, 835 F.2d 912, 916 (D.C. Cir. 1987); *see also Beverly Enterprises, Inc. v. Herman*, 119 F. Supp. 2d 1, 9 (D.D.C. 2000) ("there must be a showing that Congress was aware of, *and expressly approved of*, the prior agency position") (emphasis added). Absent such a showing, "inferences from congressional silence are treacherous; oversights are common in the hurly-burly of congressional enactment; omissions are not enactments; and even deliberate omissions are often subject to alternative interpretations." *Alto Dairy v. Veneman*, 336 F.3d 560, 566 (7th Cir. 2003). Here, there is no indication that Congress "considered—let alone endorsed" OFCCP's interpretation of Section 503. *Koszola v.*

*FDIC*, 393 F.3d 1294, 1299 (D.C. Cir. 2005). Nor could OFCCP's failure to use particular tools be reasonably interpreted as adopting a position that those tools are forbidden; an agency's "'powers . . . are not lost by being allowed to lie dormant.'" *Altman v. SEC*, 666 F.3d 1322, 1327 (D.C. Cir. 2011) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 647 (1950)).

Second, plaintiff argues that Congress's enactment of data-collection requirements under the Vietnam Era Veterans' Readjustment Assistance Act, 38 U.S.C. § 4211, *et seq.*, indicates that Congress knows how to grant OFCCP the authority to require contractors to collect and analyze data but failed to do so in Section 503. *See* Pl.'s Mem. at 23; Pl.'s Reply at 8-10. For this point, plaintiff relies on the doctrine that "[w]here Congress has consistently made express its delegation of a particular power, its silence is strong evidence that it did not intend to grant the power." *Alcoa Steamship Co. v. Fed. Maritime Comm'n*, 348 F.2d 756, 758 (D.C. Cir. 1965).

Plaintiff misreads the history of the statute it claims is dispositive. Plaintiff maintains that the version of this law in existence in 1974 "explicitly required contractors to submit annual reports called VETS-100 and VETS-100A that contain specific data on the protected veteran status of applicants and employees of government contractors" and "expressly states that the data collection will be required 'in addition to' the

affirmative action requirement set forth in Section (a)(1)."
Pl.'s Mem. at 23. In fact, neither the language of the statute
as enacted in 1972 nor as amended in 1974 contained any such
requirement. *See* Pub. L. No. 92-540, § 2012(a), 86 Stat. 1097
(1972), *reprinted in* 1972 U.S.C.C.A.N. 1259; Pub. L. No. 93-508,
tit. IV, § 402(1), (2), 88 Stat. 1578 (1974), *reprinted in* 1974
U.S.C.C.A.N. 1835.

   Only in 1982 did Congress add a provision requiring
contractors to report annually "the number of employees in the
workforce of such contractor, by job category . . . who are
veterans" and "the total number of new employees hired by the
contractor during the period covered by the report and the
number of such employees who are veterans." Pub. L. No. 97-306,
tit. III, § 310(a), 96 Stat. 1429, 1442 (1982). This amendment
not only came nearly a decade after Section 503 was enacted, it
was also motivated by Congress's desire to restore OFCCP's prior
practice of requiring similar reports by regulation. *See* S. Rep.
No. 97-550, at 82 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2933.
Thus, the 1982 amendment does not show that Congress thought
that the previous affirmative-action language foreclosed data
collection. This argument also overstates the utility of such
evidence; it is "a relatively weak aid given that Congress may
well have intended the same word to have a different meaning in

22

different statutes." *Firstar Bank, N.A. v. Faul*, 253 F.3d 982,
991 (7th Cir. 2001).

*     *     *

The text of Section 503 delegates broad authority to the
President to define the ways in which contractors must engage in
affirmative action. Nothing in Section 503, the remainder of the
Rehabilitation Act, or the Americans with Disabilities Act
precludes the use of benchmarks for workforce diversity or data
collection and analysis to help meet those benchmarks. Nor does
the Rule violate Section 503's mandate to improve the employment
position of *qualified* individuals with disabilities. By
delegating broad power to the President to define the scope of
the affirmative-action requirement and placing no limits on the
tools OFCCP has implemented in this Rule, "Congress has directly
spoken to the precise question at issue." *Chevron*, 467 U.S. at
842. Accordingly, "that is the end of the matter; for the court
. . . must give effect to the unambiguously expressed intent of
Congress." *Id.* at 842–43.

**D.   The Rule is a Permissible Construction of Section 503.**

For the reasons described above, the Rule survives scrutiny
under a *Chevron* Step One analysis. Moreover, OFCCP's
interpretation also survives a *Chevron* Step Two analysis because
it is "a permissible construction of the statute." *Id.* at 843.
At Step Two, the Court must defer to OFCCP's interpretation

23

"whether or not it is the only possible interpretation or even the one a court might think best." *Holder v. Martinez-Gutierrez*, 132 S. Ct. 2011, 2017 (2012). The agency's judgment must be "respect[ed] . . . so long as its reading is a reasonable one." *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 409 (1996). Only if Section 503 "cannot bear the interpretation adopted by the [agency]" will the Rule fail at Step Two. *Sullivan v. Everhart*, 494 U.S. 83, 92 (1990). Because the text of Section 503 grants unqualified authority over the scope of the affirmative-action requirement and nothing in the Rehabilitation Act or any other statute forbids the tools OFCCP has chosen, OFCCP's interpretation is subject to deference. Indeed, even if Section 503 were ambiguous as to the breadth of OFCCP's authority, "ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion." *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).

## V.   The Rule is Not Arbitrary and Capricious.

The plaintiff's second argument is that the Rule is arbitrary and capricious. To determine whether the Rule is arbitrary and capricious, the Court looks to whether the agency "considered the factors relevant to its decision and articulated a rational connection between the facts found and the choice made." *Keating*

*v. FERC*, 569 F.3d 427, 433 (D.C. Cir. 2009) (citing *Balt. Gas &
Elec. Co. v. Natural Resources Defense Council*, 462 U.S. 87, 105
(1983)). In reviewing an agency's action, the Court engages in a
"thorough, probing, in-depth review" to determine "whether the
decision was based on a consideration of the relevant factors
and whether there has been a clear error of judgment." *Citizens
to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–16 (1971).
While the Court's inquiry is "searching and careful," the
standard of review is highly deferential; the agency's actions
are "entitled to a presumption of regularity," and the court
cannot "substitute its judgment for that of the agency." *Id.* at
415–16.

This also holds true when an agency reverses a prior policy.
The agency must "supply a reasoned analysis" for its action,
*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463
U.S. 29, 42 (1983), but "if the agency adequately explains the
reasons for a reversal of policy, change is not invalidating,
since the whole point of *Chevron* is to leave the discretion
provided by the ambiguities of a statute with the implementing
agency." *Brand X*, 545 U.S. at 981 (quotation marks omitted). It
is therefore normally the case that "the fact that the new rule
reflects a change in policy matters not at all." *Air Transport
Ass'n v. Nat'l Mediation Bd.*, 663 F.3d 476, 484 (D.C. Cir.
2011). Agencies must provide "more detailed justification,"

25

however, when the "new policy rests upon factual findings that contradict those which underlay its prior policy." *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009).

## A. Data Collection

Plaintiff attacks the Rule's data-collection requirement as an unjustified departure from past practice. *See* Pl.'s Mem. at 25. This argument ignores the current regulations implementing Section 503, which already require all contractors to invite newly hired employees to disclose whether they are individuals with disabilities. *See* 41 C.F.R. § 60-741.42(a). Applying this same obligation to the pre-offer stage does not meaningfully depart from past practice and OFCCP sufficiently explained that "[t]raditionally, construction and transportation contractors who meet the basic coverage thresholds . . . of section 503 have not been exempted from any of its provisions." Final Rule, 78 Fed. Reg. at 58,701.

Plaintiff also argues that the data-collection requirement is arbitrary and capricious because it is not tailored to *qualified* individuals with disabilities. *See* Pl.'s Reply at 23. This argument misunderstands the point of data collection, which is to establish robust data regarding the disability status of all job applicants to "enable the contractor and OFCCP to better monitor and evaluate the contractor's hiring and selection practices" and to "provide the contractor and OFCCP with

26

valuable information regarding the number of individuals with disabilities who apply for jobs with contractors." Final Rule, 78 Fed. Reg. at 58,691. That a particular applicant may have been unqualified for a particular job does not undermine the utility of this data.

### B.   Data Analysis

Plaintiff claims that the requirement that contractors compile and analyze data regarding their workforce and applicant pool is arbitrary and capricious because the agency "[n]ever before" interpreted Section 503's affirmative-action requirement to encompass data analysis and failed to explain why construction contractors are not exempt. *See* Pl.'s Mem. at 24–25. The fact that previous regulations under Section 503 did not require contractors to compile data regarding their workforce and applicant pool, however, does not make the new requirement arbitrary and capricious. *Cf. Fox*, 556 U.S. at 515 (even an express reversal of agency policy need only be justified by "reasoned explanation for its action"). Nor is such a requirement unprecedented; current regulations under Executive Order 11,246 require all contractors to compile information regarding the number of their employees by race and gender as well as records that may identify the gender, race, and ethnicity of employees and, where possible, job applicants. *See* 41 C.F.R. §§ 60-1.7(a), 1.12.

OFCCP explained that extending similar requirements for
individuals with disabilities was necessary because the lack of
data "makes it nearly impossible for the contractor and OFCCP to
perform even rudimentary evaluations of the availability of
individuals with disabilities . . . or to make any sort of
objective, data-based assessments of how effective contractor
outreach and recruitment efforts have been." Final Rule, 78 Fed.
Reg. at 58,701. The agency reasonably declined to exempt
construction contractors because they are not exempted under the
regulations implementing Executive Order 11,246 and have not
traditionally been exempted from other Section 503 regulations.
*See id.*

### C.   Utilization Goal

Plaintiff argues that the utilization goal is arbitrary and
capricious because the agency: (1) did not adequately explain
the need for a utilization goal; (2) did not consider the unique
nature of the construction industry; and (3) arrived at the 7%
figure arbitrarily. *See* Pl.'s Mem. at 26-30; Pl.'s Reply at 12-
23. These arguments are unavailing because the record reflects
that, at each step, OFCCP "considered the factors relevant to
its decision and articulated a rational connection between the
facts found and the choice made." *Keating*, 569 F.3d at 433.

### 1.   The Failure of Past Regulations Demonstrates the Need for a Utilization Goal.

28

Plaintiff argues that OFCCP's decision to include a utilization goal in the Rule "reverses nearly four decades of agency policy implementing Section 503," a reversal that OFCCP failed to justify. Pl.'s Mem. at 24, 27. Plaintiff is correct that the agency has not previously set a utilization goal under Section 503, but neither has it disclaimed one. Even if OFCCP had reversed course, "the fact that the new rule reflects a change in policy matters not at all." *Air Transport Ass'n*, 663 F.3d at 484. Such a change would require additional justification only if it "rests upon factual findings that contradict those which underlay [the] prior policy," *Fox*, 556 U.S. at 515, but plaintiff identified no such findings.

Regardless, OFCCP explained the need for the change. Although regulations under Section 503 have been in place since the 1970s, "the intervening years have seen little improvement in the unemployment and workforce participation rates of individuals with disabilities." Final Rule, 78 Fed. Reg. at 58,703; *see also id.* at 58,682–58,683 (cataloguing the gap between individuals with and without disabilities regarding household income, hourly wages, and unemployment rates). Commenters to the proposed rule agreed that "affirmative action efforts under Section 503 have been largely meaningless without, among other things, measurable goals for the employment of people with disabilities." *Id.* at 58,703. OFCCP reasonably

concluded that "affirmative action process requirements, without
a quantifiable means of assessing whether progress toward equal
employment opportunity is occurring, are insufficient." *Id.*

Plaintiff faults OFCCP for failing to prove that government
construction contractors are part of the problem, Pl.'s Mem. at
27, and that the disparity is "caused by discriminatory barriers
to employment, as opposed to the disadvantages posed by the
disabilities themselves." Pl.'s Reply at 15 (emphasis omitted).
Plaintiff's arguments ask the Court to hold the agency to an
overly searching standard of review akin to heightened
constitutional scrutiny. For example, in *Contractors Ass'n v.
City of Philadelphia*, 6 F.3d 990 (3d Cir. 1993), the Third
Circuit required similar proof to sustain the constitutionality
of government-contracting preferences for businesses owned by
racial minorities and women. *See id.* at 1003-08, 1010-11. These
preferences, however, were subject to heightened constitutional
scrutiny. *See id.* at 999-1001. By contrast, preferences for
business owned by individuals with disabilities could be
justified by anecdotal evidence of discrimination under
rational-basis review. *See id.* at 1001, 1011-12. The Rule here
is subject to arbitrary-and-capricious review, which is
similarly deferential.

OFCCP relied on statistical evidence showing that the wages
and employment rates of individuals with disabilities have

30

largely stagnated and remain significantly behind those of
individuals without disabilities. Additional evidence proving
that government contractors are engaging in widespread
discrimination is not required to make the imposition of a
utilization goal "rational." *Keating*, 569 F.3d at 433.
Similarly, although a mix of factors may contribute to the
disparity, OFCCP could reasonably infer that discrimination is
one of them. *Cf. Allen v. Heckler* 780 F.2d 64, 68 (D.C. Cir.
1985) ("the obligation to assist the handicapped [under Section
501 of the Rehabilitation Act] is not dependent on a finding
that the status quo is discriminatory").[5]

>   2.   *OFCCP Justified Its Refusal to Exempt the Construction
>        Industry.*

Plaintiff's second argument centers on OFCCP's refusal to
exempt the construction industry from the utilization goal. *See*
Pl.'s Mem. at 24-27; Pl.'s Reply at 12-13, 20-23. Plaintiff

---

[5] This inference is further justified by reports indicating
widespread discrimination against individuals with disabilities.
A recent report by the National Council on Disability found that
"20 percent of private employers say the greatest employment
barriers to people with disabilities are discrimination,
prejudice, or employer reluctance to hire." Administrative
Record ("AR") at 2744. Numerous other studies have concluded
that "a substantial part of the wage differential can be
attributed to disability-related discrimination." *Id.* (quotation
marks omitted). The Administrative Record also reflects that
studies have found that individuals with disabilities receive
fewer interviews, less favorable recommendations, lower salary
offers, and lower review ratings. *Id.* The disparity in work-
related recommendations remains even when the individuals "are
rated as equivalent on work qualifications" to co-workers
without a disability. *See id.*

claims that OFCCP has not explained its decision to reverse its
policy of "expressly exempt[ing] the construction industry from
. . . utilization analysis." Pl.'s Mem. at 24. According to
plaintiff, it is much harder for construction contractors to
conduct a utilization analysis because "work in the construction
industry is typically project-based, transitory and seasonal,"
"[t]he number of workers . . . varies widely from day to day and
from project to project," and construction contractors are
"uniquely decentralized." *Id.* at 26. The defendants counter
that, in fact, construction contractors already engage in
similar actions under Executive Order 11,246. *See* Def.'s Mem. at
41-42.

The regulations implementing Executive Order 11,246 require
construction contractors to group their employees by
construction trade, strive to meet utilization goals for
diversity within those trades, and take various steps—including
the review of hiring processes. *See* 41 C.F.R. §§ 60-4.2(d), 60-
4.3(a), 60-4.6. While the requirements under the new Rule are
not identical, they are tied to the same construction-trade
groupings, require contractors to meet similar goals, and
utilize similar review requirements. *See* Final Rule, 78 Fed.
Reg. at 58,745-58,746. Accordingly, OFCCP reasonably declined to
credit arguments that the construction industry is uniquely
unable to comply with the utilization goal.

OFCCP also reasonably rejected arguments that construction work is "uniquely hazardous and physical compared to other industries," making it impossible for construction contractors to find enough qualified individuals with disabilities to hire. *See* Pl.'s Mem. at 26. OFCCP found this argument to be "fundamentally based on the flawed notion that individuals with disabilities as a group are incapable of working in these jobs." Final Rule, 78 Fed. Reg. at 58,707. The fact that a certain disability might prevent someone from taking a certain job in the construction industry does not mean that the industry is significantly less suited to employing individuals with disabilities. Indeed, many disabilities would have little effect on employment by construction contractors. For example, "a person with an auditory processing disorder would typically need no accommodation to work as [a] carpenter. A person with a significant stutter would ordinarily need no accommodation to operate machinery." Amicus Br. of Disability Rights Orgs., ECF No. 20 at 7-8.[6] These examples are not an exhaustive list and

---

[6] The same *amici* noted that census data reflects that individuals with disabilities already work in physical jobs at a high rate. *See id.* at 8-9 ("The United States Census Bureau reports that nearly three million people with disabilities worked in the highly-physical job categories 'craft workers,' 'laborers and helpers,' 'operatives,' and 'technicians' between 2008-2010.") (citing United States Census Bureau, Disability Employment 3: EEO-1 Job Categories by Disability Status, Sex, and Race/Ethnicity, *available at* http://factfinder2.census.gov/faces

there are many additional disabilities that, with reasonable accommodation, would not preclude an individual from engaging in even more construction-industry jobs. Accordingly, OFCCP was justified in refusing to exempt construction contractors.

    3.    *OFCCP's Methodology for Reaching the 7% Figure is Not Arbitrary and Capricious.*

   The agency's method for calculating the 7% utilization goal was also reasonable. In reviewing the agency's calculation, the Court is mindful that "[a]n agency has wide discretion in making line-drawing decisions." *Nat'l Shooting Sports Found. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) (quotation marks omitted). The Court cannot expect "pinpoint precision," so long as the agency "identif[ied] the standard and explain[ed] its relationship to the underlying regulatory concerns." *WorldCom, Inc. v. FCC*, 238 F.3d 449, 461-62 (D.C. Cir. 2001). "The relevant question is whether the agency's numbers are within a zone of reasonableness." *Id.* at 462 (quotation marks omitted).

   Because no data exists reflecting the number of individuals with disabilities who work or wish to find work, OFCCP was forced to estimate. It began with data from the American Community Survey ("the Survey") to conclude that "5.7 percent of the civilian labor force has a disability." Final Rule, 78 Fed. Reg. at 58,704; *see also* AR at 2786, 2790. This figure, however,

---

/tableservices/jsf/pages/productview.xhtml?pid=EEO_10_3YR_DOLALL
3N&prodType=table.

reflects the status quo under which individuals with disabilities suffer from large income and employment gaps. *See id.* at 58,704-58,705. Accordingly, OFCCP estimated the number of individuals with disabilities who are not currently in the workforce, but would be if they did not have to face barriers or discrimination related to their disability. *Id.* at 58,705. It did so by assuming that "those . . . who identify as having an occupation, but who are currently not in the labor force, remain interested in working should job opportunities become available." *Id.* Using Survey data, OFCCP compared figures on individuals with disabilities who claim to have an occupation with those reflecting only those individuals with disabilities who claim to have an occupation and are in the labor force. *See id.* This comparison revealed that the equivalent of 1.7% of the workforce is an individual with a disability who identified as having an occupation but is not in the workforce. *Id.; see also* AR at 2799-2800.

Plaintiff challenges OFCCP's use of the Survey, but points to no better data on the subject and instead argues that "the only rational approach" is to "keep[] in place the current . . . practice." Pl.'s Reply at 17. While the Survey is not perfect, it "is the best source of nationwide disability data available

today." Final Rule, 78 Fed. Reg. at 58,704.[7] Plaintiff is concerned, however, that the Survey "did not use the same definition of disabilities as the new Rule," Pl.'s Mem. at 28, did not supply industry-specific and location-specific data, Pl.'s Reply at 16-17, and did not gather data on whether respondents were *qualified* individuals with disabilities. *See id.* at 16. None of these arguments make OFCCP's estimate unreasonable.

First, while the definition of "disabled" under the Survey "is . . . not as broad as that of the Rehabilitation Act," Final Rule, 78 Fed. Reg. at 58,704, if anything, that makes the goal slightly low, not irrational.

Second, OFCCP considered and rejected the use of industry-specific and location-specific data because no such data exists. *See id.* OFCCP did not need such data because nationwide data is sufficient to meet OFCCP's goal—providing a benchmark to give contractors a sense for whether their affirmative-action efforts are working. While nationwide data may not capture unique circumstances in specific geographic locations and industries, there is no indication that the prevalence of qualified

---

[7] OFCCP asked in its advance notice "what data should be examined in order to identify the appropriate availability pool of . . . individuals [with disabilities] for employment?" Advance Notice, 75 Fed. Reg. at 43,117. Most respondents cited the Survey. *See* Notice of Proposed Rulemaking, 76 Fed. Reg. at 77,057.

individuals with disabilities varies so widely that a nationwide goal is unreasonable.

Third, no survey could capture whether a respondent is qualified, because qualification is evaluated on a case-by-case and job-by-job basis. Plaintiff claims that this renders the goal arbitrary because the data it uses is "irrelevant." Pl.'s Reply at 16. This argument is not persuasive. Even if some individuals with disabilities may not be qualified for particular occupations by virtue of their disability, it was reasonable to assume that many individuals with disabilities are qualified for many different occupations. Therefore, although data indicating a respondent's specific qualification status might provide a more precise figure, it was not unreasonable to use the data that exists.

It is also important to note that the utilization goal is not a quota. Thus, any contractor that engages in significant affirmative-action efforts, but falls short of 7% because it is faced with too few qualified applicants with disabilities could arguably have complied with the Rule. No contractor is required to hire any unqualified individual and all that occurs if the benchmark is not met is that the contractor must examine its hiring practices to determine if they are excluding qualified individuals with disabilities. *See* 78 Fed. Reg. 58,745-58,746. OFCCP is therefore entitled to more leeway because the purpose

of the goal is itself to serve as an approximation. *See WorldCom*, 238 F.3d at 461-62 (D.C. Cir. 2001) (agencies need not supply "pinpoint precision" so long as they have "identif[ied] the standard and explain[ed] its relationship to the underlying regulatory concerns").

Plaintiff also challenges the agency's calculation of the 1.7% figure, which represents individuals with disabilities who would enter the workforce in the absence of disability-discrimination barriers. Plaintiff thinks it likely that many of these individuals are "unable to work . . . because of the disqualifying nature of their disabilities." Mem. at 28. OFCCP found, however, that "given the acute disparity in the workforce participation rates of those with and without disabilities, it is reasonable to assume that at least a portion of that gap is due to a lack of equal employment opportunity." Final Rule, 78 Fed. Reg. at 58,705; *see also* AR 2799-2800. This assumption is reasonably based on the stark differences between the employment position of individuals with disabilities and those without disabilities. *See* Final Rule, 78 Fed. Reg. at 58,706 (citing Bureau of Labor Statistics data indicating that 69.7% of individuals without disabilities were in the workforce, while 20.9% of individuals with disabilities were in the workforce, and that the unemployment rate for individuals without

disabilities was 8.7%, while the rate for those with

disabilities was 15%).

   Plaintiff also claims that OFCCP created the 1.7% figure by

comparing apples to oranges because the agency added a

percentage of the current workforce (5.7%) to a percentage of

the population of individuals with disabilities (1.7%) to

conclude, after rounding down, that 7% of the workforce is a

reasonable utilization goal. *See* Pl.'s Mem. at 28; Pl.'s Reply

at 18-19. OFCCP clarified at oral argument that its calculation

involved a comparison, across each of the job groups measured by

the Survey, between Survey respondents with disabilities who

claimed to have an occupation but were not in the labor force

and the universe of all respondents with disabilities who

claimed to have an occupation. The Court cannot say that the

agency's method falls outside a zone of reasonableness,

especially since it was used to calculate a utilization goal

that is itself intended to serve as a benchmark for contractors

to assess the progress of their affirmative-action efforts.

   Plaintiff may well be correct that more targeted data and

modified calculations would lead to a more precise utilization

goal, but perfect precision is not what the Administrative

Procedure Act demands. *See WorldCom*, 238 F.3d at 461-62. None of

plaintiff's arguments persuade the Court that the 7% figure is

an unreasonable benchmark figure towards which government
contractors should strive.

## VI.  The Rule Does Not Violate the Regulatory Flexibility Act.

The plaintiff's final argument is that the Rule does not
comply with the Regulatory Flexibility Act. The Regulatory
Flexibility Act requires agencies to analyze the impact of their
regulations on small businesses. *See* 5 U.S.C. §§ 603, 604. The
Act exempts agencies from compliance when the agency "certifies
that the rule will not . . . have a significant economic impact
on a substantial number of small entities." *Id.* § 605(b). This
certification is reviewed "in accordance with" the judicial
review provisions of the Administrative Procedure Act, *id.* §
611(a)(2), which are "highly deferential, 'particularly . . .
with regard to an agency's predictive judgments about the likely
economic effects of a rule.'" *Helicopter Ass'n Int'l v. FAA,* 722
F.3d 430, 438 (D.C. Cir. 2013) (alteration in original) (quoting
*Nat'l Telephone Coop. Ass'n v. FCC*, 563 F.3d 536, 541 (D.C. Cir.
2009)). Ultimately, "[i]f an agency makes a 'reasonable, good-
faith effort to carry out [the Regulatory Flexibility Act's]
mandate,' then its decision will stand." *Fla. Bankers Ass'n v.
U.S. Dep't of Treasury*, __ F. Supp. 2d __, 2014 WL 114519, at
*10 (D.D.C. Jan. 13, 2014) (quoting *United Cellular Corp. v.
FCC,* 254 F.3d 78, 88 (D.C. Cir. 2001)).

OFCCP certified that the Rule will not have a significant economic impact on small entities. Final Rule, 78 Fed. Reg. at 58,727–58,728. It justified this conclusion by estimating the expected financial burden of complying with the Rule on all contractors. *See id.* at 58,717–58,719, 58,723–58,726 (estimating the cost involved in reviewing the Rule, complying with the pre-offer self-identification provision, conducting the data and utilization analyses, and providing reasonable accommodations to newly hired employees with disabilities). OFCCP then examined the costs for smaller entities and concluded that contractors with 50 to 100 employees would expend $3,318, or .02% of their average receipts, while contractors with 100 to 500 employees would spend $5,197, which is .01% percent of their average receipts. *See id.* at 58,727–58,728. OFCCP concluded that these are not "a significant economic impact." *Id.* at 58,727.

Plaintiff argues that this analysis was erroneous because it wrongly assumed that "contractors already have systems in place to perform the newly required tasks because they already do so under Executive Order 11246." Pl.'s Mem. at 31. As discussed above, construction contractors are required under the regulations implementing Executive Order 11,246 to group their employees by construction trade, use those groups to meet benchmarks for workforce diversity, and take various actions—including reviewing employment processes—to meet these

41

benchmarks. *See supra* at 4, 31. The new Rule requires them to use the same groups for similar purposes. *See id.* It was thus reasonable to assume that complying with the new Rule will not require the creation of costly new systems. *Cf. Fla. Bankers*, 2014 WL 114519, at *10 (IRS's certification that a rule would not have a substantial impact on small businesses upheld in large part because the affected businesses already "have developed the systems to perform such withholding and reporting"). OFCCP's certification that the Rule will not impose a significant economic burden was therefore reasonable.

## VII. Conclusion

For the foregoing reasons, the Court hereby **DENIES** plaintiff's motion for summary judgment and **GRANTS** defendants' cross motion for summary judgment. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**


Signed:    **Emmet G. Sullivan**
           **United States District Judge**
           **March 21, 2014**